## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## SOUTHERN DIVISION

MAC'S CONVENIENCE STORES LLC, a
Delaware limited liability company,

      Plaintiff,

v.

KAISH LLC, a Tennessee limited liability
company, and AKBAR BHAMANI, an
individual,

      Defendants.

Civil Action No. _____

**JURY TRIAL DEMANDED**

---

## COMPLAINT

---

For its Complaint against Defendants Kaish LLC ("Kaish") and Akbar Bhamani ("Bhamani"), Plaintiff Mac's Convenience Stores LLC ("Mac's") alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Mac's is a Delaware limited liability company.

2.      The sole member of Mac's, Couche-Tard U.S. Inc. ("Couche-Tard U.S."), is a Delaware corporation with its principal place of business in North Carolina.

3.      Kaish is a Tennessee limited liability company.

4.      Upon information and belief, the sole member of Kaish is Bhamani who is an individual, upon further information and belief, residing in Gwinnett County, Georgia.

5.      This Court has personal jurisdiction over Kaish including, without limitation, because: (i) Kaish purposefully availed itself of the privilege of acting in Tennessee by entering into contracts to be performed in Tennessee to sublease certain real property and operate certain

1

businesses in Tennessee; (ii) Kaish did, in fact, operate such businesses in Tennessee; (iii) the causes of action in this matter arise from Kaish's related actions in Tennessee; and (iv) Kaish's related actions have a substantial connection with Tennessee to make the exercise of jurisdiction over Kaish reasonable.

6.      This Court has personal jurisdiction over Bhamani including, without limitation, because: (i) Bhamani purposefully availed himself of the privilege of acting in Tennessee by entering into contracts to be performed in Tennessee regarding certain real property and business operations in Tennessee; (ii) this cause of action arises from Bhamani's related actions in Tennessee; and (iii) Bhamani's related actions have a substantial connection with Tennessee to make the exercise of jurisdiction over Bhamani reasonable.

7.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000 and there is complete diversity of citizenship among the parties because Plaintiff is not a citizen of the same state as either of the Defendants.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as the events giving rise to Plaintiff's claims occurred in this judicial district, and pursuant to Paragraph 26 of the Subleases, *infra*, upon which Plaintiff's claims are based, which designate Hamilton County, Tennessee as the required venue.

## GENERAL ALLEGATIONS

### The Master Lease

9.      On or about October 13, 2003, R1 TN 1, LLC ("R1 TN 1") and The Pantry, Inc. ("The Pantry") entered into a Lease Agreement (the "Master Lease"), under which The Pantry leased certain real property from R1 TN 1.

10.     The term of the Master Lease commenced on October 16, 2003, and expired on October 31, 2023.

11.     The Master Lease applied to multiple leased premises, including gas stations and convenience stores located at the following addresses in Chattanooga, Hamilton County, Tennessee: (1) 4011 Ringgold Road, Chattanooga, Tennessee (the "Ringgold Road Premises"); (2) 6960 Lee Highway, Chattanooga, Tennessee (the "Lee Highway Premises"); and (3) 2300 Jenkins Road, Chattanooga, Tennessee (the "Jenkins Road Premises") (collectively, the "Premises").

12.     On or about September 14, 2015, The Pantry merged with and into Circle K Stores, Inc. ("Circle K"), and Circle K became the holder of the tenant-interest in the Master Lease concerning the Premises.

### The Subleases

13.     On or about February 13, 2017, Circle K entered into three separate sublease agreements for the Ringgold Road Premises (the "Ringgold Road Sublease"), the Lee Highway Premises (the "Lee Highway Sublease"), and the Jenkins Road Premises (the "Jenkins Road Sublease"). True and correct copies of the Ringgold Road Sublease, the Lee Highway Sublease, and the Jenkins Road Sublease (collectively, the "Subleases") are attached as **Exhibit A**, **Exhibit B**, and **Exhibit C**, respectively.

14.     The terms and provisions of each of the Subleases are substantially the same.

15.     Under the terms of the Subleases, Circle K subleased each of the three Premises to Paradise Petroleum LLC ("Paradise Petroleum").

16.     The effective term of each of the Subleases (the "Sublease Terms") was from on or about February 13, 2017, to August 31, 2023. Ex. A, ¶ 3; Ex. B, ¶ 3; Ex. C, ¶ 3.

17.     On or about March 15, 2017, Circle K assigned to Mac's all of its rights, title and interests under the Master Lease and the Subleases.

18.     On or about September 16, 2019, Mac's, Paradise Petroleum, and Kaish entered into three separate Assignment and Assumption of Subleases with Consent relating to the Ringgold Road Sublease (the "Ringgold Road Sublease Assignment"), the Lee Highway Sublease (the "Lee Highway Sublease Assignment"), and the Jenkins Road Sublease (the "Jenkins Road Sublease Assignment"). True and correct copies of the Ringgold Road Sublease Assignment, the Lee Highway Sublease Assignment, and the Jenkins Road Sublease Assignment (collectively, the "Sublease Assignments") are attached as **Exhibit D**, **Exhibit E**, and **Exhibit F**, respectively.

19.     Under the terms of the Sublease Assignments, Paradise Petroleum assigned all of its rights and obligations under the Subleases to Kaish. Ex. D, ¶¶ 1–2; Ex. E, ¶¶ 1–2; Ex. F, ¶¶ 1–2.

20.     Specifically, the Sublease Assignments provide: "Assignor [Paradise Petroleum] desires to assign, transfer and convey all of its right, title, interest and obligations in and to the Sublease[s] to Assignee [Kaish], and Assignee [Kaish] desires to accept such assignment and assume all of Assignor's [Paradise Petroleum] liabilities, responsibilities, and obligations under the Sublease[s], upon the terms and conditions set forth herein." Ex. D, ¶ G; Ex. E, ¶ G; Ex. F ¶ G.

21.     The Sublease Assignments further state: "By its acceptance and execution hereof, Assignee [Kaish] hereby assumes all of the right, title and interest of Assignor [Paradise Petroleum] under the Sublease[s] and agrees to perform all of the covenants, agreements and obligations of Assignor [Paradise Petroleum] under the Sublease[s] from and after the Effective

Date . . . ." Ex. D, ¶ 2; Ex. E, ¶ 2; Ex. F ¶ 2.

22.     The Subleases require Kaish to pay Mac's rent in monthly installments in the manner and amount described in each of the Subleases. Ex. A, ¶ 5; Ex. B, ¶ 5; Ex. C, ¶ 5.

23.     Specifically, the Jenkins Road Sublease requires Kaish to pay annual rent of $48,278.88 in installments of $4,023.24 per month through October 18, 2018, and, thereafter, monthly rental amounts, which increased as described in the Master Lease. Ex. C, ¶ 5(b).

24.     The Ringgold Road Sublease requires Kaish to pay annual rent of $58,892.40 in installments of $4,907.70 per month through October 31, 2018, and, thereafter, monthly rental amounts, which increased as described in the Master Lease. Ex. A, ¶ 5(b).

25.     The Lee Highway Sublease requires Kaish to pay annual rent of $46,242.36 in installments of $3,853.53 per month through October 31, 2018, and, thereafter, monthly rental amounts, which increased as described in the Master Lease. Ex. B, ¶ 5(b).

26.     The Subleases also require Kaish to pay additional rent, late charges, sales taxes, and other program fees as described in each of the Subleases. Ex. A, ¶¶ 5(d), 5(e), 5(f); Ex. B, ¶¶ 5(d), 5(e), 5(f); Ex. C, ¶¶ 5(d), 5(e), 5(f).

27.     The Subleases further require Kaish to pay, in monthly installments, as additional rent, "all taxes, assessments, duties, impositions and burdens" (collectively defined in the Subleases as "Taxes") that are "assessed, charged or imposed upon the Premises or any building thereon, or upon the owner of occupier thereof." Ex. A, ¶ 8; Ex. B, ¶ 8; Ex. C, ¶ 8.

28.     The Subleases also require that Kaish "shall be solely responsible for all repair and maintenance of the Premises, which shall require [Kaish], at its sole expense, to make all necessary repairs and replacements to the Premises," and that "[s]uch repairs and replacements shall be made promptly, as and when necessary." Ex. A, ¶ 9; Ex. B, ¶ 9; Ex. C, ¶ 9 (emphasis in

original).

29.     The Subleases further provide that, if the Premises or a portion thereof, is damaged or destroyed by fire, casualty, or disaster during the Sublease Term, Kaish "will promptly repair and restore the Improvements located at or on the Premises, including, without limitation, the Improvements damaged or destroyed by such fire, casualty, or dispute to their condition immediately prior to such fire, casualty, or disaster," and "will commence repair and restoration as soon as reasonably possible and will diligently pursue the same until completion" unless Mac's exercises its right to terminate the Sublease. Ex. A, ¶ 16; Ex. B, ¶ 16; Ex. C, ¶ 16.

30.     Paragraph 16 of the Subleases also states that none of the rent provided for in Section 5 of them shall abate after damage or destruction by fire, casualty, or disaster during the Sublease Term. *Id.*

31.     Paragraph 14 of each of the Subleases also requires Kaish to carry certain insurance, including, without limitation, commercial general public liability and property damage insurance with a combined single limit of $3,000,000 or such other amount as required by Mac's. Ex. A, ¶ 14(a); Ex. B, ¶ 14(a); Ex. C, ¶ 14(a).

32.     Kaish is further required to maintain insurance "in an amount equal to the replacement cost of the Improvements on the Premises" and that "the proceeds of such insurance coverage [will] be used to repair or restore the Premises to their condition prior to such casualty . . . ." Paragraph 14(b) further provides that such insurance shall provide that payments for losses be made jointly" to Mac's as the landlord and Kaish as the tenant. Ex. A, ¶ 14(b); Ex. B, ¶ 14(b); Ex. C, ¶ 14(b).

33.     Kaish is further required to maintain insurance "covering all [of Kaish's] leasehold improvements, in an amount not less than the full replacement cost without deduction

for depreciation from time to time during the Term" providing protection against any period included within the classification of "Fire and Extended Coverage." Ex. A, ¶ 14(c); Ex. B, ¶ 14(c); Ex. C, ¶ 14(c).

34. The following, among other things, constitute defaults under the Subleases: (i) failure to pay rent, additional rent, taxes, or any other sums of money due under the Subleases or the Dealer Agreements (described below); (ii) failure to comply with any provisions of the Subleases, the Dealer Agreements, or any other agreement between Mac's as the landlord and Kaish as the tenant; (iii) failure to use the Premises for their intended use for a period of fifteen consecutive days; or (iv) Kaish's abandonment of the Premises. Ex. A, ¶ 25(a); Ex. B, ¶ 25(a); Ex. C, ¶ 25(a).

35. In the event of Kaish's default under any of the Subleases, in addition to all remedies available at law or in equity, Mac's is entitled to: (i) enter the Premises, without process of law and without terminating the Subleases, to perform Kaish's obligations under the Subleases; (ii) terminate the Subleases, resume possession of the Premises, and recover immediately from Kaish all rent concessions under the Subleases and the difference between the rent and the fair rental value of the Premises for the remainder of the Term, reduced to present worth; or (iii) resume possession of and re-rent the Premises. Ex. A, ¶ 25(b); Ex. B, ¶ 25(b); Ex. C, ¶ 25(b). If Mac's opts for option (i) above, Kaish is obligated to reimburse Mac's for any expenses that Mac's incurred to effect compliance with Kaish's obligations under the Sublease. *Id*.

36. In the event of Kaish's default under any of the Subleases, in addition to the above-stated remedies, Mac's is also entitled to "recover all expenses incurred by reason of the breach, including, without limitation, attorneys' fees and costs and paralegal expenses." Ex. A, ¶

25(b); Ex. B, ¶ 25(b); Ex. C, ¶ 25(b); *see also id*. at ¶ 36 ("[Kaish] agrees that [Kaish] will pay, in addition to rents and other sums due under this Sublease all collection and court costs incurred by [Mac's] and [Mac's] attorneys' fees and costs incurred for the enforcement of [Mac's] rights under this Sublease.").

37.     Upon termination of the Subleases, whether by default, abandonment or otherwise (such as expiration of the Subleases), Kaish is also required to "remove or cause to be removed all of [Kaish's] personal property, trade or other fixtures, and equipment (including, but not limited to, all underground storage tanks and related piping) from the Premises by or at the expense of [Kaish] by the expiration of the Term or within three (3) days after the earlier termination of the Sublease." Ex. A, ¶ 17; Ex. B, ¶ 17; Ex. C, ¶ 17.

38.     As to any abandoned property, Mac's is permitted, in its sole discretion, to retain abandoned property for its sole benefit (leaving such property at the Premises or removing it), remove the abandoned property and dispose of it, deliver the abandoned property to Kaish, or store the abandoned property for the benefit of Kaish at Kaish's sole expense. Kaish is also required to pay Mac's, immediately upon Mac's demand, the cost of the removal and disposal, delivery, and/or storage of such abandoned property. *Id*.

**The Dealer Agreements**

39.     On March 24, 2017, Mac's and Paradise Petroleum entered into three separate Complete Contracts of Sale for the Ringgold Road Premises (the "Ringgold Road Dealer Agreement"), the Lee Highway Premises (the "Lee Highway Dealer Agreement"), and the Jenkins Road Premises (the "Jenkins Road Dealer Agreement"). True and correct copies of the Ringgold Road Dealer Agreement, the Lee Highway Dealer Agreement, and the Jenkins Road Dealer Agreement (collectively, the "Dealer Agreements") are attached as **Exhibit G**, **Exhibit**

**H**, and **Exhibit I**, respectively.

40.     The terms and provisions of each of the Dealer Agreements are substantially the same.

41.     The effective term of each of the Dealer Agreements (the "Dealer Agreement Term") was from April 1, 2017, to March 31, 2027. Ex. G, ¶ 1(a); Ex. H, ¶ 1(a); Ex. I, ¶ 1(a).

42.     Mac's and Paradise Petroleum subsequently signed addendums modifying the effective term of the Ringgold Road Dealer Agreement to begin April 10, 2017, and end April 9, 2027, the effective term of the Lee Highway Dealer Agreement to begin April 6, 2017, and end April 5, 2027, and the effective term of the Jenkins Road Dealer Agreement to begin April 13, 2017, and end April 12, 2027.

43.     On August 14, 2019, Mac's, Paradise Petroleum, and Kaish entered into three separate Assignment and Assumption Agreements relating to the Ringgold Road Dealer Agreement (the "Ringgold Road Dealer Agreement Assignment"), the Lee Highway Dealer Agreement (the "Lee Highway Dealer Agreement Assignment"), and the Jenkins Road Dealer Agreement (the "Jenkins Road Dealer Agreement Assignment"). True and correct copies of the Ringgold Road Dealer Agreement Assignment, the Lee Highway Dealer Agreement Assignment, and the Jenkins Road Dealer Agreement Assignment (collectively, the "Dealer Agreement Assignments") are attached as **Exhibit J**, **Exhibit K**, and **Exhibit L**, respectively.

44.     Under the terms of the Dealer Agreement Assignments, which are all substantially the same, Paradise Petroleum assigned all of its rights and obligations under the Dealer Agreements to Kaish, and Kaish agreed to assume all of Paradise Petroleum's rights under the Dealer Agreements. Ex. J, ¶ 2; Ex. K, ¶ 2; Ex. L, ¶ 2.

45.     Mac's, Paradise Petroleum, and Kaish subsequently signed amendments

modifying the effective term of the Lee Highway Dealer Agreement Assignment and the Jenkins Road Dealer Agreement Assignment to September 16, 2019, and the Ringgold Road Dealer Agreement Assignment to October 29, 2019.

46.    The Dealer Agreements provide that Mac's would be the "exclusive supplier of all of [Kaish's] motor fuel product requirements at the Premises at all times during the [Dealer Agreement] Term." Ex. G, ¶ 2; Ex. H, ¶ 2; Ex. I, ¶ 2.

47.    The Dealer Agreements also included Commodity Schedules, which are attached to and incorporated into each Dealer Agreement. The Dealer Agreements require Kaish to purchase from Mac's all of Kaish's requirements for gasoline and diesel covered under the agreements in no less than the quantities shown on the Commodity Schedules. Ex. G, ¶¶ 2–3; Ex. H, ¶¶ 2–3; Ex. I, ¶¶ 2–3.

48.    Kaish is required to pay Mac's for the fuel products purchased under the Dealer Agreements in the amounts and manner set forth in the Commodity Schedules and Paragraph 4 of the Dealer Agreements. Ex. G, ¶ 4; Ex. H, ¶ 4; Ex. I, ¶ 4.

49.    Paragraph 24 of each of the Dealer Agreements also requires Kaish to carry Commercial/Comprehensive General Liability Insurance covering all operations at the Premises with a minimum property damage limit of $1,000,000 per occurrence and in the aggregate and which name Mac's as an additional insured. Ex. G, ¶ 24(a); Ex. H, ¶ 24(a); Ex. I, ¶ 24(a).

50.    The Dealer Agreements provide that Mac's may terminate them for numerous reasons, including the following, without limitation: if Kaish fails to purchase at least 75% of the minimum volume requirements in the Commodity Schedules, if Kaish fails to maintain an inventory of any one or more grades of motor fuel covered by the agreements in an amount adequate to meet customer demand, and any grounds under which termination of a franchise is

permitted under the provisions of the Petroleum Marketing Practices Act, which include, among other things, failure to pay the fuel supplier amounts to which it is legally entitled and failure to operate the Premises for seven consecutive days. Ex. G, ¶ 23(c); Ex. H, ¶ 23(c); Ex. I, ¶ 23(c).

51. The Dealer Agreements further provide that, in a suit for breach of the agreements, the "prevailing party shall be entitled to all attorneys' fees, costs of suit and reasonable expenses incurred in order to secure, defend or protect the rights inuring to the prevailing party under [the Dealer Agreements], or to enforce the terms thereof, in addition to any other relief to which the prevailing party may be entitled." Ex. G, ¶ 34(b); Ex. H, ¶ 34(b); Ex. I, ¶ 34(b). Further, termination of the Dealer Agreements "shall not prejudice [Mac's] right to seek monetary damages or equitable relief against [Kaish]." *Id.* at ¶ 34(c).

52. The Subleases all contain a "Cross Default Provision" providing that "[a]ny default by [Kaish] or an affiliate under any agreement between [Mac's] and [Kaish] or an affiliate shall constitute a default by [Kaish] under this Sublease, and any default by [Kaish] under this Sublease shall constitute a default by [Kaish] or an affiliate under any other agreement between [Mac's] and [Kaish] or an affiliate." The Cross Default Provision further states: "In the event of either of the above-referenced situations, [Mac's] shall be entitled to all of its remedies set forth in this Sublease and in all other agreements between [Mac's] and [Kaish] or an affiliate, respectively." Ex. A, ¶ 25(d); Ex. B, ¶ 25(d); Ex. C, ¶ 25(d).

53. On or around August 7, 2019, Kaish and Mac's also entered into a Security and Cross Default Agreement (the "Cross Default Agreement") that applies to all three of the Premises. A true and correct copy of the Cross Default Agreement is attached as **Exhibit M**.

54. The Cross Default Agreement provides: "The parties agree that all of the agreements between [Kaish] and one or more of the [Mac's] entities including, without

limitation, the [Dealer Agreements] and all other documents and agreement [sic] executed in connection with the [Dealer Agreements] (as may be amended, the 'Related Agreements') are part of a single transaction and, as such, certain considerations were mutually given and received by both parties in light of these transactions being treated as a single transaction." Ex. M.

55.     The "Related Agreements," as defined by the Cross Default Agreement, include the Subleases. *See id*.

56.     The Cross Default Agreement further provides: "Kaish hereby acknowledges that the Related Agreements entered into with Mac's are intended to be treated as a unitary agreement in all respects. Kaish acknowledges that the treatment of all of the Related Agreements as a unitary agreement was and is of primary importance to Mac's, and Mac's would not have entered into the Related Agreements without simultaneously entering into this Agreement and Kaish agreeing to the treatment of all of the Related Agreements as a unitary agreement. All rights and obligations of Kaish under this Agreement relating to the [Premises] shall apply to all [Premises] and Related Agreements. Any default of Kaish under this Agreement, or any of the Related Agreements (even if such default pertains to a single [Premises]) shall be a default pertaining to all [Premises] and Related Agreements." *Id.* at § 2.

### The Personal Guaranties

57.     On August 7, 2019, Bhamani and Mac's entered into three separate Personal Guaranties of Performance relating to the Ringgold Road Premises (the "Ringgold Road Guaranty"), the Lee Highway Premises (the "Lee Highway Guaranty"), and the Jenkins Road Premises (the "Jenkins Road Guaranty"). True and correct copies of the Ringgold Road Guaranty, the Lee Highway Guaranty, and the Jenkins Road Guaranty (collectively, the "Guaranties") are attached as **Exhibit N**, **Exhibit O**, and **Exhibit P**, respectively.

58.     Under the terms of the Guaranties, Bhamani, agreed to, among other things, fully, unconditionally, and irrevocably guarantee the full and prompt payment of Kaish's liabilities under the Dealer Agreements. Ex. N, ¶ 1(a)(i); Ex. O, ¶ 1(a)(i); Ex. P, ¶ 1(a)(i).

59.     Bhamani further agreed that, in the event Kaish fails at any time to make any part of the payments owed or perform its obligations under, among other things, the Dealer Agreements, he would pay or perform the liabilities guaranteed as if they constitute a direct and primary obligation of his. Ex. N, ¶ 1(b); Ex. O, ¶ 1(b); Ex. P, ¶ 1(b).

60.     Bhamani, as guarantor, also agreed to pay to Mac's "all costs and expenses (including without limitation, liquidation costs, expense payments, and attorneys' fees and other legal costs) incurred by [Mac's]" in collection of Kaish's liabilities (as defined in the Guaranties) and any obligations of Bhamani under the Guaranties. Also, "the prevailing party shall be entitled to all attorneys' fees, costs of suit and reasonable expenses incurred in order to secure, defend or protect the rights inuring to the prevailing party" under the Guaranties or to enforce their terms. Ex. N, ¶ 8; Ex. O, ¶ 8; Ex. P, ¶ 8.

61.     Bhamani's obligations under the Guaranties additionally extended to Kaish's liabilities under the Subleases, including pursuant to the Cross Default Agreement and the Cross Default Provision in the Subleases.

**Jenkins Road Premises**

62.     In or about April 2020, a tornado event occurred in Chattanooga, Tennessee, that significantly damaged the Jenkins Road Premises, including, without limitation, substantial damage to the store roof and gas canopy as well as damage to the fuel dispensers and associated equipment.

63.     After the tornado event that substantially damaged the Jenkins Road Premises,

Kaish failed to promptly repair and restore the Premises in material breach of its obligations under the Jenkins Road Sublease. *See* Ex. C at ¶ 16.

64.     Indeed, upon information and belief, Kaish failed to make any material repairs to the Premises and did not restore the Premises and its Improvements to return it to the pre-tornado condition as required.

65.     These failures occurred despite Mac's offering help and making numerous other forms of outreach.

66.     Further, upon information and belief, Kaish did not carry insurance sufficient to replace the Improvements on the Premises and did not carry insurance meeting the minimum coverage requirements under both the Jenkins Road Sublease and the Jenkins Road Dealer Agreement. *See* Ex. C, ¶¶ 14(a), (b), and (c); Ex. I, ¶ 24.

67.     The Jenkins Road Premises has been closed since the casualty event in or about April 2020 and never re-opened. Kaish has failed to pay rent, taxes, and other amounts due to Mac's under the Jenkins Road Sublease since then.

68.     As a result of Kaish's failure to pay rent, taxes, and other amounts owed to Mac's under the Jenkins Road Sublease, its failure to repair and restore the Jenkins Road Premises and Improvements as required, and its failure to carry sufficient insurance coverage for the Jenkins Road Premises, Kaish is in default under and material breach of the Jenkins Road Sublease. Ex. C, ¶ 25(a)(i)–(ii).

69.     Also, because the Premises has been shuttered since about April 2020, Kaish is in further default under and material breach of the Jenkins Road Sublease as it has not used the Jenkins Road Premises for its intended use for a period of fifteen consecutive days and abandoned the Jenkins Road Premises for more than three years. *Id.* at ¶ 25(a)(vii)–(viii).

70.     Moreover, since the Jenkins Road Premises closed in or about April 2020, Kaish has not purchased any fuel for the Jenkins Road Premises (let alone the minimum required amount) from Mac's for more than three years. Ex. I, ¶¶ 3, 23(c).

71.     Kaish also failed to carry insurance meeting the minimum coverage requirement of $1,000,000 set forth in the Jenkins Road Dealer Agreement. Ex. I, ¶ 24.

72.     As a result of Kaish's failure to purchase the minimum required amount of fuel from Mac's for the Jenkins Road Premises and failure to carry insurance meeting the minimum coverage requirement, Kaish is also in default under and material breach of the Jenkins Road Dealer Agreement. Ex I, ¶¶ 3, 23(c), 24.

73.     As a direct and proximate result of Kaish's material breaches of the Jenkins Road Sublease and the Jenkins Road Dealer Agreement, Mac's has suffered substantial damages, including but not limited to: (a) unpaid rent, taxes, fees, and other amounts owed under the Jenkins Road Sublease presently in excess of $200,489.61; and (b) costs to remove underground storage tanks from the Jenkins Road Premises after the property was closed in excess of $72,404.68.

**Ringgold Road Premises**

74.     Kaish closed the Ringgold Road Premises on or around January 1, 2022.

75.     Since the Ringgold Road Premises closed on or around January 1, 2022, Kaish has failed to pay rent, taxes, fees, and other amounts due to Mac's under the Ringgold Road Sublease.

76.     As a result of Kaish's failure to pay rent, taxes, fees, and other amounts owed under the Ringgold Road Sublease, Kaish is in default under and material breach of the Ringgold Road Sublease. Ex. a, ¶ 25(a)(i)–(ii).

77.     Kaish is in further default under and material breach of the Ringgold Road Sublease because it has not used the Ringgold Road Premises for its intended use for a period of fifteen consecutive days and abandoned the Ringgold Road Premises for nearly two years. *Id.* at ¶ 25(a)(vii)–(viii).

78.     Moreover, since the Ringgold Road Premises closed on or around January 1, 2022, Kaish has not purchased any fuel for the Ringgold Road Premises (let alone the minimum required amount) from Mac's for more than one year.

79.     As a result of Kaish's failure to purchase the minimum required amount of fuel from Mac's for the Ringgold Road Premises, Kaish is also in default under and material breach of the Ringgold Road Dealer Agreement. Ex G, ¶¶ 3, 23(c).

80.     As a direct and proximate result of Kaish's material breaches of the Ringgold Road Sublease and the Ringgold Road Dealer Agreement, Mac's has suffered substantial damages, including but not limited to: (a) unpaid rent, taxes, fees, and other amounts owed under the Ringgold Road Sublease presently in excess of $109,268.24; and (b) costs to remove underground storage tanks from the Ringgold Road Premises after the property was closed in excess of $82,976.58.

**Lee Highway Premises**

81.     Kaish closed the Lee Highway Premises in or around September 2022.

82.     Kaish has failed to pay rent, taxes, fees, and other amounts due to Mac's under the Lee Highway Sublease since September 2022.

83.     As a result of Kaish's failure to pay rent, taxes, fees, and other amounts owed under the Lee Highway Sublease, Kaish is in default under and material breach of the Lee Highway Sublease. Ex. B, ¶ 25(a)(i)–(ii).

84.     Kaish is in further default under and material breach of the Lee Highway Sublease because it has not used the Lee Highway Premises for its intended use for a period of fifteen consecutive days and abandoned the Lee Highway Premises for more than one year. *Id.* at ¶ 25(a)(vii)–(viii).

85.     Moreover, since the Lee Highway Premises closed in or around September 2022, Kaish has not purchased any fuel for the Lee Highway Premises (let alone the minimum required amount) from Mac's for more than one year.

86.     As a result of Kaish's failure to purchase the minimum required amount of fuel from Mac's for the Lee Highway Premises, Kaish is in default under and material breach of the Lee Highway Dealer Agreement. Ex H, ¶¶ 3, 23(c).

87.     As a direct and proximate result of Kaish's material breaches of the Lee Highway Sublease and the Lee Highway Dealer Agreement, Mac's has suffered substantial damages, including but not limited to: (a) unpaid rent, taxes, fees, and other amounts owed under the Lee Highway Sublease presently in excess of $64,407.04; and (b) costs to remove underground storage tanks from the Lee Highway Premises after the property was closed in excess of $74,871.60.

**Kaish's Failure to Cure its Breaches**

88.     On March 24, 2022, and July 25, 2022, Mac's provided Kaish and Bhamani with notices of default regarding the aforementioned breaches with respect to the Ringgold Road Premises and the Jenkins Road Premises and related agreements, with no response.

89.     On February 23, 2023, Mac's provided Kaish and Bhamani with a comprehensive Notice of Default (the "Notice") and opportunity to cure the aforementioned breaches, with respect to all three of the Premises and related agreements. A true and correct copy of the Notice

is attached as **Exhibit Q**.

90.     Kaish never responded to the Notice and failed to cure its breaches, resulting in termination of the Subleases and Dealer Agreements as of at least March 6, 2023. *See id.*

91.     Bhamani also never responded to the Notice and, despite requests by Mac's, failed to pay any of the amounts owed by Kaish under the Subleases and Dealer Agreements or fulfill any of Kaish's performance obligations thereunder.

92.     As Kaish failed to timely cure its material breaches of the Subleases and Dealer Agreements, resulting in Mac's termination thereof, the Subleases require Kaish to "remove or cause to be removed all of [Kaish's] personal property, trade or other fixtures, and equipment (including, but not limited to, all underground storage tanks and related piping) from the Premises by or at [Kaish's] expense . . . within three (3) days after the . . . termination of the Sublease." Ex. A, ¶ 17; Ex. B, ¶ 17; Ex. C, ¶ 17.

93.     Following Mac's termination of the Subleases and Dealer Agreements, Kaish failed to remove all property, fixtures, and equipment, as described in the Subleases, and specifically including the underground storage tanks and piping, within the required three-day period.

94.     Mac's has taken possession of each of the Premises, as it is permitted to do under the Subleases, and, among other costs and damages incurred as described above, Mac's has incurred significant amounts to, among other things, remove the underground storage tanks and piping from each of the Premises, for which it is entitled to recover all amounts incurred and damages. Ex. A, ¶¶ 17, 25(b), 29; Ex. B, ¶¶ 17, 25(b), 29; Ex. C, ¶¶ 17, 25(b), 29.

## COUNT ONE

## Breach of Contract

**(Against Defendant Kaish)**

95.     Mac's incorporates by reference all preceding paragraphs as though fully set forth herein.

96.     The Subleases, Dealer Agreements, and Cross Default Agreement are valid and enforceable contractual agreements between Mac's and Kaish.

97.     Mac's has performed all of its duties and obligations under the Subleases, Dealer Agreements, and Cross Default Agreement.

98.     As described herein, Kaish materially breached the Subleases by failing to pay rent, taxes, fees, and other amounts owed to Mac's under the Subleases.

99.     As described herein, Mac's further materially breached the Subleases by failing to use the Premises for their intended use for a period of fifteen consecutive days and abandoning each of the Premises.

100.     As described above, Mac's also materially breached the Jenkins Road Sublease by failing to repair and restore the Jenkins Road Premises and Improvements following the tornado event and failing to carry sufficient insurance coverage for the Jenkins Road Premises.

101.     Also, as detailed above, Kaish materially breached the Dealer Agreements by failing to purchase the minimum required amount of fuel from Mac's for each of the Premises and by failing to carry sufficient insurance coverage for the Jenkins Road Premises.

102.     As described above, Kaish also materially breached the Subleases and Dealer Agreements by failing to remove all property, fixtures, and equipment, as described in the Subleases, and specifically including the underground storage tanks and piping, and failing to pay the costs incurred by Mac's to remove all such property, fixtures, and equipment, including the underground fuel storage tanks and piping.

103.     Pursuant to the Cross Default Agreement, the Subleases and Dealer Agreements are part of a single transaction and treated as a unitary agreement and, therefore, a default of Kaish under any one of such agreements constitutes a default under all such agreements.

104.     As a direct and proximate result of these material breaches, Mac's has incurred damages in an amount to be proven in trial that include, but are not limited to: (a) unpaid rents, taxes, fees, and other amounts owed under the Subleases; (b) costs to remove underground tanks and piping at each Premises; and (c) all other amounts owed to Mac's under the operative agreements or damages incurred as a result of Kaish's breaches.

105.     Mac's is also entitled to recover its attorneys' fees and costs pursuant to Paragraphs 25(b) and 36 of the Subleases and Paragraph 34(b) of the Dealer Agreements.

## COUNT TWO

## Breach of Guaranty

## (Against Defendant Bhamani)

106.     Mac's incorporates by reference all preceding paragraphs as though fully set forth herein.

107.     The Guaranties are valid and enforceable contractual agreements between Mac's and Bhamani.

108.     Mac's has performed all of its duties and obligations under the Guaranties.

109.     As described above, Bhamani materially breached the Guaranties by failing to pay any of the amounts owed by Kaish under the Subleases and Dealer Agreements and failing to fulfill any of Kaish's performance obligations thereunder.

110.     As a direct and proximate result of these breaches, Mac's has incurred damages in an amount to be proven in trial that include, but are not limited to, (a) unpaid rents, taxes, fees,

and other amounts owed under the Subleases; (b) costs to remove underground tanks and piping at each Premises; and (c) all other amounts owed to Mac's under the operative agreements or damages incurred as a result of Kaish's breaches.

111. Mac's is also entitled to recover its attorneys' fees and costs pursuant to Paragraphs 25(b) and 36 of the Subleases, Paragraph 34(b) of the Dealer Agreements, and Paragraph 8 of the Personal Guaranties.

## PRAYER FOR RELIEF

WHEREFORE, Mac's requests the Court grant the following relief:

a.    Monetary damages in an amount to be proven at trial, but in no event less than the $604,417.75 in damages described herein;

b.    Attorneys' fees and costs, pursuant to Paragraphs 25(b) and 36 of the Subleases, Paragraph 34(b) of the Dealer Agreements, and Paragraph 8 of the Personal Guaranties, or other applicable law; and

c.    Such additional relief as the Court deems just and proper.

DATED this 4th day of December, 2023.

s/ Jason I. Coleman
Jason I. Coleman (TN BPR No. 031434)
D. Michael Sweetnam (GA Bar No. 694960)
(*Pro Hac Vice* pending)
SWEETNAM, SCHUSTER &
SCHWARTZ, LLC
1050 Crown Pointe Parkway, Suite 500
Atlanta, Georgia 30338
Telephone: (404) 444-2368
Email: jcoleman@sweetnamlaw.com
Email: msweetnam@sweetnamlaw.com

Andrea L. Marconi (AZ Bar. No. 022577)
FENNEMORE CRAIG, P.C.
(*Pro Hac Vice* pending)
2394 E. Camelback Road

Suite 600
Phoenix, Arizona 85016
Telephone: (602) 916-5000
Email: amarconi@fennemorelaw.com

*Attorneys for Plaintiff*
*Mac's Convenience Stores LLC*