# Exhibit I

DocuSign Envelope ID: 8D8171FF-613B-4633-BBA3-121F89C10F61

Facility # 3781

### Effective Date Addendum

This Effective Date Addendum ("Addendum") is entered into by and between **MAC'S CONVENIENCE STORES, LLC,** with a business address of 4080 West Jonathan Moore Pike, Columbus, Indiana 47201 ("Franchisor") and **Paradise Petroleum LLC** ("Franchise Dealer") having a place of business at 2300 Jenkins Road, Chattanooga, Tennessee 37421.

### WITNESSETH:

WHEREAS, the Franchisor and Franchise Dealer are parties to a **Complete Contract of Sale** originally dated April 1, 2017 and expiring March 31, 2027 (the "Franchise Agreement"), which Franchise Agreement constitutes a franchise under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.*; and

WHEREAS, Franchisor and Franchise Dealer desire to Amend the term of the Franchise Agreement and all ancillary documents, agreements and addendums thereto as set forth herein below.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which the parties hereto acknowledge the Franchisor and Franchise Dealer hereby agree as follows:

1.      Franchisor and Franchise Dealer hereby agree that the term of the Franchise Agreement and all ancillary documents, agreements and addendums thereto is Amended to begin on April 13, 2017 and end on April 12, 2027.

2.      All other terms and conditions of the Franchise Agreement remain unchanged.

3.      The parties hereto agree further that the Amendment herein of the Franchise Agreement and all ancillary documents, agreements and addendums thereto does not create a new franchise for purposes of the PMPA.

Executed _____ 6/4/2017 | 10:35 MST _____

**FRANCHISOR:**                                          **FRANCHISE DEALER:**

**MAC'S CONVENIENCE STORES, LLC.**          **Paradise Petroleum LLC**

By: _M Mc L_____                           By: _Mehul Shah_____
     B95B02F7B06148C                                          35F95D97B0B74AE
     Matt McCure                                                  Mehul Shah

Title:   Vice President                                      Title:   Managing Member

Witness: _Ken Langston_____
          FA17B1DE22D44E4

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F



# MAC'S CONVENIENCE STORES LLC
## Branded Reseller Agreements

| NO. | DESCRIPTION |
|-----|-------------|
| 1. | Complete Contract of Sale (Branded-Reseller) UL Version |
| 2. | Amendment to Complete Contract of Sale |
| 3. | Schedule of Seller's Equipment |
| 4. | Revised Summary of Title I of the PMPA |
| 5. | Commodity Schedule |
| 6. | First Right of Refusal Addendum – Reseller |
| 7. | Incentive and Amortization Agreement |
| 8. | Key Person Rider – Reseller |
| 9. | Security Agreement |
| 10. | Personal Guaranty of Performance – Mehul Shah |
| 11. | Personal Guaranty of Performance – Rajeshri Chokshi |
| 12. | Personal Guaranty of Performance – Bhupinder Sachar |

*April 13* (handwritten annotation)

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

Site # 3781

## COMPLETE CONTRACT OF SALE (BRANDED-RESELLER)

This Complete Contract of Sale (Branded) (the "Contract") is made and entered into between Mac's Convenience Stores LLC, a limited liability company, with a business address of 4080 West Jonathan Moore Pike, Columbus, Indiana 47201 hereinafter called "Seller" and Paradise Petroleum LLC with a business address of 4858 Highway 58, Chattanooga, Tennessee 37416, hereinafter called "Purchaser".

### WITNESSETH

In consideration of the mutual promises herein contained, Seller shall sell and deliver to Purchaser at the premises located at 2300 Jenkins Road, Chattanooga, Tennessee 37421, (the "Premises"), and Purchaser shall purchase, receive and pay for, branded product(s) under certain BP Oil Corporation trademarks, service marks, trade names, brand names, trade dress, logos, color patterns, color schemes, design schemes, insignia, image standards or other brand identifications that Seller allows Purchaser to use (the "Proprietary Marks"), and other products, of the kind and in the quantities and under the terms and conditions specifically set forth in Commodity Schedule(s) annexed hereto and made a part hereof. Seller's supplier of such branded products under the Proprietary Marks is BP Oil Corporation, and such supplier and its successor(s) and assigns are referred to hereinafter as the "Supplier".

1.  Duration.
    (a) This Contract shall be for a term of TEN (10) years (the "Term"), subject to Seller's termination rights under paragraph 23 herein. The Term of the Contract shall commence on the 1st day of April, 2017 and expire on the 31st day March, 2027.
    (b) Purchaser agrees that the branded reseller business ("Business") shall be fully operational in accordance with the terms of this Contract and open and operational within (i) 120 days of the Effective Date if the Business is a conversion; or (ii) 365 days of the Effective Date if the Business is new to the fuel industry.
    (c) In the event this Contract expires and the parties do not extend or renew by written instrument, but Seller continues to accept orders from Purchaser for motor fuel products, such sales shall be upon all of the terms and conditions hereof, provided that such sales shall not be construed as evidence of a renewal of this Contract by operation of law or otherwise, but shall imply only a Contract for a month-to-month term, which Seller may terminate at any time subject to any valid requirements of any applicable statute.

2.  Products. Purchaser agrees that Seller shall be the exclusive supplier of all Purchaser's motor fuel product requirements at the Premises at all times during the Term hereof. The following Commodity Schedule(s) forming a part of this Contract were affixed at or before the signing hereof.

| COMMODITY SCHEDULE(S) | DATE |
|---|---|
| Gasoline | April 1, 2017 |

By mutual agreement, this Contract may be amended from time to time by adding other or additional schedules, substituting revised schedules or by deleting one or more items or provisions from any Commodity Schedule(s) listed hereinabove.

3.  Quantity.
    (a) Seller shall sell to Purchaser and Purchaser shall purchase from Seller all Purchaser's requirements for the product(s) covered by this Contract in no less than the quantities shown on the applicable Commodity Schedule(s). However, during any period of this Contract for which the amount of any such product(s) that Seller is required to deliver to Purchaser is prescribed by government rules, regulations or orders, or becomes subject to an allocation by Supplier, the quantity of such product(s) covered by this Contract shall be the quantity so prescribed or allocated instead of the quantity shown on the applicable Commodity Schedule(s). If Supplier reduces its allocation of products to Seller, then Seller may restrict deliveries of products to Purchaser without liability and may allocate Seller's supply of products among Seller's other customers and classes of customers, including Seller's affiliates and Seller itself for its own use, on any basis which in Seller's sole judgment is fair and reasonable under the circumstances, allowing for such priorities as Seller deems appropriate. Any purchase or sale in excess of the volumes described above shall not in any way be considered to modify this Contract as regards quantities to be delivered.
    (b) Seller reserves the right to use, and require Purchaser to use, such Automatic Tank Gauge motor fuel inventory monitoring and ordering system ("ATG") via a broadband/internet connection on the Premises as Seller may require. The installation of the ATG will be at Seller's own expense. Purchaser shall be responsible for Seller's actual monthly out-of-pocket expenses incurred by Seller for providing broadband/internet connectivity (through a third-party provider); provided, however, that if Purchaser currently subscribes to broadband/internet services at the Premises, Purchaser may elect to use its current broadband/internet services for the ATG in lieu of those arranged or provided by Seller, and in such circumstances Purchaser shall

COMPLETE CONTRACT OF SALE
(BRANDED RESELLER CV) (Rev. 2/2017)

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

not be responsible for any broadband/internet connectivity fees incurred by Seller. Purchaser shall comply with such reasonable rules and regulations as Seller may from time to time establish regarding deliveries.

4. Price/ Method of Payment.

(a) The price of the product(s) covered by this Contract shall be as stated in the applicable Commodity Schedule(s). Purchaser shall pay Seller for all goods delivered to Purchaser by Seller at or before the time of delivery of the goods ("Payment Date") as further set forth below. Purchaser hereby assigns to Seller all of Purchaser's right, title and interest in the proceeds from the sale of goods delivered by Seller that are effectuated through credit card transactions ("Credit Card Proceeds") and otherwise. These assignments of rights are effective immediately when Purchaser's customers purchase goods from Purchaser; however, the funds shall be credited to Seller's account by the financial institution responsible for processing the Credit Card Proceeds ("Card Bank"), as soon as commercially feasible. The assignment of Credit Card Proceeds is a form of payment for goods sold and shall be the property of Seller immediately upon the foregoing assignments. If the Credit Card Proceeds exceed the balance on Purchaser's account with Seller for the sale of any goods as of the Payment Date, Seller shall at its option either (i) pay such excess amount to Purchaser within a commercially reasonable time, or (ii) treat such excess amount as a credit in favor of Purchaser. Any payment by Seller to Purchaser shall be made after deducting any processing fee in effect under Supplier's then current Card Guide (defined below), by: (i) check to Purchaser; or (ii) a credit to Purchaser's bank account by EFT (defined below). Title to any funds paid by Seller to Purchaser shall not pass to Purchaser unless and until such funds are actually transferred to Purchaser's account or until a check is delivered to Purchaser.

(b) Where Seller requires payment via EFT, Purchaser will establish a commercial account with a financial institution that provides EFT services and will authorize Seller to initiate transfers of funds between Purchaser's account and Seller's accounts for payment of all amounts due to Seller under this Contract. Should any EFT transaction be rejected by Purchaser's financial institution for any reason, Seller may, at its sole discretion, require subsequent payments be made in cash or by other means satisfactory to Seller.

(c) If at any time the financial responsibility of Purchaser shall become impaired or unsatisfactory to Seller, or should Purchaser be in arrears in his accounts with Seller, Seller may require, as a condition of making further deliveries under this Contract, payment by Purchaser of all past due accounts and cash payment prior to, or upon, for all future deliveries.

(d) As used in this subparagraph (d), "Purchaser-Affiliated Party" means, in relation to Purchaser, (i) any entity controlled, directly or indirectly, by the Purchaser, (ii) any person or entity that controls, directly or indirectly, the Purchaser, or (iii) any entity under common control, directly or indirectly, with the Purchaser. As used in this subparagraph (d), "control" of any entity means ownership of at least fifty percent (50%) of the voting power of the entity. In addition to and not in limitation of any other rights or remedies (including any right to set off, counterclaim, or otherwise withhold payment) available to Seller, Seller may without prior notice to any person set off any sum or obligation owed by any Purchaser-Affiliated Party to Seller (whether arising under this Contract, the Incentive and Amortization Agreement or any other agreement or contract between Purchaser and Seller) against any sum or obligation owed by Seller to any Purchaser-Affiliated Party (whether arising under this Contract, the Incentive and Amortization Agreement or any other agreement or contract between Purchaser and Seller). This right shall survive the termination or nonrenewal of this Contract.

5. Control. Purchaser is an independent businessman with the exclusive right to direct and control the business operation at the Premises, including the establishment of the prices at which products and merchandise are sold. Seller reserves no control over the business at the Premises. Purchaser has no authority to employ anyone as an employee or agent of Seller for any purpose.

6. Liability. Neither Seller nor Supplier shall be liable to Purchaser or to any other person for any damage to or loss of property, or for injury to or death of persons or for the violation by Purchaser or any other person of any governmental statute, law, regulation, rule, or ordinance, arising from the operation or activities of Purchaser or any other person pursuant to this Contract. Purchaser shall indemnify, protect, defend, and save harmless Seller and Supplier, and their respective officers, directors, employees, agents and representatives, from and against any and all losses, claims, liabilities, environmental cleanup costs, fines, penalties, suits and actions, judgments and costs, including attorneys' fees and the costs of litigation, which shall arise from or grow out of any injury to or death of persons, or damage to or loss of property, or violation by Purchaser or any other person of any governmental statute, law, regulation, rule, or ordinance, directly or indirectly arising out of, or resulting from, or in any way connected with (i) Purchaser's performance of this Contract, (ii) operation of Purchaser or activities of any other person at the Premises, or (iii) the condition of the Premises or of the adjoining streets, sidewalks or ways, irrespective of whether such injury, death, damage or loss is sustained by Purchaser or any other person, firm or corporation which may seek to hold Seller or Supplier liable. Purchaser acknowledges and agrees to provide Seller written assurance within ten (10) days from Seller's request for Purchaser to accept tender of a claim and to notify and instruct Purchaser's insurance carriers that Seller is an indemnified party. The existence or non-existence of any insurance that may be required under this Contract will not limit Purchaser's indemnity or other obligations under this Contract. This indemnity shall survive the termination or nonrenewal of this Contract.

COMPLETE CONTRACT OF SALE                                  2
(BRANDED RESELLER CV) (Rev. 2/2017)

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

7. <u>Credit</u>. Nothing herein shall be construed as obligating Seller to extend any credit to PurchaserIf Seller, in its sole determination, elects to extend credit to Purchaser, such extension of credit shall only be made in writing on such terms and conditions that Seller may require including, without limitation, the following:

(a) In the event payment is not made on or before the due date, a late payment charge and an interest payment charge in such amounts established by Seller from time to time, not to exceed the maximum allowed by law, may be imposed for each month (and any part thereof) which elapses from due date to the date payment is received by Seller.

(b) If there are additional business transactions between Purchaser and Seller, including without limitation those relating to credit sales of products other than those identified herein, promissory notes, or real estate, unless it is clearly indicated in writing by Purchaser as to how payments received by Seller from Purchaser are to be applied, then such payments shall be applied by Seller in the following order or priority: (i) trade accounts, (ii) promissory notes, (iii) rentals or other amounts due under any other agreement or transactions.

(c) Seller reserves the right to withdraw such credit, or modify the terms and conditions of such credit, immediately at any time on giving to Purchaser notice thereof.  In the event credit is withdrawn, all amounts then due and owing shall become payable immediately, and all future sales by Seller to Purchaser shall be for cash (or at Seller's option certified or cashier's check, money order or other means approved by Seller) payable prior to, or upon delivery.

(d) Seller shall have the right but not the obligation to offset any indebtedness owed by Seller to Purchaser against any indebtedness owed by Purchaser to Seller, whether arising from the sale of goods or product(s) under this Contract, or from any other business transaction described in subparagraph (c) above.

(f) In order to secure payment of all Purchaser's present and future indebtedness owed by Purchaser to Seller at any time during the Term of this Contract, including renewal periods, or upon its termination or expiration, Purchaser hereby grants to Seller a security interest and/or a purchase money security interest in (i) all of Purchaser's inventory of petroleum products purchased from Seller, regardless of when purchased, (ii) all accounts receivable owing to Purchaser regardless of when or how incurred, (iii) all of Purchaser's equipment at the Premises, whether or not purchased from Seller, and (iv) all proceeds of Purchaser's inventory, accounts receivable and equipment.  Purchaser shall sign all agreements, financing statements, and renewals as necessary to memorialize and provide public record of this security interest. **Seller reserves the right to require from Purchaser from time to time a security deposit, letter of credit, personal guaranty and/or other forms of security acceptable to Seller to secure Purchaser's obligations under this Contract or any other contract or agreement between Seller and Purchaser.**

8. <u>Credit Cards</u>.

(a) As long as Seller elects to accept specified credit cards, credit identifications, fleet cards, debit cards, pre-paid cards or other similar transaction authorization cards (collectively "Transaction Cards"), Purchaser shall accept and honor all Transaction Cards identified in Supplier's Transaction Card guide and other similar manuals and guidelines, whether in written or electronic form (such guide, manuals, and other guidelines referred to as the "Card Guide") for the purchase of authorized products and services,. Purchaser shall pay any Transaction Card processing fee that may be assessed by Seller for providing such services. Subject to applicable law, Seller may change any or all of its fees, charges or both at any time on ten (10) days' written notice to Purchaser

(b) For each transaction not authorized, disputed by a customer, or otherwise subject to charge back under the Card Guide, Seller may either charge the amount to Purchaser's account or require Purchaser to make immediate refund to Seller, including refund by draft or EFT initiated by Seller, without any deduction for any processing fee. Any credit card transactions that are charged back because of failure to comply with the then-current instructions and policies in the Card Guide or because of customer dispute will be the responsibility of the Purchaser.

(c) Purchaser acknowledges receipt of a copy of the current Card Guide, which is incorporated by reference herein, and shall comply fully with the operating rules, terms and conditions thereof.  Without limiting any rights or remedies available to Seller, if Purchaser fails to comply with this paragraph or the Card Guide, Seller may limit or terminate Purchaser's right to participate in Supplier's Transaction Card program. Further, Supplier or Seller may alter, modify, amend, or terminate the Transaction Card program at any time upon notice to Purchaser.

(d) Purchaser and Seller agree that all Transaction Card sales at the Premises shall be made pursuant to Supplier's point of sale ("POS") system for processing Transaction Cards. Purchaser shall comply with Supplier's POS policies and guidelines, as amended from time to time, as well as Seller's software and hardware standards, established from time to time by Seller, relating to Electronic Point of Sale ("EPOS") systems, including, but not limited to, Seller-approved compatible hardware, customer activated terminals, integrated and non-integrated EPOS systems, and other requirements necessary to electronically accept and process the Transaction Cards, including the purchase of such required equipment and software.

(e) Except as otherwise specified, Purchaser shall not store any personally identifiable data about the cardholder-customer except to facilitate card transactions in accordance with this Contract and shall comply with the then-current Payment Card Industry Data Security Standard ("PCI Standard"), which is referred to in the Card Guide.  Purchaser must protect all card transaction records retained pursuant to this Contract in accordance with these data security provisions.  Purchaser agrees to use

Case 1:23-cv-00284   Document 1-9   Filed 12/04/23   Page 6 of 60   PageID #: 222

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

these records only for purposes of this Contract and safeguard them in accordance with the PCI Standard. Purchaser is liable for any failure of Purchaser or any or all of Purchaser's employees, agents, representatives, subcontractors, and processors to comply with this subparagraph (e). Purchaser is responsible at Purchaser's sole expense for providing any additional data security measures that Purchaser deems necessary to protect its particular data and interests. Seller does not in any way represent or warrant that the measures contained in these data security provisions are sufficient or adequate to protect Purchaser's particular data and interests. SELLER HEREBY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES, AND LIABILITIES WITH RESPECT TO THE PCI STANDARD, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(f) Purchaser shall indemnify, defend and hold Seller harmless for any and all losses, fines, penalties, damages, costs or expenses including without limitation attorney's fees, arising out of the Purchaser's breach or violation of, or failure to comply with, the PCI Standard or the Card Guide. The indemnity provision contained in this subparagraph (f) to paragraph 8 shall survive termination of this Contract.

9. <u>Delivery/Title/Risk of Loss</u>. Delivery, passage of title and risk of loss of the product(s) covered by this Contract shall be as set forth in the attached Commodity Schedule(s).

10. <u>Taxes</u>. It is agreed that any duty, tax, fee or other charge which Seller may be required to collect or pay under any municipal, state, federal or other laws now in effect or hereafter enacted with respect to the production, manufacture, inspection, transportation, storage, sale, delivery or use of the product(s) covered by this Contract shall be added to the prices to be paid by Purchaser for product(s) purchased hereunder. In no event, however, shall Purchaser permit a tax sale or seizure by levy of execution of similar writ or warrant to occur against the Premises or any of the inventory, supplies, or equipment located thereon.

11. <u>Failure To Perform</u>.

(a) Any delays in or failure of performance of either party hereto shall not constitute default hereunder or give rise to any claims for damages if and to the extent that such delay or failure is caused by occurrences including, but not limited to, acts of God or the public enemy; expropriation or confiscation of facilities; compliance with any order or request of any governmental authority; acts of war, rebellion or sabotage or damage resulting therefrom; embargoes or other import or export restrictions; fires, floods, explosions, accidents, or breakdowns; riots; strikes or other concerted acts of workers, whether direct or indirect; or any other causes whether or not of the same class or kind as those specifically above named which are not within the control of the party affected and which, by the exercise of reasonable diligence, said party is unable to prevent or provide against. A party whose performance is affected by any of the causes set forth in the preceding sentence shall give prompt written notice thereof to the other party.

(b) Seller shall be under no obligation to make deliveries hereunder at any time when in Seller's sole judgment it has reason to believe that the making of such delivery would be likely to cause strikes to be called against it or cause its properties to be picketed.

(c) The Term of this Contract shall not be extended, and Seller shall not be required to make up deliveries omitted on account of any of the causes set forth in subparagraphs (a) and (b) above.

(d) Nothing in this paragraph shall excuse Purchaser from making payment when due for deliveries made under the Contract.

12. <u>Determination of Quantity and Quality</u>. The quantity and quality of product(s) sold hereunder shall be for all purposes conclusively deemed to be the quantity and quality set forth in Seller's document of delivery unless, within twenty-four (24) hours of the time of delivery, Purchaser delivers to Seller written notice of any claimed shortage in quantity or claimed deviation in quality, or where discovery of any such shortage or deviation could not reasonably have been discovered by careful inspection at the time of delivery, within three (3) days after discovery. Time is of the essence in complying with this provision. Purchaser's written notice, or the absence thereof, shall be conclusive with respect to the fact of and the time and date of notice under this paragraph.

13. <u>Trademarks</u>.

(a) Subject to the approval of Seller and Supplier, Seller grants to Purchaser the non-exclusive right to use certain Proprietary Marks designated by Seller at the Premises in connection with the advertising, marketing, and resale of the petroleum products purchased from Seller under this Contract. Purchaser agrees that petroleum products of others will not be sold by Purchaser under the Proprietary Marks. Purchaser shall not sell any motor fuel that is not branded under any location that displays Proprietary Marks including, without limitation, under any canopy or fueling island where Purchaser is selling motor fuel and that is identified under any Proprietary Mark. Purchaser understands and agrees that Supplier retains the right, subject to requirements of law, to withdraw the right to use such Proprietary Marks from Purchaser at any time, notwithstanding any request or demand by Seller to the contrary and any such withdrawal shall be without Seller's liability to Purchaser. Purchaser understands, acknowledges, and agrees that Supplier may promulgate from time to time standards, policies, guidelines, procedures, programs, requirements,

COMPLETE CONTRACT OF SALE          4
(BRANDED RESELLER CV) (Rev. 2/2017)

specifications, standards, strategies, and instructions ("Image and Operations Guidelines") regarding image, appearance, station operations, promotions, advertising, the size and location of signs, the wearing of uniforms, and other matters related to the sale of motor fuels under the Proprietary Marks. Purchaser agrees that such Image and Operations Guidelines may be promulgated by any means, including without limitation Seller's and/or Supplier's marketing website, email or other electronic means. Irrespective of the means in which such Image and Operations Guidelines are promulgated, Purchaser shall comply fully with the Image and Operations Guidelines as they exist or may be modified from time to time and cause its employees to do the same.

(b) Seller shall have the right to substitute the trademarks, service marks, trade names, brand names, trade dress, logos, color patterns, color schemes, design schemes, insignia, image standards and /or other brand identifications owned or controlled by a supplier other than Supplier for the Proprietary Marks. In the event of such substitution, all references to the Supplier in this Contract shall be deemed to refer to the substituted supplier and all references to the Proprietary Marks in this Contract shall be deemed to refer to the trademarks, service marks, trade names, brand names, trade dress, logos, color patterns, color schemes, design schemes, insignia, image standards and/or other brand identifications of said substituted supplier.

(c) Upon termination, nonrenewal, or expiration of this Contract or prior thereto upon demand by Seller or Supplier, Purchaser shall discontinue the posting, mounting, display or other use of said Proprietary Marks. In the event that Purchaser fails to do so to the satisfaction of Seller or Supplier, subject to applicable law, Seller and Supplier (i) shall have the right to cause any and all signage, placards, and other displays bearing the Proprietary Marks to be removed from the Premises; and (ii) shall have the right to use any means necessary to remove, cover or obliterate the Proprietary Marks, including entry to the Premises, to do so. In the event the Seller or Supplier take any such action hereunder, Purchaser shall bear all costs and expenses thereof, including without limitation the costs of removing, obliterating, or covering the Proprietary Marks, attorney fees, and other legal costs and expenses. Under no circumstances will Purchaser display signage bearing the Proprietary Marks at the Premises without the prior written approval of Seller.

(d) Purchaser acknowledges and understands that it is not Supplier's licensee of the Proprietary Marks. Purchaser shall not shall not mix, commingle, blend, adulterate, or otherwise change the composition of any of the product(s) purchased hereunder and resold by Purchaser under said Proprietary Marks with other products or substances in any manner.

(e) Seller and Supplier are hereby given the right to enter the station Premises and to examine at any time, and from time to time, the contents of Purchaser's tanks or containers in which said product(s) purchased hereunder are stored and to take samples therefrom and, if in the opinion of Seller or Supplier, any samples thus taken are not said product(s) and in the condition in which delivered by Seller to Purchaser then Seller may at its option cancel and terminate this Contract.

(f) While using the Proprietary Marks, Purchaser shall: (i) operate the Premises responsibly, with due care, prudence, good judgment, and skill; (ii) not engage in dishonest, fraudulent, or scare-selling practices; (iii) diligently promote the sale of motor fuel from the Premises; (iv) perform all services in a good, workmanlike manner; (v) keep the Premises neat and clean and in good repair and the driveways, parking spaces, and sidewalks free of ice and snow, and in good repair; (vi) keep the yards, lawns, shrubs and other plantings neat and clean and free from weeds, debris, snow, ice, and rubbish; and (vii) comply with all laws, ordinances, rules and regulations of constituted public authority governing the use and occupancy of the Premises and the conduct of Purchaser's business at the Premises.

(g) Purchaser shall participate in Supplier's image evaluation program, any "mystery" or shop audit program, or any other similar program, conducted or sponsored by Supplier. Purchaser shall pay any fee that may be assessed by Seller for arranging for such audit and evaluation services. Purchaser shall promptly take corrective action as required by Supplier to bring the Premises into compliance with the Image and Operations Guidelines. Purchaser understands and agrees that Purchaser's failure to comply with any such program shall be a material breach of this contract.

(h) Purchaser understands and acknowledges that Seller may install, or has installed, certain signage at the Premises for the purpose of displaying the Proprietary Marks. Unless the parties hereto have agreed otherwise, Purchaser agrees that said signage shall remain the property of Seller, or the Supplier as the case may be, and that said signage may not be removed, transferred, sold, or otherwise disposed of without the prior written consent of Seller.

(i) If Purchaser (i) violates any Supplier image or appearance standard; or (ii) receives a substandard score with respect to any standard or criterion on any Supplier image evaluation program, "mystery shopper" or inspection program, or any other similar program conducted or sponsored by Supplier (any such violation or deficiency referred to hereinafter as the "Deficiency"), Purchaser shall pay to Seller a reasonable penalty fee not to exceed One Thousand Dollars ($ 1,000.00 ) for any Deficiency and immediately correct each Deficiency to bring the Premises into full compliance with Supplier's standards or programs. If Purchaser fails to correct any Deficiency within ten (10) days after Purchaser's receipt of written notice of such Deficiency, Seller shall have the option, in Seller's sole discretion, to correct any such Deficiency. If Seller exercises its option hereunder, Purchaser shall immediately pay unto Seller, upon demand, all reasonable expenses incurred by Seller to correct each such Deficiency. Nothing contained in this subparagraph (i) shall be understood or deemed to waive or modify any of Seller's rights, or any of Purchaser's obligations, under this Contract.

14. Inspection of Records; Audit. Seller and Supplier have a right to inspect Purchaser's operation of the businesses conducted at the Premises, and in particular have a right to verify that Purchaser is complying with (a) all its contractual obligations contained in this

Case 1:23-cv-00284   Document 1-9   Filed 12/04/23   Page 8 of 60   PageID #: 224

Contract, including but not limited to Purchaser's use of the Proprietary Marks, and (b) all federal, state and local laws and regulations pertaining to environmental protection and trademark use. In order that they may exercise the aforementioned rights, Seller and Supplier shall have the right, and Purchaser shall permit Seller and Supplier, to enter the Premises unimpeded to review and audit all station records including, but not limited to, all records of deliveries, sales and inventory reconciliation, to take samples of motor fuels stored at the Premises, and to inspect equipment.

15. <u>Customer Service and Complaints</u>. While using Proprietary Marks, Purchaser agrees: (a) to render appropriate, prompt, efficient, courteous service at the Premises to Purchaser's customers for such product(s) and to respond expeditiously to all complaints of such customers, making fair adjustment when appropriate; (b) to conduct Purchaser's business in a fair and ethical manner and maintain the Premises' facilities, all in a manner which will foster customer acceptance of and desire for the product(s) sold by Seller to Purchaser; (c) to provide sufficiently qualified and neatly dressed attendants, uniformed as appropriate, to render first-class service to customers; (d) to maintain the restrooms in a clean, orderly, sanitary, and well lighted condition and adequately provided with necessary supplies; (e) not to employ or permit any illegal, unethical, coercive, deceptive or unfair practices in the operation of the Premises; (f) not store or sell illegal drugs or drug paraphernalia or prescription drugs or permit the same to be used or consumed at the Premises; (g) not display, use, store, offer for sale, or rent any item of a pornographic nature at the Premises (such items shall include, without limitation, pornographic, sexually explicit, or so-called "adult": magazines, videotapes, compact disks, digital video disks, or other like items) or any other such item that Seller determines, in its sole judgment, to be offensive to the general public; (h) to offer three (3) grades of gasoline products branded under the Proprietary Marks for sale to the public; (i) to insure that all employees at the Premises are able to understand and speak the English language with sufficient fluency to communicate effectively with Purchaser's customers and emergency response personnel; (j) to post, at all times, actual, current motor fuel prices in numbers, in price sign systems approved by Supplier, in Supplier's sole discretion, located on the Premises; the Premises shall be kept open for the maximum number of hours each day and days each week permitted thereunder:

| | |
|---|---|
| Hours of Operation: | Open 24 hours each day, 7 days each week. |

Purchaser (or where Purchaser is a business entity such as a corporation, limited liability company, or partnership, its Key Person) shall be present at the Premises no less than forty (40) hours per week.

16. <u>Quality, Specification or Name of Product</u>. Seller shall have the right at its sole discretion at any time during the life of this Contract to change, alter, amend or eliminate any of the trade names, trademarks or brands of petroleum product(s) covered by this Contract. Seller may also, in its discretion, either (a) change or alter the quality, grade, or specifications of any product(s) covered by this Contract or (b) discontinue the availability of any such product(s). Any such change or discontinuation shall not affect the minimum purchase requirements set forth in the Commodity Schedule(s) attached hereto. Seller shall give Purchaser written notice of discontinuance of the manufacture of any product(s) covered by this Contract. The Contract shall terminate as to such discontinued product(s) when such notice is effective.

17. <u>Assignment</u>.

(a) This Contract is personal to Purchaser. Provided Seller elects not to exercise Seller's right of first refusal as set forth in subparagraph (d) below, Purchaser's interest in this Contract nonetheless shall not be transferred or assigned by Purchaser in whole or in part, directly or indirectly, without the prior written consent of Seller which consent shall not be unreasonably withheld. It shall be reasonable to withhold such consent if Seller notifies Purchaser, in writing, within forty-five (45) days of Seller's receipt of the application, or other documents that Seller requires a prospective assignee or transferee ("Prospective Franchisee") to provide to Seller, any of the following: (i) the Prospective Franchisee has less business experience and training that normally required by the Seller of prospective franchisees; (ii) the Prospective Franchisee has less financial resources than that normally required by the Seller of prospective franchisees; (iii) the Prospective Franchisee does not satisfy Seller's then current uniformly applied requirements, if any, applicable to prospective franchisees; (iv) the Prospective Franchisee operates a franchise under an agreement with a franchisor other than Seller to whom the transfer or assignment is proposed, if the then current uniformly applied requirements of Seller precludes the Prospective Franchisee from operating a franchise under an agreement with another franchisor; or (v) Purchaser has not offered in writing to transfer or assign the franchise to Seller in accordance with Seller's right of first refusal set forth in subparagraph (d) below, or has otherwise failed to comply with any and all of the terms and conditions therein.

Nothing contained in the foregoing subparagraph (a) shall limit Seller's right to impose other conditions or requirements for its consent under this paragraph. Seller may assign this Contract in whole or in part upon ten (10) days' prior written notice to Purchaser.

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

(b) No assignment or transfer shall affect the continuing primary liability of Purchaser (which liability, following assignment or transfer shall be joint and several with the assignee). No consent to any of the foregoing shall operate as a waiver in any subsequent instance.

(c) If Seller consents to any assignment or transfer, Purchaser shall pay to Seller an administrative fee in the amount of Six Thousand Five Hundred Dollars ($6,500) in the form of a bank cashiers check prior to or at the closing of any assignment or transfer.

(d) Purchaser may not transfer or assign any of Purchaser's interest in this Agreement and/or its business on the Premises without first offering, in writing, to transfer or assign the same to Seller or its designee on the same terms and conditions expressly agreed to between Purchaser and the third party, in accordance with the terms and conditions set forth in the First Right of Refusal Addendum to this Contract.

18. <u>Waiver</u>. No waiver by Seller of any breach of any of the covenants or conditions herein contained to be performed by Purchaser shall be construed as a waiver of any succeeding breach of the same or any other covenant or condition.

19. <u>Environmental Compliance</u>

(a) Purchaser shall become informed about and comply with all local, state and federal laws, statutes, regulations and ordinances related to environmental protection or compliance relevant to Purchaser's operations at the Premises, whether currently in effect or which may come into effect in the future, including where applicable, obligations imposed on the "owner" and "operator" of an underground storage tank system ("UST").

(b) Purchaser shall comply with all applicable local, state and federal UST compliance requirements, whether currently in effect or which may come into effect in the future, including, but not limited to: (i) required inspections of any release detection equipment for USTs and product lines; (ii) required inspections of any automatic tank gauging equipment; and (iii) maintenance and required inspections of any vapor recovery equipment. Purchaser shall maintain written records of all maintenance and inspections of UST equipment. Purchaser will maintain such records at the Premises for at least thirty-six (36) months, or longer, if required by law. Purchaser understands and agrees that raising, removing, by-passing or disabling UST monitoring or release detection probes, alarms and systems, or falsification of records of such systems is a violation of law and could result in the assessment of civil or criminal penalties by the appropriate government agency.

(c) Purchaser shall make accurate daily physical measurement of all products stored in USTs and perform accurate daily and monthly reconciliation of such measurements with metered sales and product deliveries in accordance with Seller, state, local and federal requirements. Purchaser shall develop and maintain accurate written records of the daily physical product measurements and daily and monthly reconciliation. Purchaser will maintain such records at the Premises for at least thirty-six (36) months or longer if required by law. Purchaser shall immediately notify Seller and any appropriate local, state or federal governmental agency after discovery of any inventory loss or other condition which may be the result of a leaking UST or other equipment failure. Purchaser shall immediately investigate and undertake all appropriate initial abatement and other emergency measures to contain, treat, mitigate and/or remediate a discharge, spill, or release of motor fuels or other petroleum products at the Premises. Purchaser shall cooperate at all times with Seller during any such investigation or remedial activity.

(d) Purchaser shall become informed about and comply with all applicable local, state and federal requirements related to the generation, handling, transportation, treatment, storage and/or disposal of solid or hazardous wastes. Purchaser also shall implement appropriate recycling, waste management and waste minimization practices and procedures as necessary to remain in compliance with all applicable local, state and federal environmental protection and compliance requirements.

(e) Purchaser agrees that representatives of Seller and/or Supplier shall be permitted to enter upon the Premises from time to time to perform physical measurements and reconciliation of product stored in USTs and to inspect and/or test any equipment and records used for complying with any local, state, or federal environmental protection or environmental compliance requirements, including, but not limited to, Purchaser's reconciliation and inspection records. However, Seller is not obligated to make any such inspections or tests.

(f) Purchaser shall, if requested by Seller, cooperate in all current and future environmental protection programs established by Seller and/or Supplier.

(g) Purchaser shall properly maintain all USTs, hoses, connections, and associated equipment at the Premises. Seller may, without liability to Purchaser, refuse to make delivery of products covered under this Contract if Seller believes any UST, hose, connection, or associated equipment is not safely maintained or in compliance with applicable safety standards. Purchaser shall not use the UST at the Premises including, without limitation, the associated product lines, hoses, and motor fuel dispensing equipment, during the Term of this Contract for any purpose other than the storage, handling, marketing, and distribution of the Seller's petroleum products.

(h) Purchaser shall indemnify, defend, protect and hold Seller, its employees, officers, members, directors, shareholders, agents and affiliates harmless from and against any and all liabilities, losses, obligations, claims, damages (consequential or otherwise), penalties, suits, actions, judgments, costs and expenses (including attorneys' fees) of whatever nature for personal injury (including death) of persons (including, without limitation, agents and employees of Seller or Purchaser) or property damage

(including, without limitation, damage to the property of Seller or Purchaser), which may be imposed on, incurred by or asserted against Seller directly or indirectly, (i) caused in whole or in part by Purchaser's failure to comply with the terms of this paragraph 19 or with any local, state or federal law, statute, regulation or ordinance, whether currently in effect or which may come into effect, related to environmental protection or environmental compliance or (ii) for any releases or discharges of petroleum products into the environment caused, in whole or in part, by the acts or omissions of Purchaser, its employees, agents, contractors, customers, licensees, or invitees. This indemnity in no way limits and is intended to be within the scope of the general indemnity set forth in paragraph 6 hereof. The terms and provisions of this paragraph 19 shall survive the expiration, nonrenewal, or termination of this Contract.

20. Price Regulation.

(a) If at any time Seller determines that due to governmental regulations, it is unable to increase the price of any of the product(s) deliverable under this Contract by an amount which is sufficient in Seller's judgment to reflect increases in either (i) the cost of such product(s) to Seller or Seller's supplier or (ii) the fair market value of such product(s), which have occurred since the date of this Contract or the date of the last increase in the price of such product(s) whichever is later, Seller may cancel this Contract upon thirty (30) days' written notice to Purchaser, or may suspend this Contract while such limitation is in effect. The Term of this Contract shall not be extended, and Seller shall not be required to make up deliveries omitted, on account of Seller's suspension of this Contract as provided in this paragraph 20.

(b) Notwithstanding any other provision of this Contract, if any state or local law, rule, regulation, or order (i) regulating the price at which a product(s) to be delivered hereunder may be sold, or (ii) limiting the discretion of Seller to determine to whom they will sell such product(s), becomes effective during the Term of this Contract in any state in which such product(s) is to be delivered hereunder, Seller shall have the right to terminate this Contract immediately.

21. Notices. All written notices required or permitted to be given by this Contract shall be deemed to be duly given if delivered personally or sent by certified or a reputable, national overnight mail service to Seller or to Purchaser, as the case may be, at the address set forth above or to such other address as may be furnished by either party to the other in writing in accordance with the provisions of this paragraph. The date of mailing shall be deemed the date of giving such notice, except for notice of change of address, which must be received to be effective.

22. Equipment/Trade Fixtures.

(a) Purchaser shall provide all necessary buildings, improvements, equipment, tools, and like appliances, except for equipment and/or trade fixtures listed on the Schedule of Seller's Equipment attached hereto and made a part hereof. It is expressly understood and agreed that title to all equipment and/or trade fixtures listed in Schedule of Seller's Equipment shall at all times remain with Seller. Purchaser shall be responsible for maintaining and repairing all equipment and/or trade fixtures listed in Schedule of Seller's Equipment. In no event shall such equipment and/or trade fixtures be considered a part of the real estate, nor shall the same be levied upon or sold as the property of Purchaser. Should any such equipment and/or trade fixtures be levied upon, Purchaser shall immediately notify both the levying creditor, disclaiming ownership and the Seller, in order that the Seller may protect its rights. Purchaser shall not encumber or remove the equipment and/or trade fixtures or do or cause to be done anything which results in said equipment and/or trade fixtures or any part thereof being seized, taken in execution, attached, destroyed or damaged or otherwise disturbing or damaging Seller's title to the equipment and/or trade fixtures.

(b) If damage to or destruction of any equipment or trade fixtures provided by Seller occurs in connection with Purchaser's operations at the Premises, Purchaser shall pay Seller the cost of repair or replacement.

23. Termination.

(a) The parties may terminate this Contract by mutual written agreement in the form and manner permitted by the PMPA.

(b) If, upon expiration of this Contract, or any renewal period thereof, and for a period of one (1) year thereafter, Purchaser receives, or has received, from a ready, willing and able seller, a bona fide offer (the "Offer") to sell or supply motor fuels to the Purchaser for resale at the Premises, and Purchaser at that time is ready and willing to accept said Offer, the Purchaser shall give Seller written notice ("Notice"), setting forth the name and address of the prospective seller, and the terms of said Offer. Seller shall have the prior, exclusive option to match any such bona fide Offer. Seller shall exercise its option by notifying the Purchaser, in writing, of its decision to do so within thirty (30) days of Seller's receipt of the Notice, in which event Purchaser shall execute a motor fuel supply agreement with Seller that shall contain the terms of the Offer. If Seller does not exercise its option within the aforementioned thirty (30) day period, Seller shall be deemed to have elected not to exercise said option.

(c) This Contract may be terminated by Seller: (i) if Purchaser makes any material false or misleading statement or representation which induces Seller to enter into this Contract, or which is relevant to the relationship between the parties hereto; (ii) under the circumstances described as causes for termination by Seller elsewhere in this Contract; (iii) if Purchaser dies or if the sole owner of Purchaser dies (iv) if Purchaser fails to purchase at least seventy-five percent (75%) the minimum volume requirements contained in the attached Commodity Schedule(s); (v) if Purchaser fails to maintain an inventory of any one or more grades of motor

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

fuel covered by this Contract in an amount adequate to meet customer demand; (vi) any grounds under which termination of a franchise is permitted under the provisions of the Petroleum Marketing Practices Act (P.L. 95-297), as amended from time to time; (vii) if Purchaser fails to construct and open the Premises in accordance with Paragraphs 1 and 13; or (viii) upon assignment of the Contract by Purchaser contrary to the terms of this Contract.

(d) Upon loss of Seller's right to grant the use of the Supplier's Proprietary Marks, Seller may terminate this Contract. Seller will not be liable for the consequences of such loss unless they result from an act by Seller taken in bad faith for the purpose of causing the loss of Seller's right to grant the right to use the Proprietary Marks.

(e) Purchaser agrees not to engage in or permit any illegal or improper act or conduct, on or about the Premises, which act or conduct is detrimental to Seller or any member of the public. Subject to any other requirements of law, at the option of Seller, this Contract may be terminated without further notice (i) upon the failure of Purchaser to desist from any such further acts or conduct after written notice from Seller to do so, or (ii) upon Purchaser's failure to pay any amount when and as due, and no forbearance, course of dealing, or prior payment shall affect these rights of termination.

(f) Upon the expiration of the Term hereof or upon termination hereof, Seller shall have the right, at its option, to enter upon the Premises and to remove, paint out, or obliterate any signs, symbols or colors on said Premises or on the buildings or equipment thereof which in Seller's opinion would lead a patron to believe that Seller's products are being offered for sale at the Premises. Purchaser shall reimburse Seller for all expenses incurred by Seller under this subparagraph 24(f).

(g) Termination of this Contract by either party for any reason shall not relieve the parties of any obligation theretofore accrued under this Contract.

(h) Purchaser understands and agrees that Seller is relying upon Purchaser to purchase the minimum volume of motor fuel product set forth in paragraph 2 herein above and the applicable Commodity Schedule(s) attached hereto, and that any breach or repudiation of this Contract, or other failure to purchase those minimum volumes of motor fuel product by Purchaser will result in serious losses to Seller. Purchaser and Seller acknowledge that the amount of such losses is, and will be, difficult to determine. Therefore, Purchaser shall pay unto Seller, as liquidated damages, and not as a penalty, to compensate Seller for such losses in the amount described below upon any (i) breach of Purchaser's obligations under this Contract that results in the termination of the Contract; (ii) act or failure by the Purchaser that results in Seller's unilateral termination of the Contract under the PMPA; or (iii) repudiation of the Contract by Purchaser. The amount of liquidated damages shall be the greater of three cents **($0.03)** per gallon multiplied by (iv) the minimum volume in gallons set forth in paragraph 2 herein above and the applicable Commodity Schedule(s) attached hereto, that remain unpurchased (calculated without regard to any excess volume purchased in any prior months) as measured from the time of termination or repudiation, as the case may be, to the date the Term would have ended but for the earlier termination or repudiation, or (v) the average monthly volume in gallons actually purchased by Purchaser (calculated from the date of commencement of the Term to the date of termination or repudiation, as the case may be) multiplied by the number of months remaining on the Term of the Contract, as measured from the time of termination or repudiation, as the case may be, to the date the Term would have ended but for the earlier termination or repudiation. The provisions of this paragraph 23(h) do not affect such other rights and remedies as Seller may have under this Contract and under applicable law including, but not limited to, the PMPA and the Uniform Commercial Code.

(i) Notwithstanding any provision herein to the contrary, this Contract shall terminate on the Lease Expiration Date (as defined in paragraph 35) if Purchaser fails to secure all rights and interests in the Premises described in paragraph 35(b)(ii) below. In the event this Contract is terminated pursuant to this paragraph 23(i), then so long as Purchaser has not breached its covenant set forth in paragraph 35(b)(ii) below, Purchaser shall not be liable to Seller for damages for any lost income, profits or liquidated damages, and the provisions of paragraph 23(g) above shall not apply.

24. Purchaser's Insurance Requirements.

(a) Purchaser shall, at its sole expense, obtain insurance from a reputable insurance carrier authorized to do business in the State in which the Premises is located providing full and continuous coverage for the full Term and all renewal periods thereof equivalent to the following: (i) if Purchaser operates, or permits the operation of, a garage business on the Premises, Garage Liability Insurance covering fire, theft or collision, with a minimum limit of One Million Dollars ($1,000,000) each occurrence and coverage in the general aggregate of no less than One Million Dollars ($1,000,000.00); (ii) if Purchaser operates, or permits the operation of, a service bay and/or car wash on the Premises, Garagekeeper's Legal Liability Insurance covering the care, custody and control of vehicles, with a minimum limit of Seventy-Five Thousand Dollars ($75,000;); (ii) Commercial/Comprehensive General Liability Insurance covering all operations at the Premises and the Premises, complete operations and products liability, fire, explosion and collapse liability, and contractual liability with minimum bodily injury limits of One Million Dollars ($1,000,000) each person, One Million Dollars ($1,000,000) each occurrence, a minimum property damage limit of One Million Dollars ($1,000,000) each occurrence, and coverage in the general aggregate of no less than One Million Dollars ($1,000,000.00); (iii) Comprehensive Automobile Liability Insurance covering all owned, hired or otherwise operated non-owned automobiles with minimum bodily injury limits of One Million Dollars ($1,000,000) each person, One Million Dollars ($1,000,000) each occurrence, and a minimum property damage limit of One Million Dollars ($1,000,000) each occurrence providing for injury, death, or property damage resulting from each occurrence; (iv) Liquor Liability Insurance, if alcoholic beverages are permitted to be sold at the

COMPLETE CONTRACT OF SALE                                    **9**
(BRANDED RESELLER CV) (Rev. 2/2017)

Premises, with policy coverage of at least One Million Dollars ($1,000,000) for liabilities arising out of the dispensing or selling of alcoholic beverages, including without limitation any liabilities imposed by any applicable dram shop or alcoholic beverage control act; (v) Workers Compensation Insurance as required by law; (vi) Employer's Liability Insurance against common law liability, in the absence of statutory liability, for employee bodily injury arising out of the master-servant relationship with a coverage limit of the greater of such amount required by law or One Million Dollars ($1,000,000) for any one occurrence; and (vii) environmental pollution/impairment insurance coverage in an amount of at least One Million Dollars ($1,000,000) on a continuous and uninterrupted basis insuring Purchaser for all environmental liabilities arising out of, but not limited to, the storage, handling, dispensing, and/or sale of motor fuel products and lubricants at the Premises, and/or the ownership and operation of Purchaser's business(es) at the Premises. Such environmental/pollution impairment coverage shall extend at least two (2) years beyond the expiration, termination, or nonrenewal of this Contract. Purchaser may meet the requirement for environmental pollution/impairment coverage for underground storage tanks by participating in the federal Environmental Protection Agency ("EPA") approved state financial assurance fund or other EPA approved method to demonstrate financial responsibility or by satisfying any of the other financial assurance test requirements of the EPA's Financial Responsibility Regulations (40 CFR Part 280).

(b) Purchaser understands and agrees that any insurance coverage purchased by Seller shall not contribute to the Purchaser's coverage requirements under subparagraph (a) above. All insurance policies covered by subparagraph (a) will name Seller and the Supplier as additional insureds and will be primary as to any other existing, valid and collectible insurance. All such insurance shall contain provisions whereby the insurer releases all rights of subrogation against Seller. The foregoing requirements are minimum insurance requirements only and may or may not adequately meet the entire insurance needs of Purchaser. Seller may require Purchaser to carry additional types and amounts of insurance coverage, including modifications to any existing insurance required under subparagraph (a) above. Seller may reject any Purchaser insurance policy that contains deductibility clauses, conditions or exclusions, or that are underwritten by insurance companies that are unacceptable to Seller, in Seller's sole discretion. Each policy or policies shall provide that the liability coverage afforded applies separately to each insured against whom a claim is brought as though a separate policy had been issued to each insured. If Seller so requires, Purchaser shall furnish Seller with certificates of such insurance that provide that coverage will not be canceled or materially changed prior to 30 days' advance written notice to Seller. The insurance required hereunder in no way limits or restricts Purchaser's obligations under the law or this Contract as to indemnification of Seller.

(c) If Purchaser fails, for any reason, to procure or maintain, insurance coverage satisfactory to Seller, Seller may, in Seller's sole discretion and upon notice to Purchaser, procure the required insurance. In such event, upon Seller's request, Purchaser shall promptly furnish Seller with all information relating to the Purchaser or Purchaser's business requested by Seller in connection with the procurement of such insurance. Upon written demand, Purchaser shall immediately reimburse Seller for all Seller's costs incurred in procuring and maintain such insurance coverage. Seller's election to exercise its rights under this subparagraph 24(c) does not preclude Seller from exercising any other rights it may have under this Contract, the law or in equity. Seller's election not to exercise its rights under this subparagraph 24(c) shall not be construed to be a waiver of Purchaser's obligations under this paragraph 24 or otherwise limit Seller's rights under this Contract, the law or in equity.

25. Nature of Agreement/ No Third Party Beneficiary.

(a) In consideration of the granting and execution of this Contract, it is understood and agreed that there shall be no contractual obligation to extend or renew the period or terms of this Contract in any way, and the parties agree that this Contract shall not be considered or deemed to be any form of "joint venture" or "partnership" at the Premises of Purchaser or elsewhere. This Contract shall bind the executors, administrators, personal representatives, assigns, and successors of the respective parties.

(b) This Contract is personal to the Purchaser and is intended for the sole use and benefit of Seller and Purchaser. Nothing contained herein shall be deemed, interpreted, or construed to create, or express any intent to create, third party beneficiary rights in favor of any person or entity, except for any indemnified party (or other person entitled to be indemnified pursuant to this Contract), and Seller and Purchaser specifically state and agree that no such intent exists.

26. Compliance with Laws.

(a) Purchaser shall comply with all laws, statutes, regulations, ordinances, and rules of all applicable governmental authorities with respect to the operation of its business at the Premises,

(b) In addition to the foregoing, Purchaser shall comply with the Americans with Disabilities Act of 1990, 42 U.S.C. Section 12101, et seq., and regulations promulgated pursuant thereto, as well as all analogous and applicable state laws.

(c) Both parties expressly agree that it is the intention of neither party to violate statutory or common law and that if any section, sentence, paragraph, clause or combination of same is in violation of any law, such sentences, paragraphs, clauses or combination of same shall be inoperative and the remainder of this Contract shall remain binding upon the parties hereto.

27. Express Warranties. Seller warrants that the product(s) supplied hereunder will conform to the promises and affirmations of fact made in Seller's current technical literature and printed advertisements, if any, related specifically to such product(s); that it will convey good title to the product(s) supplied hereunder, free of all liens, and that the product(s) supplied hereunder meet such

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

specifications as have been expressly made a part of this Contract. THE FOREGOING WARRANTIES ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN, ORAL OR IMPLIED. THE WARRANTY OF MERCHANTABILITY, IN OTHER RESPECTS THAN EXPRESSLY SET FORTH HEREIN, AND WARRANTY OF FITNESS FOR PARTICULAR PURPOSE, IN OTHER RESPECTS THAN EXPRESSLY SET FORTH HEREIN, ARE EXPRESSLY EXCLUDED AND DISCLAIMED.

28.  Non-Exclusive Territory.  Nothing in this Contract grants Purchaser an exclusive territory to market or resell any petroleum products purchased from Seller hereunder.  Seller reserves the right to market or sell, and authorize others to market or sell, petroleum products in any manner Seller chooses, including through its own retail outlets or through designated wholesalers or other retailers.

29.  Entire Agreement; Modifications.
        (a) This Contract, including any Attachments (defined below) cancels and supersedes all prior written and unwritten agreements, attachments, schedules, appendices, amendments, promises, and understandings between the parties pertaining to the matters covered under this Contract, except any indebtedness owed to Seller by Purchaser, and is a final, complete and exclusive statement of the agreement between Seller and Purchaser. THERE ARE NO ORAL UNDERSTANDINGS, REPRESENTATIONS OR WARRANTIES AFFECTING IT. EXECUTION OF THIS CONTRACT BY PURCHASER IS AN ACKNOWLEDGEMENT THAT NO REPRESENTATIONS NOT SET FORTH IN WRITING HEREIN HAVE BEEN MADE OR RELIED UPON BY PURCHASER.
        (b) Purchaser shall provide Seller no less than sixty (60) days prior written notice of any change in the name or legal form of Purchaser.

30.  Damages.   NO CLAIM SHALL BE MADE UNDER THIS CONTRACT FOR SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, EXCEPT AS PROVIDED OTHERWISE BY LAW.

31.  Commencement.  This Contract or any modification thereof shall not be binding upon Seller until signed on its behalf by an authorized representative of Seller.  Commencement of performance hereunder prior to signing as above stipulated in no case shall be construed as a waiver by Seller of this requirement.

32.  Survivorship.  To the extent, but only to the extent, that any provision of state law requires Seller to permit the succession of the rights and obligations hereunder to a designated family member of Purchaser upon Purchaser's death, such provision is incorporated herein by reference.  In the absence of such provision, this Contract shall terminate upon the death of the Purchaser, if the Purchaser is a natural person, or upon the death of the person who is the sole owner of the Purchaser, if Purchaser is a business entity.

33.  Joint and Several Obligations.  All acknowledgments, representations, warranties, debts, and obligations of performance of Purchaser under this Contract are made, and binding on, all those signing this Contract jointly and severally as the Purchaser.  Notwithstanding the foregoing, if Purchaser is an entity, each Owner (as defined in the Key Person Rider) and Key Person's liability under this Contract shall be joint and several.

34.  Seller's Equitable Remedies/Attorneys' Fees.
        (a) Purchaser agrees that money damages may not be a sufficient remedy for the breach of this Contract and that, therefore, in addition to all remedies available at law, Seller shall be entitled to specific performance, injunctive relief, declaratory judgment and/or other equitable remedies, as appropriate.
        (b) To the fullest extent permitted by law, the prevailing party shall be entitled to all attorneys' fees, costs of suit and reasonable expenses incurred in order to secure, defend or protect the rights inuring to the prevailing party under this Contract, or to enforce the terms thereof, in addition to any other relief to which the prevailing party may be entitled.
        (c) Seller's termination of this Contract shall not prejudice Seller's right to seek monetary damages or equitable relief against Purchaser.

35.  Miscellaneous.
        (a) Purchaser represents and warrants to Seller that:
            (i)      the Premises is subject to an Underlying Lease that will expire by its own terms on October 31, 2023 ("Lease Expiration Date"), and Purchaser has no right under the Underlying Lease to unilaterally renew or otherwise extend the Underlying Lease; and
            (ii)     As of the commencement of the Term, Purchaser has, pursuant to the Underlying Lease (as defined in subparagraph (b) below), all rights and interests in the Premises until the Lease Expiration Date, including the right to remain in possession of the Premises during the Term to allow:  (A) Purchaser to perform its obligations under this Contract and any related or

Case 1:23-cv-00284   Document 1-9   Filed 12/04/23   Page 14 of 60   PageID #: 230

supplemental agreements; and (B) Seller to exercise its rights and remedies under this Contract and any related or supplemental agreements.

(b) Without limiting the terms contained in paragraph 35(a) herein above, if the Premises is subject to an underlying lease or leases, Purchaser:

(i) further represents and warrants that Purchaser is not in violation or breach of any provision of the lease or leases;

(ii) shall keep the lease or leases in effect and good standing during the Term; and

(iii) shall obtain all consents, approvals or licenses requested by Seller to exercise any of Seller's rights or remedies under this Contract or any related or supplemental agreements, including rights of entry or access to recover Seller's or Supplier's signs and equipment.

(c) Purchaser shall keep the Premises free from all liens and encumbrances that may adversely affect:

(i) Purchaser's ability to effectively operate its businesses at the Premises;

(ii) Purchaser's ability to perform its obligations under this Contract or any related or supplemental agreements; or

(iii) Seller's ability to exercise its rights and remedies under this Contract or any related or supplemental agreements.

36. <u>Further Assurances</u>. Purchaser shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder and to carry out the intent of this Contract.

37. <u>Governing Law</u>. This Contract shall be governed by and construed in accordance with the laws of the State of Tennessee and controlling U.S. federal law, except for any rule of court or law of said state which would make the law of any other jurisdiction applicable.

38. <u>Attachments</u>. All exhibits, schedules, riders, and documents attached hereto, including the Card Guide (collectively, "Attachments"), are hereby incorporated herein and made a part of this Contract.

**SELLER: Mac's Convenience Stores LLC**

By: _Matt McCure_
B95B02F7806148C
Matt McCure

Title: Vice President

Witness: _Ken Langster_
FA17B1DE22D44E4

Date: 3/24/2017 | 12:51 MST

**PURCHASER: Paradise Petroleum LLC**

By: _Mehul Shah_
35F95D97B0974AE
Mehul Shah

Title: Managing Member

Date: 3/24/2017 | 06:48 MST

Case 1:23-cv-00284   Document 1-9   Filed 12/04/23   Page 15 of 60   PageID #: 231

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

## AMENDMENT TO COMPLETE CONTRACT OF SALE (BRANDED-RESELLER)

This Amendment to the Complete Contract of Sale (Branded-Reseller) ("Amendment") by and between **MAC'S CONVENIENCE STORES LLC** with a business address of 4080 West Jonathan Moore Pike, Columbus, Indiana 47201 ("Seller") and **PARADISE PETROLEUM LLC** ("Purchaser") having a place of business at 4858 Highway 58, Chattanooga, Tennessee 37416.

### WITNESSETH:

WHEREAS, Purchaser operates a retail motor fuel and convenience store business at the premises located at 2300 Jenkins Road, Chattanooga, Tennessee 37421 (the "Premises"); and

WHEREAS, the Seller and Purchaser are parties to a **Complete Contract of Sale** (Branded-Reseller) with a commencement date of April 1, 2017 (the "Contract") that provides, in part, that Seller shall deliver and sell to Purchaser, and Purchaser shall accept and pay for, BP branded motor fuel products, for Purchaser's resale to the general motoring public at the Premises; and

WHEREAS, Seller and Purchaser desire to Amend the Contract as set forth herein below as an inducement to the purchase of the package of fifteen (15) stations from Circle K Stores, Inc.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which the parties hereto acknowledge the Seller and Purchaser hereby agree as follows:

1.   The Complete Contract of Sale shall be amended as follows:

   a.   Section 1. <u>Duration</u> (c) Seller and Purchaser shall both have the right to terminate the month-to-month term.

   b.   Section 7. <u>Credit</u> (c) any changes to the credit shall be made in a commercially reasonable manner.

   c.   Section 23. <u>Termination</u> (b) this paragraph shall be deleted.

   d.   Section 23. <u>Termination</u> (i) shall be deleted and replaced as follows:

      i.   Notwithstanding any provision herein to the contrary, this Contract shall terminate on the Lease Expiration Date (as defined in paragraph 35) if Purchaser fails to secure all rights and interests in the Premises described in paragraph 35(b)(ii) below; provided, however, that the Contract shall not terminate in the event the Underlying Lease is assigned under the terms of the Sublease and Purchaser continues to occupy the Premises and operate the Business thereon. In the event this Contract is terminated pursuant to this paragraph 23(i), then so long as Purchaser has not breached its covenant set forth in paragraph 35(b)(ii) below, Purchaser shall not be liable to Seller for damages for any lost income, profits or liquidated damages, and the provisions of paragraph 23(h) above shall not apply.

e. Section 35. <u>Miscellaneous</u> (b) shall be deleted and replaced as follows:

(b) Without limiting the terms contained in paragraph 35(a) herein above, if the Premises is subject to an underlying lease or leases, Purchaser:

(i) further represents and warrants that Purchaser is not in violation or breach of any provision of the Underlying Lease or lease;

(ii) shall not perform any action or fail to perform any action necessary to keep the lease or Underlying Lease in effect and good standing during the term of the Underlying Lease or lease; and

(iii) shall obtain all consents, approvals or licenses requested by Seller to exercise any of Seller's rights or remedies under this Contract or any related or supplemental agreements, including rights of entry or access to recover Seller's or Supplier's signs and equipment.

f. Section 35. Miscellaneous (c) shall be deleted and replaced as follows:

(c) Purchaser shall keep the Premises free from all liens and encumbrances caused by Purchaser that may adversely affect:

(i) Purchaser's ability to effectively operate its business at the Premises;

(ii) Purchaser's ability to perform its obligations under this Contract or any related supplemental agreements; or

(iii) Seller's ability to exercise its rights and remedies under this Contractor any related supplemental agreements.

2. The Incentive and Amortization Agreement shall be amended as follows:

a. Section 2. Repayment of Incentive Amounts (c) (vii) shall be deleted and replaced as follows:

i. Purchaser assigns or transfers its rights or interests, or any portion thereof, in this Agreement, the Complete Contract of Sale, Purchaser's ownership interest in or Purchaser's lease of the Premises without the prior written consent of the Seller;

3. The Security Agreement shall be amended as follows:

a. Section 6. shall be deleted and replaced as follows:

i. Debtor shall not sell or assign, or offer to sell, assign or otherwise transfer the Collateral, or any interest therein, without the prior written consent of the Secured Party, with the exception of the sale inventory in the normal course of business. Debtor will, at all times, maintain, preserve and keep the Collateral in good repair, working order and condition and will not commit or suffer any waste thereof, reasonable wear and tear excepted.

4. There are no other modifications, amendments or alterations to the Contract. If any provision or term of this Amendment conflicts with or contradicts any provision or term of the Contract, the provision or term of this Amendment shall govern.

5.      The parties hereto agree further that the Amendment herein of the Contract and all ancillary documents, agreements and addendums thereto does not create a new franchise for purposes of the PMPA.

Executed this day ___3/24/2017 | 06:48 MST___

**SELLER:**                                          **PURCHASER:**
**MAC'S CONVENIENCE STORES LLC**         **PARADISE PETROLEUM LLC**

By:  _Matt McCure_                          By:  _Mehul Shah_
      B95B02F7806448C                            35F05D97B0B74AE
      Matt McCure                                 Mehul Shah

Title:   Vice President                     Title:   Managing Member

Witness:  _Ken Langston_
        EA17B1DF22D44E4

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

## SCHEDULE OF SELLER'S EQUIPMENT
## ATTACHMENT
## TO COMPLETE CONTRACT OF SALE

The following items are property of the Seller and are subject to the rights and limitations set forth in the Complete Contract of Sale:

All BP image
High Rise sign faces
BP MID, sign faces, and goal posts
Canopy sign faces and Channel Letters
Building Mounted Legends
ATG communication equipment
Communication equipment required for monitoring inventory via the ATG

Title to such items shall at all times remain with Seller. This Attachment is not to be deemed exclusive per se and may be amended by mutual acknowledgement of the parties.

Rev July 2016

DEPARTMENT OF ENERGY

**Revised Summary of Title I of the Petroleum Marketing Practices Act**
(Extracted from the Federal Register, Vol. 61, No. 123, Tuesday, June 25, 1996, 32786-32790)
AGENCY: Department of Energy.

ACTION: Notice.

--------------------------------------------------------------------

SUMMARY: This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

FOR FURTHER INFORMATION CONTACT: Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-6978.

SUPPLEMENTARY INFORMATION: Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. Secs. 2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the Federal Register on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to ``company'' operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780.

Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchise-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C. Sections. 2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term ``franchise'' is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act. Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located. Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the headings "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. Secs. 2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

C. Mutual Agreement To Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. Sec. 2802(b)(E).

E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

## II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

### A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

### B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

### C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

### D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

## III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

### A. How Much Notice Is Required

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

### B. Manner and Contents of Notice

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:

(1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;

(2) The date the termination or non-renewal takes effect; and

(3) A copy of this summary.

## IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

### A. Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

### B. Interim Franchises

3

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading ``Notice Requirements for Termination or Nonrenewal.''

V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. Sections 2801-2806.

VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

Further Discussion of Title I--Definitions and Legal Remedies

I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

A. Franchise

A ``franchise'' is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.  The term ``franchise'' includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

B. Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

C. Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

E. Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

G. Fail to Renew and Nonrenewal

4

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

C. Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

D. Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

E. Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:
    (1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
    (2) To materially alter, add to, or replace such premises;
    (3) To sell such premises;
    (4) To withdraw from marketing activities in the geographic area in which such premises are located; or
    (5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.
Marc W. Chupka,
Acting Assistant Secretary for Policy.
[FR Doc. 96-16124 Filed 6-24-96; 8:45 am]

13.7 Summary Statement of PMPA Rights/BMA Contract Package 5.0

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

**2007 PMPA AMENDMENT**

15 U.S.C. § 2807.    Prohibition on restriction of installation of renewable fuel pumps.

**(a) Definition**
In this section:

(1) Renewable fuel
   The term "renewable fuel" means any fuel-

      (A) at least 85 percent of the volume of which consists of ethanol; or

      (B) any mixture of biodiesel and diesel or renewable diesel (as defined in regulations adopted pursuant to section 7545(o) of Title 42 (40 CFR, part 80)), determined without regard to any use of kerosene and containing at least 20 percent biodiesel or renewable diesel

(2) Franchise-related document
   The term "franchise-related document" means-

      (A) a franchise under this Chapter; and

      (B) any other contract or directive of a franchisor relating to terms or conditions of the sale of fuel by a franchisee

**(b) Prohibitions**

(1) In general

   No franchise-related document entered into or renewed on or after December 19, 2007, shall contain any provision allowing a franchisor to restrict the franchisee or any affiliate of the franchisee from-

      (A) installing on the marketing premises of the franchisee a renewable fuel pump or tank, except that the franchisee's franchisor may restrict the installation of a tank on leased marketing premises of such franchisor;

      (B) converting an existing tank or pump on the marketing premises of the franchisee for renewable fuel use, no long as such tank or pump and the piping connecting them are either warranted by the manufacturer or certified by a recognized standards setting organization to be suitable for use with such renewable fuel;

      (C) advertising (including through the use of signage) the sale of any renewable fuel;

      (D) selling renewable fuel in any specified area on the marketing premises of the franchisee (including any area in which a name or logo of a franchisor or any other entity appears);

      (E) purchasing renewable fuel from sources other than the franchisor if the franchisor does not offer its own renewable fuel for sale by the franchisee;

      (F) listing renewable fuel availability or prices, including on service station signs, fuel dispensers, or light poles; **or**

      (G) allowing for payment of renewable fuel with a credit card,

so long as such activities described in subparagraphs (A) through (G) do not constitute mislabeling, misbranding, willful adulteration, or other trademark violations by the franchisee

(2) Effect of provision

   Nothing in this section shall be construed to preclude a franchisor from requiring the franchisee to obtain reasonable indemnification and insurance policies

**(c) Exception to 3-grade requirement**

   No franchise-related document that requires that 3 grades of gasoline be sold by the applicable franchisee shall prevent the franchisee from selling a renewable fuel in lieu of 1, and only 1, grade of gasoline.

**Revised Summary of Title I of the Petroleum Marketing Practices Act (PMPA)**

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

## COMMODITY SCHEDULE (MOTOR FUEL SALES TO PURCHASER)

PURCHASER: Paradise Petroleum LLC       FACILITY # 3781
DELIVERY POINT: 2300 Jenkins Road, Chattanooga, Tennessee 37421
PRODUCT: Gasoline       GRADE: 87, 89, 91

      This Commodity Schedule is attached to, and made a part of, a certain Complete Contract of Sale (Branded-Reseller) (the "Contract") between Purchaser and Seller dated April 1, 2017. Unless otherwise indicated, the capitalized terms used in this Commodity Schedule shall have the same meaning used in the Contract.

1. Quantity. Except as otherwise provided in the Contract, the quantity of gasoline covered by this Commodity Schedule shall be all Purchaser's requirements, but in no case less than a minimum of 8,850,000 gallons from April 1, 2017 to March 31, 2027, in calendar monthly (January through December) and annual minimum and maximum quantities hereinafter specified.

      Monthly Quantity: Minimum 73,750 gallons and Maximum 110,625 gallons.

      Annual Quantity: Minimum 885,000 gallons and Maximum 1,327,500 gallons.

2.    Delivery. Where delivery is made to Purchaser's business location, delivery shall be complete on unloading of the tank wagon or transport truck. Where delivery is made into equipment furnished by Purchaser, delivery shall be complete at the point of loading of such equipment.

3.    Title. Title to product covered under the Contract shall pass to Purchaser upon delivery of product.

4.    Risk of Loss. Risk of loss of product shall pass to Purchaser upon delivery of product.

5.    Inspection. Purchaser shall have the right, at its expense, to have an inspection made at delivery point, provided such inspection shall not delay shipment. Should Purchaser fail to make inspection, it shall accept Seller's inspection and measurement.

6.    Price. The Seller's price per gallon to be paid by Purchaser shall be the Supplier's posted per gallon terminal price in effect at the time loading commences, plus all applicable taxes and all fees, plus State loading and environmental fees, if any, plus the cost of transportation, plus **$0.01** per gallon. The Seller's price per gallon is based upon the delivery of a full transport truckload of product. Delivery of a quantity of product less than a full transport truckload shall be subject to an additional delivery charge. All prices charged by Seller are subject to the provisions of applicable law.

**ACCEPTED:**                    **ACCEPTED:**

**SELLER: Mac's Convenience Stores LLC**      **PURCHASER: Paradise Petroleum LLC**

By: _Matt McCure_                  By: _Mehul Shah_
      Matt McCure                        Mehul Shah

Title: Vice President                  Title: Managing Member

Witness: _Ken Langston_                Date: 3/24/2017 | 06:48 MST

Date: 3/24/2017 | 12:51 MST

Rev July 2016

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

# FIRST RIGHT OF REFUSAL ADDENDUM

This First Right Of Refusal Addendum ("**Addendum**") is attached to and is part of that certain Complete Contract of Sale, dated April 1, 2017 ("**Contract**") by and between Paradise Petroleum LLC, ("**Dealer**"), and Mac's Convenience Stores LLC ("**Marketer**"). Any undefined term used herein shall have the meaning as set forth in the Contract to which this Addendum is attached.

1.      Grant of First Right of Refusal. Dealer hereby grants to Marketer, and its successors and assigns, a right of first refusal ("**Right of First Refusal**") to purchase the Property (as defined below) on the terms and conditions set forth in this Addendum. For purposes of this Addendum, "**Property**" means any and all assets of Dealer, in whatever form, tangible or intangible, that now or in the future constitute, or that Dealer uses now or in the future in the operation of, Dealer's Station, including without limitation, all of Dealer's right, title and interest, whenever or however acquired, whether fee title, a leasehold, or other interest or right, in and to the real property situated at 2300 Jenkins Road, Chattanooga, in the County of Hamilton, State of Tennessee, all improvements, including buildings, structures, and fixtures, now or in the future on, in or under such real property, and all of Dealer's right, title and interest in and to all equipment, fixtures, and personal property at Dealer's Station. As used in this Addendum, Dealer's personal property includes all contracts and leases to which Dealer is a party that relate to the Dealer's Station, including without limitation the Contract and names, goodwill, business operations and other intangibles use in or related to Dealer's Station.

2.      Rights Period. All rights granted to Marketer and all obligations of Dealer in this Addendum are binding on any successors or assigns of Dealer, run with the land, are not personal to either Dealer or Marketer, and shall survive any future transfer of the Property to any party, entity, or person other than Marketer, or any future assignment of the Agreement by Marketer. The rights granted in this Addendum shall continue until the later of the expiration of the Contract to which this Addendum is attached, or the expiration of any renewal or extension thereof (the "**Rights Period**").

3.      Offer to Purchase or Transfer Interest; Notice. The Right of First Refusal shall not apply to sales of Products, merchandise, and other inventory at the Dealer's Station and disposal/sale of obsolete equipment in the normal course of business. Subject to the preceding sentence, Marketer's rights hereunder are triggered by any Offer (as defined below) for any of the Property, whether the Offer is for some or all of the real property only, some or all of the equipment, fixtures, and personal property only, or some combination thereof. If at any time within the Rights Period, Dealer receives from a third party ("**Offer**") a bona fide written offer ("**Offer**") to purchase or otherwise transfer all or any portion of Dealer's right, title and interest in the Property (the "**Interest**") that Dealer wants to accept, then Dealer shall immediately notify Marketer in writing (the "**Offer Notice**") of the terms of the Offer. The Offer Notice shall include a complete copy of the proposed or executed written agreement or other documents embodying the Offer that contain all of the terms and conditions between the Dealer and Offeror, with no material terms yet to be negotiated, together with copies of all information regarding the Property and the Interest that Dealer has supplied to Offeror. Dealer shall represent and warrant the accuracy and completeness of the information set forth in the Offer Notice and other documents submitted to Marketer. The term "transfer" includes a sale, lease, gift, or other transfer of possession, ownership, or control.

4.      Exercise of Right; Completion of Transaction. Marketer may exercise its Right of First Refusal and acquire the Interest at the price and on the terms contained in the Offer, as such terms may be adjusted as set forth in Section 5 below, by providing written notice to Dealer of Marketer's exercise ("**Exercise Notice**") by no later than forty five (45) days after Marketer's receipt of the Offer Notice required in Section 3 above. If Marketer exercises its Right of First Refusal, the closing shall be completed within sixty (60) days after Marketer's delivery of its Exercise Notice, or at such later date as may be specified in the Offer, and otherwise in accordance with the terms of the Offer. Regardless of the terms of the Offer, Dealer shall deliver to Marketer title to the Interest free from all encumbrances and claims of creditors and with lease payments under any real or

**FIRST RIGHT OF REFUSAL ADDENDUM**
**Rev. July 2016**

personal property lease paid in full through the date of closing. Dealer shall cooperate and promptly undertake such action as may be requested by Marketer to transfer any applicable permits, leases, or other rights to Marketer. In the absence of anything to the contrary contained in the Offer, (i) Dealer represents and warrants to Marketer that the transfer of the Interest does not include any of the liabilities associated therewith, and (ii) Dealer shall indemnify, defend and hold harmless Marketer from and against all claims resulting from or relating to the operations at the Property prior to closing, including but not limited to environmental contamination on the Property prior to the conveyance of the Interest to Marketer.

5.     Terms. If the terms of the Offer provide for consideration for the purchase or transfer of the Interest other than the payment of cash at closing/acquisition, and/or the purchase of real or personal property other than the Property ("**Unrelated Property**"), then the provisions of this Section 5 shall apply to all such terms in the Offer for the purposes of determining the consideration Marketer shall pay to Dealer for the Interest should Marketer exercise its Right of First Refusal.

a.     Marketer shall have no obligation to purchase any Unrelated Property included in the Offer, and, regardless of any allocation in the Offer of the purchase price or other consideration to the Unrelated Property, the fair market value of any Unrelated Property included in the Offer shall be disregarded when determining the consideration Marketer shall pay Dealer for the Interest. Dealer shall bear all costs and expenses required to determine the fair market value of any Unrelated Property included in the Offer.

b.     If the consideration payable to Dealer under the Offer includes any post-transfer consulting, non-compete, or employment agreement for Dealer or any of Dealer's owners, directors, officers, or employees, those agreements and any value thereof shall be disregarded when determining the consideration Marketer shall pay Dealer for the Interest. Dealer shall bear all costs and expenses required to determine the fair market value of any agreement noted herein and included in the Offer.

c.     If the Offer provides for payment of the purchase price or any portion thereof over any period of time after the transfer, then Marketer may pay in cash at closing the full present value of such post-transfer payments, using the interest rate specified in the Offer as the discount rate for computing the present value of such payments, or, if no interest rate is specified therein, then using a discount rate equal to the then-current prime rate of Bank of America, N.T. & S.A., at San Francisco, California.

d.     If the Offer includes as consideration for the Interest an exchange of other real or personal property interests of Offeror, this shall be deemed to constitute an offer to purchase the Interest for a price equal to the fair market value of the real or personal property offered in exchange (the "**Exchange Property**") (plus any other consideration provided for in the Offer). Marketer is not obligated to accept the Dealer's and Offeror's agreed-upon value of any Exchange Property as may be specified in the Offer and may demand a determination by a neutral third party appraiser of the fair market value of the Exchange Property. Dealer shall bear all costs and expenses required to determine the fair market value of any Exchange Property included in the Offer.

6.     Assessment of Property Condition. During the forty five (45) day period following Marketer's receipt of the Offer Notice, Marketer may enter the Property to inspect, test, and otherwise make an assessment of the condition of the Property, including without limitation the environmental and/or geological condition thereof and Dealer hereby grants Marketer a limited license to enter the Property for such purposes; provided that any such inspection, testing, and assessment shall be made in a manner so as to minimize interference with normal operations on the Property. Marketer's rights under this Section 6 include the right to undertake any testing, surveying, drilling or other analysis, including subsurface testing of the Property. Marketer shall indemnify, defend and hold harmless Dealer against any personal injury or property damage caused by Marketer or its contractors or employees in making any such inspections, testing, or assessment; provided, however, that in no event shall Marketer have any liability to Dealer as a result of any condition of the Property discovered by

Marketer during its inspections, testing and assessments, or as a result of any statement in any report or other written statement or oral communication regarding the Property; and provided further that in no event shall Marketer have any liability to Dealer for any lost profits or business interruption suffered by Dealer during, or as result of, any inspection, testing, or other assessment of the Property conducted by Marketer.

       7.     Completion of Transfer.  If Marketer does not exercise its Right of First Refusal, then Dealer may, at any time within six (6) months after the expiration of such 45-day period, transfer the Interest that was the subject of the Offer, but only to the original Offeror and only upon the terms in the Offer Notice.  If, after the delivery to Marketer of the Offer Notice, there are any changes in the Offer, or if the transfer is not consummated in the time period provided in this Section 7, and, under any circumstances, with respect to any portion of the Property that is not included in the Offer, Marketer's Right of First Refusal shall continue in existence and Dealer must comply fully and anew with its notice and other obligations as set forth in this Addendum with respect to any changes in the Offer, any transfer not timely consummated, and any transfer of any portion of the Property not included in the Offer.

**ACCEPTED:**

**MARKETER:  Mac's Convenience Stores LLC**

By: _Matt McCure_
       Matt McCure

Title: Vice President

Witness: _Ken Langston_

Date: 3/24/2017 | 12:51 MST

**ACCEPTED:**

**DEALER: Paradise Petroleum LLC**

By: _Mehul Shah_
       Mehul Shah

Title: Managing Member

Date: 3/24/2017 | 06:48 MST

**Facility # 3781**

## INCENTIVE AND AMORTIZATION AGREEMENT

This Incentive and Amortization Agreement (the "Agreement") is made and entered into as of April 1, 2017, (the "Effective Date") between **MAC'S CONVENIENCE STORES LLC** ("Seller"), with a business address of 4080 West Jonathan Moore Pike, Columbus, Indiana 47201, and **PARADISE PETROLEUM LLC** ("Purchaser"), with a business address of 4858 Highway 58, Chattanooga, Tennessee 37416, and provides as follows:

WHEREAS, Seller and Purchaser desire to enter a contract of sale concurrently herewith (the "Complete Contract of Sale"), the terms of which provide, among other things, that Seller shall deliver and sell to Purchaser, and Purchaser shall accept from Seller, and pay Seller for, branded motor fuel for resale to the general motoring public from the premises described more fully in said Complete Contract of Sale (the "Premises"); and

WHEREAS, Purchaser desires to receive from Seller, and Seller is willing to pay Purchaser, certain incentive amounts pursuant to the terms and conditions contained herein below as an inducement to enter the Complete Contract of Sale and/or bring the Premises into compliance with Supplier's Brand Standards and/or promote the sale of motor fuels under the Proprietary Marks at the Premises; and

NOW THEREFORE, for good and valuable consideration, the receipt of which Seller and Purchaser hereby acknowledge, the parties agree as follows:

1.    INCENTIVE AMOUNTS.  Seller agrees to pay unto Purchaser those incentive amounts, and only those incentive amounts, for which both Seller and Purchaser have initialed the spaces therefore provided below, each of which shall be subject to the following applicable terms and conditions:

(a)    Competitive Allowance.  The terms of this paragraph 1(a) shall apply only if the following blanks are initialed by both Seller and Purchaser:

_____*mm*_____                          _____MS_____
Seller's Initials                          Purchaser's Initials

(i)    By their initials in the space provided above for application of this paragraph 1(a) and their execution of this Agreement, Seller and Purchaser agree as follows.  Seller agrees to pay unto Purchaser the competitive allowance specified in the Incentive Amounts Schedule, attached hereto and made a part hereof, for each gallon of product purchased from Seller under the Complete Contract of Sale (said competitive allowance referred to herein as the "Competitive Allowance").

(ii)    Seller agrees to pay unto Purchaser the amount equal to the Competitive Allowance set forth in the Incentive Amounts Schedule, provided that, as of the time each such payment is due from Seller to Purchaser as set forth in the Incentive Amounts Schedule, Purchaser has satisfied those conditions contained in paragraph 1(c) and in the Incentive Amounts Schedule.

(iii)    Seller may, at any time, in its sole discretion and upon thirty (30) days prior written notice, modify the Competitive Allowance amount payable hereunder or terminate the obligation to make any further Competitive Allowance payment to Purchaser without any liability to Purchaser;

(b)    Conversion Amount.  The terms of this paragraph 1(b) shall apply only if the following blanks are initialed by both Seller and Purchaser:

_____N/A_____                          _____N/A_____
Seller's Initials                          Purchaser's Initials

(i)    By their initials in the space provided above for application of this paragraph 1(b) and their execution of this Agreement, Seller and Purchaser agree as follows.  Seller agrees to loan Purchaser the "Conversion Amount" as defined in subparagraph (ii) below.  Purchaser desires for Seller to convert the Premises to Supplier's requirements for marketing motor fuel under the Proprietary Marks, including Supplier's Brand Standards

INCENTIVE AND AMORTIZATION
Rev. July 2016

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

(such conversion hereinafter referred to as the "Conversion"). The "Conversion" shall include Seller's implementation, installation, and performance of the items set forth in the Conversion/Improvements Schedule attached hereto and incorporated herein.

(ii)     Seller agrees to loan Purchaser: (A) a conversion amount equal to the Conversion Amount set forth in the Incentive Amounts Schedule (said amount is the "Conversion Amount"), which Conversion Amount shall be expended for the sole purpose of implementing the Conversion. Seller shall have no obligation to loan Purchaser the Conversion Amount unless and until all of the following conditions have been met: (Y) Purchaser's execution and delivery to Seller of (1) a promissory note in substantially the form attached hereto as Exhibit A and incorporated herein, in a principal amount equal to the Conversion/Improvement Amount ("Note"), and (2) all of the Security required under paragraph 3 below and set forth in Exhibit B; and (B) Purchaser's satisfaction of all of the conditions contained in paragraph 1(c) below. As used herein, "Disbursement Date" means the date on which Seller confirms Purchaser's satisfaction of all of the foregoing conditions, which shall be recorded by Seller in the Incentive Amounts Schedule.

(iii)     In light of Seller's familiarity with Supplier's Brand Standards, Purchaser desires for Seller to implement the Conversion on behalf of Purchaser using solely the Conversion Amount loaned by Seller to Purchaser. Accordingly, Purchaser shall cooperate with Seller in order for Seller to obtain all approvals, permits, licenses, entitlements, and consents required to make the Conversion. Purchaser acknowledges and agrees the Conversion may disrupt business operations and/or require Purchaser to temporarily cease operations at the Premises for one (1) or more days, in whole or in part.

(iv)     Seller shall expend the Conversion Amount solely for the purposes of constructing, installing and performing the Conversion. On or promptly after the applicable Disbursement Date, Seller and/or its third-party contractors will commence the Conversion and complete the Conversion within the timeframe established by Seller. Notwithstanding the foregoing, Seller reserves the right not to install or to delay the Conversion if local, state, and/or other governmental restrictions would make the installation cost or conditions impractical in light of the Conversion Amount, as determined by Seller in its sole discretion. Seller shall promptly notify Purchaser in writing of the date that the Conversion has/have been completed ("Completion Date").

(c)     Improvement Amount. The terms of this paragraph 1(b) shall apply only if the following blanks are initialed by both Seller and Purchaser:

_____*mm*_____          _____MS_____
Seller's Initials                    Purchaser's Initials

(i)     By their initials in the space provided above for application of this paragraph 1(b) and their execution of this Agreement, Seller and Purchaser agree as follows. Seller agrees to loan Purchaser the "Improvement Amount" as defined in subparagraph (ii) below. Purchaser desires to make certain improvements at the Premises set forth more fully in the Conversion/Improvements Schedule attached hereto and made a part hereof (the "Improvements"). The "Improvements" shall include, without limitation, the implementation, installation, and performance of the items set forth in the Conversion/Improvements Schedule attached hereto and incorporated herein.

(ii)     Seller agrees to loan Purchaser: (A) an improvement amount equal to the Improvement Amount set forth in the Incentive Amounts Schedule (said amount is the "Improvement Amount") for the sole purposes of constructing, installing and implementing the Improvements, provided that the Improvements conform with Supplier's Brand Standards. Seller's obligation to disburse unto Purchaser the Improvement Amount is conditioned upon Purchaser's satisfaction, at the time such disbursement is due by Seller to Purchaser as set forth in the Incentive Amounts Schedule, of all of the following conditions and the conditions contained in paragraph 1(c) below:

(A)     Purchaser shall have obtained, and provided to Seller written verification reasonably satisfactory to Seller that Purchaser has obtained, all approvals, permits, licenses, entitlements, and consents required to make the Improvements.

(B)     Purchaser shall have duly executed and delivered to Seller (1) a promissory note in substantially the form attached hereto as Exhibit A and incorporated herein, in a principal amount equal to the Conversion/Improvement Amount ("Note"), and (2) all of the Security required under paragraph 3 below and set forth in

INCENTIVE AND AMORTIZATION                    2
Rev. July 2016

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

Exhibit B.

(C)     Purchaser shall have provided Seller with reasonable proof the Purchaser has entered into all agreements using only Seller approved contractors and other third parties necessary for Purchaser to construct and install and/or make, at Purchaser's sole expense, the Improvements set forth in the Conversion/Improvements Schedule.

(D)     Purchaser shall expend the Improvement Amount solely for the purposes of constructing, installing and implementing the Improvements and/or performing the Improvements. Upon demand by Seller, Purchaser shall provide any documentation reasonably required by Seller to substantiate the expenditure of the Improvement Amount for the purposes herein stated, including, without limitation, proof of payment for third-party invoices and related lien releases for work and materials for the Improvements.

(iii)     **Purchaser shall complete the Improvements to the reasonable satisfaction of Seller and Supplier no later than August 31, 2017 (the "Completion Deadline").** Within ten (10) days after Purchaser's completion of the Improvements and/or Conversion, but in no event later than the Completion Deadline, Purchaser shall request Seller's inspection and approval of the Improvements. Upon Seller's verification that the Improvements have been constructed in conformance and in compliance with Supplier's Brand Standards, Seller shall notify Purchaser in writing of Seller's approval thereof.

(iv)     Seller shall notify Purchaser in writing of any failure(s) of the Improvements to comply with Supplier's Brand Standards (a "Non-Compliance Notice") and Purchaser shall, within Thirty ( 30 ) days after its receipt of Seller's Non-Compliance Notice: (A) perform any work and/or any additional construction, installation, or modification necessary to remedy the non-compliance identified in Seller's Non-Compliance Notice and to bring the Improvements into compliance with Supplier's Brand Standards and (B) request that Seller re-inspect the Improvements. If, Purchaser fails to meet the Completion Deadline, does not timely remedy all of the failures identified in Seller's Non-Compliance Notice, or has otherwise not timely and properly completed the Improvements and/or Conversion so that they meet all of Supplier's Brand Standards, then the Total Unforgiven Repayment (as defined in paragraph 2(c) below) shall become immediately due and payable, in full, to Seller, as further set forth in paragraph 2 below. Seller's inspections and notices to Purchaser hereunder shall be limited to Seller's verification that the Improvements comply with Supplier's Brand Standards and Purchaser shall be solely responsible for, and shall indemnify, defend, and hold Seller and Seller's employees, agents and representatives harmless pursuant to paragraph 1(d) below, with respect to any claim with respect to, the compliance of the Improvements with all applicable laws, regulations, ordinances, codes, approvals, permits, licenses, entitlements, and consents.

(d)     Additional Conditions. The following are additional conditions for Seller's obligation to pay unto Purchaser, and Purchaser's right to receive, the Competitive Allowance, and for Seller's obligation to lend to Purchaser, and Purchaser's right to receive the benefit of, the Conversion/Improvement Amount. Purchaser's breach of or failure to satisfy any of the following conditions after the Disbursement Date shall constitute an Acceleration Event (as defined in paragraph 2(c) below):

(i)     The Premises shall be approved by Supplier for marketing motor fuel under the Proprietary Marks.

(ii)     The Complete Contract of Sale must be current (unexpired) and in effect.

(iii)     Purchaser shall have, at all times during the term of the Complete Contract of Sale, purchased motor fuel products for resale at the Premises exclusively from Seller in no less than the minimum volumes set forth in the Complete Contract of Sale.

(iv)     Purchaser shall not be in default of any provision of this Agreement, the Complete Contract of Sale, the Security, or any other related or supplemental agreement with Seller including, without limitation, any provision therein requiring timely payment to Seller.

(v)     Purchaser shall comply, and cause the Premises to comply, with Supplier's Brand Standards throughout the term of this Agreement; provided, however, that with respect to Conversion/Improvement Amount, this obligation shall only apply after Seller has approved the Improvements and/or Conversion as complying with Supplier's Brand Standards pursuant to paragraph 1(b) above.

(vi)     Purchaser shall pay when due all income and other tax, if any, associated with the Competitive Allowance payments and/or the loan of the Conversion/Improvement Amount under this Agreement.

Case 1:23-cv-00284   Document 1-9   Filed 12/04/23   Page 32 of 60   PageID #: 248

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

(e)    Indemnity.  SELLER, SUPPLIER, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS AND REPRESENTATIVES ("SELLER INDEMNIFIED PARTIES"), SHALL NOT BE LIABLE FOR ANY LOSS, DAMAGE, INJURIES, OR ANY CASUALTY OF WHATSOEVER KIND OR BY WHOMEVER CAUSED, TO PERSON OR PROPERTY OF ANYONE (INCLUDING PURCHASER) ON OR OFF THE PREMISES, ARISING OUT OF, RESULTING FROM, OR CONNECTED WITH (I) THE BREACH OF THIS AGREEMENT AND/OR THE COMPLETE CONTRACT OF SALE BY PURCHASER, (II) THE VIOLATION BY PURCHASER OR ANY OTHER PERSON, OF ANY FEDERAL, STATE, OR LOCAL STATUTE, LAW, REGULATION, RULE, OR ORDINANCE, OR (III) THE CONSTRUCTION, INSTALLATION, OR OTHER SIMILAR ACTIVITY, RELATED TO THE IMAGING OR IMPROVEMENT OF THE PREMISES.  PURCHASER HEREBY AGREES TO INDEMNIFY, PROTECT, DEFEND, AND HOLD SELLER INDEMNIFIED PARTIES HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, LIABILITIES, ENVIRONMENTAL CLEANUP COSTS, FINES, PENALTIES, SUITS AND ACTIONS, JUDGMENTS AND COSTS, INCLUDING ATTORNEYS' FEES AND THE COSTS OF LITIGATION, FOR ANY SUCH LOSS, DAMAGE, INJURY, OR OTHER CASUALTY, WHETHER CAUSED BY A NEGLIGENT ACT OR OMISSION OF PURCHASER OR SELLER INDEMNIFIED PARTIES.  PURCHASER ACKNOWLEDGES AND AGREES TO PROVIDE SELLER WRITTEN ASSURANCE WITHIN TEN (10) DAYS FROM SELLER'S REQUEST FOR PURCHASER TO ACCEPT TENDER OF A CLAIM AND TO NOTIFY AND INSTRUCT PURCHASER'S INSURANCE CARRIERS THAT SELLER IS AN INDEMNIFIED PARTY.

2.    REPAYMENT OF INCENTIVE AMOUNTS.

(a)    Unless forgiven as set forth in subparagraph (b) below, Purchaser shall repay to Seller the Conversion/Improvement Amount loaned pursuant to paragraph 1(b) above, together with interest on the Conversion/Improvement Amount at the rate of NINE percent (9%) per annum, or the highest lawful rate of interest allowed under applicable law, if lower.  All interest on the Conversion/Improvement Amount shall be compounded monthly, will accrue on a monthly basis beginning on the Disbursement Date and will continue to accrue until the total principal of the Conversion/Improvement Amount is fully repaid or forgiven. Except as set forth in subparagraphs (b) and (c) below, the total principal of the Conversion/Improvement Amount as of the Disbursement Date, plus all accrued interest, shall become due in full upon the earlier of (i) the last day of the Term, or (ii) any earlier termination of this Agreement.

(b)    Notwithstanding subparagraph (a) above, the loan of the Conversion/Improvement Amount, together with any interest accrued thereon, shall be forgiven annually at the rate set forth in the Amortization Schedule of the Incentive Amounts Schedule.  The amount of the Conversion/Improvement Amount principal forgiven pursuant to this subparagraph (b) shall reduce the principal balance of the Conversion/Improvement Amount due hereunder, and the accrued interest going forward shall be calculated based on such reduced principal balance of the Conversion/Improvement Amount.  The aggregate amount of Conversion/Improvement Amount principal and interest accrued thereon that is forgiven pursuant to this subparagraph (b) at any particular time is hereinafter referred to as the "Total Forgiven Amount."

(c)    Notwithstanding anything to the contrary contained herein, in the event (i) the Purchaser purchases any motor fuel sold at the Premises from any source other than Seller; or (ii) the Purchaser discontinues actively marketing motor fuel at the Premises; or (iii) Purchaser begins selling motor fuel at the Premises under trade names or trademarks or other brand identification other than those permissible under the Complete Contract of Sale; or (iv) Purchaser fails to comply with the image, appearance, or operational standards at the Premises set forth by Seller or Supplier, including the Brand Standards, which standards may from time to time be amended or modified; or (v) Purchaser fails to comply with any provision of this Agreement, the Complete Contract of Sale, or any related agreement, note, contract, or instrument between the parties or in favor of Seller; or (vi) there ceases to be a Complete Contract of Sale in effect between Seller and Purchaser for any reason whatsoever including, without limitation, by mutual consent; or (vii) Purchaser assigns or transfers its rights or interests, or any portion thereof, in this Agreement, the Complete Contract of Sale, Purchaser's ownership interest in or Purchaser's lease of the Premises; or (viii) if the Premises is debranded for any reason whatsoever; or (ix) any representation, statement or warranty made by Purchaser to Seller in this Agreement or in connection with negotiations related to this Agreement, or in any certificate, financial statement or document delivered pursuant to this Agreement proves to be incorrect, untrue or misleading in any material respect when made or deemed made; or (x) Purchaser becomes insolvent, or admits its inability to pay its debts as they mature, or makes an assignment

for the benefit of creditors, or applies for or is subject to the appointment of a receiver or trustee for it or a substantial part of its property or business, or initiates bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for relief under any bankruptcy law, or any such proceedings are initiated against Purchaser; or (xi) any order, judgment or decree is entered against Purchaser decreeing its dissolution, or Purchaser's existence is otherwise terminated; or (xii) Purchaser fails to purchase at least seventy-five percent (75%) the minimum volume requirements set forth in the Complete Contract of Sale ("Incentive Volume") in any Contract Year (as defined in the Incentive Amounts Schedule) during the Term (any such aforementioned event is hereinafter referred to as an "Acceleration Event"), then on the date of the occurrence of an Acceleration Event ("Acceleration Date"), the parties' respective rights and obligations with respect to forgiveness of the principal balance of the Conversion/Improvement Amount and interest accrued thereon shall, at Seller's election, cease as of the Acceleration Date. Further, upon the occurrence of an Acceleration Event, the total principal of the Conversion/Improvement Amount as of the Disbursement Date and all accrued interest as of the Acceleration Date, less the Total Forgiven Amount as of the Acceleration Date ("Total Unforgiven Repayment"), shall become immediately due and payable to Seller. An Acceleration Event shall not affect any forgiveness of the Total Forgiven Amount prior to the Acceleration Date.

(d) Seller shall have all legal and equitable remedies available to Seller with respect an Acceleration Event, whether under this Agreement, the Complete Contract of Sale, the Security, or applicable law, and Seller may pursue same in any order or priority in Seller's sole discretion. Without limiting the foregoing, Seller's remedies shall include (i) the right to setoff or equitably recoup against any amount then due Purchaser under this Agreement, the Complete Contract of Sale, or any other related agreement, instrument, note, or contract between Purchaser and Seller, and (ii) the right to terminate this Agreement in its entirety, effective in Seller's sole discretion on or at anytime after the Acceleration Date, in which case the Total Unforgiven Repayment and any other amounts owed by Purchaser to Seller under this Agreement, the Complete Contract of Sale, the Security or any other any other related agreement, instrument, note, or contract between Purchaser and Seller, shall become immediately due and payable by Purchaser to Seller. Upon termination of this Agreement pursuant to this subparagraph (d), interest shall accrue on all such amounts at the rate of eighteen percent (18%) per annum, compounded monthly, or at the highest lawful rate of interest authorized under Tennessee state law, whichever amount is lower, accruing from the date Seller terminates this Agreement until paid in full.

(e) As used in this subparagraph (f), "Purchaser-Affiliated Party" means, in relation to Purchaser, (i) any entity controlled, directly or indirectly, by the Purchaser, (ii) any person or entity that controls, directly or indirectly, the Purchaser, or (iii) any entity under common control, directly or indirectly, with the Purchaser. As used in this subparagraph (f), "control" of any entity means ownership of at least fifty percent (50%) of the voting power of the entity. In addition to and not in limitation of any other rights or remedies (including any right to set off, counterclaim, or otherwise withhold payment) available to Seller, Seller may without prior notice to any person set off any sum or obligation owed by any Purchaser-Affiliated Party to Seller (whether arising under this Agreement, the Complete Contract of Sale or any other agreement or contract between Purchaser and Seller) against any sum or obligation owed by Seller to any Purchaser-Affiliated Party (whether arising under this Agreement, the Complete Contract of Sale or any other agreement or contract between Purchaser and Seller). This right shall survive the termination of this Agreement.

3.   SECURITY. That certain Security Agreement, dated April 1, 2017, by and between Purchaser and Seller (the "Security Agreement") and those additional security instruments or agreements listed in Exhibit B (collectively, the "Security") shall secure the Note and all of Purchaser's obligations under this Agreement. In addition, Seller reserves the right, in its sole discretion, either as a condition precedent to Seller's obligation to pay to Purchaser the Conversion/Improvement Amount, or any portions thereof, or at any other time during the Term, to require a security deposit, letter of credit, personal guaranty, deed of trust, leasehold deed of trust, and/or other instrument to secure Purchaser's obligations under this Agreement. Upon Seller's requirement thereof, any additional security deposit, letter of credit, personal guaranty, deed of trust, leasehold deed of trust, and/or other instrument shall be added to the Security listed in Exhibit B.

4.   INSPECTION AND AUDIT. Within ten (10) business days after Seller's request therefore, Purchaser shall provide Seller with information and documentation relating to Purchaser's financial condition and creditworthiness. Purchaser shall permit Seller, Supplier, and their respective representatives to inspect sales records for the Premises and shall allow an independent auditor to review monthly sales figures to validate actual product sold at the Premises, whether pertaining to the an Audit Period under paragraph 2(e) or otherwise. Purchaser further agrees to permit any and all such

inspections of the Premises by Seller, Supplier, and their respective representatives that are required under the Complete Contract of Sale.

5.     ATTORNEY'S FEES. To the fullest extent permitted by law, the prevailing party shall be entitled to all attorneys' fees, costs of suit and reasonable expenses incurred in order to secure, defend or protect the rights inuring to the prevailing party under this Agreement, or to enforce the terms thereof, in addition to any other relief to which the prevailing party may be entitled.

6.     TERM; TERMINATION.

    (a)     The term of this Agreement ("Term") is for a period beginning April 1, 2017 and ending March 31, 2027, unless earlier terminated in accordance with the terms of this Agreement.

    (b)     Upon the occurrence of an Acceleration Event, Seller shall have the right to terminate this Agreement in its entirety, as further set forth in paragraph 2(d) above. Notwithstanding the termination of this Agreement, Purchaser shall continue to be liable for all amounts owing to Seller under this Agreement, including but not limited to the Total Unforgiven Repayment, as further set forth in paragraph 2 above.

7.     CONFIDENTIALITY AGREEMENT.

    (a)     Purchaser acknowledges and understands and acknowledges that the contents of this Agreement are confidential ("Confidential Information") and that Seller desires that the confidentiality of said contents be maintained. Except where otherwise required by law, Purchaser shall: (i) treat and maintain the Confidential Information as confidential; (ii) restrict disclosure of Confidential Information only to Purchaser and those officers, directors, employees, accountants, or attorneys of Purchaser who require disclosure to advise Purchaser with respect to the Confidential Information or prepare or maintain Purchaser's financial records and are directly connected with providing such advice or preparing or maintaining Purchaser's financial records; and (iii) not disclose any Confidential Information to any other person not permitted hereunder including, without limitation, any competitor or other person that Purchaser reasonably knows to be a competitor, of Seller.

    (b)     Purchaser acknowledges that Seller would be irreparably injured if Purchaser commits a breach of any of its obligations under this paragraph 7. Accordingly, in the event of Purchaser's breach of this paragraph 7, Seller shall be entitled to seek an injunction and specific enforcement of this paragraph 7, in addition to any other remedy available hereunder, at law or in equity.

8.     MISCELLANEOUS.

    (a)     Seller's failure to exercise its rights under this Agreement, including, without limitation, pursuant to paragraph 2, immediately on the occurrence of any Acceleration Event or other breach or default by Purchaser entitling it to do so shall not constitute a waiver of its rights to exercise its rights at any time before Purchaser cures its breach or default and/or pays the outstanding balance due.

    (b)     The remedies set forth in the Agreement are not exclusive but are cumulative and in addition to all other rights and remedies provided by law or equity including those under the Complete Contract of Sale.

    (c)     Purchaser shall not transfer or assign, in whole or in part, directly or indirectly, its interest in this Agreement without the prior written consent of Seller, which Seller may withhold in its absolute discretion, and any such transfer or assignment without Seller's prior written consent shall be null and void. Purchaser acknowledges and agrees that any consent granted hereunder shall be expressly conditioned upon Purchaser remaining liable, in full, for any amounts due and owing to Seller under this Agreement. Seller may transfer or assign, in whole or in part, directly or indirectly, its interest in this Agreement.

    (d)     All written notices required or permitted to be given by this Agreement shall be deemed to be duly given if delivered personally or sent via certified or via a reputable, national overnight mail service, such as Federal Express, to Seller or to Purchaser, as the case may be, at the address set forth above or to such other address as may be furnished by either party to the other in writing in accordance with the provisions herein. The date of mailing shall be deemed the date of giving such notice, except for notice of change of address, which must be received to be effective.

    (e)     All exhibits, schedules, riders, and documents attached hereto, (collectively, "Attachments"), are

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

hereby incorporated herein and made a part of this Agreement. This writing, and the Attachments attached hereto, is intended by the parties to be a final, complete and exclusive statement of their agreement about the matters covered herein. THERE ARE NO ORAL UNDERSTANDINGS, REPRESENTATIONS OR WARRANTIES AFFECTING IT. No amendments or alterations to this Agreement shall have any effect unless and until made in writing and signed by an authorize representative of Seller and Purchaser. EXECUTION OF THIS CONTRACT BY PURCHASER IS AN ACKNOWLEDGEMENT THAT NO REPRESENTATIONS NOT SET FORTH IN WRITING HEREIN HAVE BEEN MADE OR RELIED UPON BY PURCHASER.

      (f)    This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee and controlling U.S. federal law, except for any rule of court or law of said state which would make the law of any other jurisdiction applicable.

      (g)    Purchaser shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of its obligations hereunder and to carry out the intent of this Agreement.

      (h)    Purchaser's obligations to Seller under this Agreement shall survive any termination or nonrenewal of this Agreement, the Complete Contract of Sale, or the franchise relationship between Seller and Purchaser.

**ACCEPTED:**

**SELLER: Mac's Convenience Stores LLC**

By: _Matt McCure_
   B95B02F7800148C...
Matt McCure

Title: <u>Vice President</u>

Witness: _Ken Langston_
   FA17B1DE22D44E4...

Date: 3/24/2017 | 12:51 MST

**ACCEPTED:**

**PURCHASER: Paradise Petroleum LLC**

By: _Mehul Shah_
   35F06D07B0874AE...
Mehul Shah

Title: <u>Managing Member</u>

Date: 3/24/2017 | 06:48 MST

List of Schedules:

    Incentive Amounts Schedule
    Conversion/Improvements Schedule

List of Exhibits:

    A - Secured Promissory Note
    B - List of Security

INCENTIVE AND AMORTIZATION
Rev. July 2016

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

## INCENTIVE AMOUNTS SCHEDULE

This Incentive Amounts Schedule is attached to the Incentive and Amortization Agreement ("Agreement") and made a part thereof. Unless otherwise indicated, the capitalized terms used in this Incentive Amounts Schedule shall have the same meaning used in the Agreement.

### Competitive Allowance:

So long as the volume of product purchased under the Complete Contract of Sale for an Allowance Period exceeds 74,999 gallons, Seller agrees to pay to Purchaser a Competitive Allowance on all gallons from gallon one in the following amounts, payable within thirty (30) days of the last day of such Allowance Period:

| Total Monthly Volume Purchased (gallons) | Competitive Allowance (cents per gallon) |
|---|---|
| 0 – 74,999 | not eligible -- $0.000 |
| 75,000 – 91,667 | $0.0075 |
| 91,668 – 108,333 | $0.0100 |
| 108,334 and up | $0.0150 |

For the purpose of this Incentive Amounts Schedule (i) the term "product" shall mean gasoline, and (ii) the term "Allowance Period" shall mean any calendar month during the Term, the first of which shall commence on the first full month after the Effective Date.

**Improvement Amount:** So long as the volume of product purchased under the Complete Contract of Sale for each Contract Year exceeds the Incentive Volume, Seller agrees to loan to Purchaser an Improvement Amount in an aggregate principal amount not to exceed $75,000. The Improvement Amount shall be disbursed by Seller to Purchaser in two equal installments of one-half (1/2) of the Improvement Amount disbursed upon Purchaser providing Seller with proof of having obtained the applicable permits or, at Seller's sole discretion, upon Seller's approval of the Conversion/Improvements Schedule and the remaining one-half (1/2) of the Improvement Amount upon completion of the Improvements in accordance with the Conversion/Improvements Schedule.

### Amortization Schedule for Repayment of Improvement Amount and Conversion Amount:

| Year In Which Acceleration Event Occurs | Improvement Amount Payable To Seller |
|---|---|
| 1 through end of year 5 | 100% |
| 6 | 90% |
| 7 | 80% |
| 8 | 60% |
| 9 | 40% |
| 10 | 20% |

[*] For the purposes of this Amortization Schedule, Year 1 shall commence on April 1, 2017 and shall continue for a period of twelve (12) months thereafter. Each succeeding year shall commence on the anniversary of the commencement of Year 1. Thus, by way of example, if the Acceleration Event occurs in Year 1, then Purchaser shall repay Seller 100% of the Improvement Amount loaned to Purchaser by Seller, as well as 100% of any interest accrued thereon. If, for example, the Acceleration Event occurs in Year 8, then Purchaser shall repay Seller 60% of the Improvement Amount loaned to Purchaser by Seller, as well as all 60% of any interest accrued thereon.

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

## CONVERSION/IMPROVEMENTS SCHEDULE

      This Conversion/Improvements Schedule is attached to the Incentive and Amortization Agreement ("Agreement") and made a part thereof.  Unless otherwise indicated, the capitalized terms used in this Conversion/Improvements Schedule shall have the same meaning used in the Agreement.

The Improvements to be completed by Purchaser are set out as follows:

Canopy

    \_\_\_\_\_White canopy underside and columns – Repair or Paint
    \_\_\_\_\_ACM/Fascia Upgrade on Canopy ► Describe _____
    \_X\_\_LED Canopy Down Lighting Upgrade ►How many lights? _____

Islands

    \_\_\_\_\_Island forms and natural concrete islands – Repair or Replace
    \_\_\_\_\_Bollard Replacement – Bollard Covers
    \_\_\_\_\_Replace Multi-Product Dispensers (MPD's) ►How many? _____
    \_X\_MPD Decals and Valances (decals – brand and regulatory)
    \_\_\_\_\_ PCI & EMV Compliance for MPD Card Readers ►How many? _____
    \_\_\_\_\_Trash cans and windshield service centers ►How many? \_\_\_\_

General Site Improvements:

    \_\_\_\_MID Price Sign upgrades ► Type LED PRICE SIGN
    \_X\_\_ Electronic Message Boards
    \_X\_\_ Lot resurface or seal coat + ADA Compliant striping
    \_\_\_\_\_LED upgrade for Yard Lighting ► How many? \_\_\_\_\_
    \_\_\_\_\_LED upgrade for Building Lighting ► How many? \_\_\_\_\_
    \_\_\_\_\_Landscape Materials ►Describe _____
    \_\_\_\_\_Refresh Painting ►Describe _____
    \_\_\_\_ Point of Sale - Upgrade or Replace
    \_X\_ MPD Replacement Display Glass

I acknowledge receipt and applicability of this Conversion/Improvements Schedule

Mehul Shah

_____
Franchise Dealer

SELLER Acknowledgement of Completion:  By _____ Date_____

Case 1:23-cv-00284   Document 1-9   Filed 12/04/23   Page 38 of 60   PageID #: 254

## EXHIBIT A

### SECURED PROMISSORY NOTE

Chattanooga, Tennessee                                                                 April 1, 2017

| | |
|---|---|
| Name of Maker: | Paradise Petroleum LLC ("***Maker***") |
| Address: | 4858 Highway 58, Chattanooga, Tennessee 37416 |
| Amount Owed: | $75,000.00 |
| Interest Rate: | 9.0% per annum, compounded monthly |

1.        FOR VALUE RECEIVED, Maker promises to pay to the order of **MAC'S CONVENIENCE STORES LLC** ("*Payee*"), at 4080 West Jonathan Moore Pike, Columbus, Indiana 47201, or at such other place as may be designated in writing by Payee, the principal amount of Seventy Five Thousand and 00/100 Dollars ($75,000.00), together with all accrued interest thereon as provided in that certain Incentive and Amortization Agreement, dated April 1, 2017, by and between Payee and Maker (*"Agreement"*), in lawful money of the United States in immediately available funds.  Upon Maker's satisfaction of the conditions therefor set forth in the Agreement, the amount payable hereunder from Maker to Payee shall be forgiven as provided in paragraph 2(b) of the Agreement.  Additions to principal, the due date and other requirements for payment of all principal and interest hereunder, less any amount thereof forgiven pursuant to paragraph 2(b) of the Agreement, shall be as provided in paragraph 2 of the Agreement and in the Incentive Amounts Schedule attached to the Agreement.

2.        This Promissory Note ("*Note*") is the "Note," as defined in paragraph 1(b)(ii)(B) of the Agreement, and is fully negotiable by Payee.  Capitalized terms used herein have the meanings assigned to them in the Agreement unless otherwise defined herein.  Reference is made to the Agreement for a statement of the obligations of Maker and the circumstances in which payment hereunder may be accelerated.

3.        The payment of this Note is secured by that certain Security Agreement, dated April 1, 2017, by and between Maker and Payee ("Security Agreement"), together with Form UCC-1, granting Payee a security interest in and to all of Maker's interest in the equipment, fixtures, gasoline and petroleum products in inventory, gasoline and petroleum accounts receivable, after acquired inventory, accounts owned by Maker and consigned to Payee, and contract rights located on and/or related to Maker's retail motor fuel station business located at 2300 Jenkins Road, Chattanooga, Tennessee 37421, together with all other property described in or referred to in the Security Agreement.  This Note, the Security Agreement, and the Agreement are collectively referred to herein as the "Loan Documents."

4.        Time is of the essence hereof.  In the event of any default in the payment of any amount due and payable under the Agreement or any of the other Loan Documents (a "Default"), then the entire amount of principal and accrued interest hereunder, less any amount thereof that has been forgiven as of the date of such Default, and all other obligations of Maker to Payee, direct or indirect, absolute or contingent, now existing or hereafter arising, shall, at the option of Payee, become due and payable immediately, without presentment or notice, and Payee shall be authorized to exercise all of the rights and remedies provided herein, in the Loan Documents, and under the Tennessee Uniform Commercial Code, as well as all other rights and remedies either at law or in equity.  From and after any Default, the entire unpaid principal balance, and all unpaid interest that accrued as of the date of such Default, less any amount thereof that has been forgiven as of such date, shall automatically bear an interest at the rate of eighteen percent (18%) per annum, compounded monthly, or the highest rate of interest permitted by law.

5.        No delay or failure of Payee in the exercise of any right or remedy provided for hereunder shall be deemed a waiver of such right by Payee, and no exercise of any right or remedy shall be deemed a waiver of any other right or remedy which Payee may have.

6.        Maker agrees to pay the expenses incurred, including attorney's fees and costs, recording fees, filing fees, escrow fees and any other related costs in any attempt to collect any amount due pursuant to this Note or to otherwise enforce the provisions of this Note.

INCENTIVE AND AMORTIZATION                                   **10**
Rev. July 2016

7.     Maker agrees that if any legal action, arbitration, or other proceeding is necessary to enforce this Note or to enforce or protect the lien(s) under any of the Loan Documents, the prevailing party shall be entitled to reasonable attorneys' fees in addition to any other relief to which that party may be entitled.  Such attorneys' fees shall include those incurred to enter and/or confirm any arbitration award in a court of competent jurisdiction, to prosecute or defend any appeal, and/or to enforce any judgment.  This provision is applicable to the entire Note and all of the other Loan Documents.

8.     All agreements between Maker and Payee are expressly limited, so that in no event or contingency, whether because of the advancement of the proceeds of this Note, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to Payee for the use, forbearance, or retention of the money to be advanced under this Note exceed the highest lawful rate permissible under applicable usury laws.  If, under any circumstances, fulfillment of any provision of this Note or any other agreement pertaining to this Note, after timely performance of such provision is due, shall involve exceeding the limit of validity prescribed by law that a court of competent jurisdiction deems applicable, then, ipso facto, the obligations to be fulfilled shall be reduced to the limit of such validity.  If, under any circumstances, Payee shall ever receive as interest an amount that exceeds the highest lawful rate, the amount that would be excessive interest shall be applied to reduce the unpaid principal balance under this Note and not to pay interest, or, if such excessive interest exceeds the unpaid principal balance under this Note, such excess shall be refunded to Maker.  This provision shall control every other provision of this Note.

9.     Maker waives presentment, demand, notice of dishonor, and protest.

10.     This Note shall be construed and enforceable according to the laws of the State of Tennessee for all purposes except when federal law applies (including, without limitation, any federal usury ceiling or other federal law preempting state usury laws, which, from time to time, is applicable to the indebtedness evidenced by this Note).  The pleading of any statute of limitations as a defense to the obligations evidenced by this Note is waived to the fullest extent permissible by law.  If any provision of this Note, or the application of it to any party or circumstance, is held void, invalid, or unenforceable by a court of competent jurisdiction, the remainder of this Note, and the application of such provision to other parties or circumstances, shall not be affected thereby, the provisions of this Note being severable in any such instance.  Maker represents and warrants to Payee that the proceeds of this Note will be used solely for business, commercial investment, or similar purposes, and that no portion of it will be used for personal, family, or household purposes.  The parties agree that this Note and the Loan Documents are a product of their joint effort.  As a result, any rules of construction, including but not limited to Civil Code section 1654 and the rule that a contract should be construed against the drafter, shall not apply.

**MAKER:**
Paradise Petroleum LLC

DocuSigned by:

*Mehul Shah*

35F95D97B0B74AE...

By:  Mehul Shah

Its:  Managing Member

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

## EXHIBIT B

## LIST OF SECURITY

Personal Guaranty
Security Agreement
UCC Financing Statement

Case 1:23-cv-00284   Document 1-9   Filed 12/04/23   Page 41 of 60   PageID #: 257

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

Facility # 3781

## KEY PERSON RIDER
### (The "Key Person Rider")

1. Purchaser states that the following named person, Mehul Shah (such person referred to as the "Owner"), has an ownership interest in Purchaser. The parties hereto agree that, should Owner, or any one of the Owners, relinquish, convey, or otherwise transfer, directly or indirectly, in whole or in part, his or her ownership interest in the Purchaser, the complete contract of sale ("Contract") between Purchaser and Seller, to which this Key Person Rider is attached and incorporated into, may be terminated or nonrenewed by Seller.

2. (a) It is understood and agreed that Viraj Barot is designated the "Key Person," which designation is deemed by the parties hereto to be a reasonable and material provision of the Contract. The Key Person shall personally operate on a daily basis the business of Purchaser at the Premises covered by the Contract. The phrase "to operate on a daily basis the business of Purchaser at the Premises covered by the Contract" shall mean that the Key Person must (i) manage the business in accordance with the Contract and (ii) have authority to make all business decisions that an unincorporated retail service station dealer normally makes concerning operations of a retail service station business. Purchaser represents that the Key Person has the authority to buy and sell motor fuel, to enter into financing agreements on behalf of Purchaser, and to authorize merchandising and/or cooperative advertising programs.
    (b) Notwithstanding anything contained to the contrary in this Key Person Rider, nothing in the Key Person Rider releases, transfers, or otherwise modifies the obligations or duties of Purchaser under the Contract. The parties hereto agree that failure of the Key Person to operate on a daily basis the business of Purchaser at the Premises covered by the Contract in compliance with the terms and conditions contained in the Contract shall be grounds for the termination or nonrenewal, as applicable, of the Contract by the Seller.

3. Purchaser may seek Seller's consent to add, modify, or delete, by amendment, one or more of the names listed above in paragraph 1 or 2(a) by making a written request at least thirty (30) days prior to any change. Such request shall include such information as Seller may designate as necessary to determine the qualifications of the new person. Seller will consider and respond to Purchaser's request within thirty (30) days following receipt of Purchaser's written request. Such request for amendment may be denied at Seller's reasonable discretion.

4. These covenants are attached to and incorporated into the Contract between Purchaser and Seller and may be enforced as if set forth in said Contract. This Key Person Rider cancels and supersedes any pre-existing Key Person Rider of said Contract.

**ACCEPTED:**

**ACCEPTED:**

**SELLER: Mac's Convenience Stores LLC**

**PURCHASER: Paradise Petroleum LLC**

By: _Matt McCure_
     DocuSigned by:
     895B02F7806148C...
     Matt McCure

By: _Mehul Shah_
     DocuSigned by:
     35F95D97B0874AE...
     Mehul Shah

Title: Vice President

Title: Managing Member

Witness: _Ken Langston_
     DocuSigned by:
     FA17B1DE22D44E4...

Date: 3/24/2017 | 06:48 MST

Date: 3/24/2017 | 12:51 MST

**KEY PERSON RIDER**
Rev. July 2016

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

## SECURITY AGREEMENT

Paradise Petroleum LLC, with an address of 4858 Highway 58, Chattanooga, Tennessee 37416 (hereinafter referred to as the "Debtor") hereby grants a security interest to Mac's Convenience Stores LLC, with a business address of 4080 West Jonathan Moore Pike, Columbus, Indiana 47201 (hereinafter referred to as the "Secured Party"), in and to all of its interest in the equipment, fixtures, gasoline and petroleum products in inventory, gasoline and petroleum accounts receivable, after acquired gasoline and petroleum inventory, accounts owned by Secured Party and consigned to Debtor and contract rights more fully described in Exhibit A, attached hereto and made a part hereof (such equipment, fixtures, and contract rights referred to hereinafter as the "Collateral"). Proceeds from the sale of the Collateral are also included with the definition of Collateral.

Debtor hereby represents, warrants, covenants and agrees that:

1.      This security agreement (referred to hereinafter as the "Security Agreement") is given to secure (a) the performance by the Debtor of the covenants and agreements contained herein; (b) the performance and payments by the Debtor under the covenants and agreements contained in the Complete Contract of Sale, dated April 1, 2017, by and between Secured Party and Debtor (the "Contract"), which is hereby expressly made a part hereof; or (c) any and all other indebtedness or obligations now or hereafter incurred or arising pursuant to the provisions of this Security Agreement, the Contract, or any other agreement or contract between Debtor and Secured Party (all such performance, payments, and/or obligations hereinafter collectively referred to as the "Obligations"). This Security Agreement shall also secure any and all renewals or extensions of the whole or any part of the Obligations, however evidenced, with interest, if necessary, at such lawful rate as may be agreed upon, and any such renewals or extensions or any change in the terms shall not impair in any manner the validity of or the priority of this Security Agreement, nor release the Debtor from liability for the Obligations.

2.      To the extent that the Collateral, or any portion thereof, will be attached to real estate, the description of such real estate and the known owner of record of such real estate are set forth in Exhibit A attached hereto and made a part hereof. If the Collateral is attached to such real estate prior to the perfection of the security interest granted herein, the Debtor will, on demand, furnish the Secured Party with a disclaimer or disclaimers, executed by persons having an interest in such real estate.

3.      Debtor has, or will acquire, full and clear title to the Collateral, and, except for the security interest granted herein, will at all times keep the Collateral free from any adverse lien, security interest or encumbrance.

4.      Debtor warrants and represents that no financing statement covering all or any portion of the Collateral is currently on file in any public office.

5.      Debtor authorizes Secured Party, at the expense of Debtor, to execute and file financing statements and/or fixture filings in those public offices deemed necessary by the Secured Party to protect its security interest established hereby. Debtor will pay all filing fees for the filing of this instrument or of financing statements or fixture filings filed to perfect the security interest established hereby or in connection herewith.

6.      Debtor shall not sell or assign, or offer to sell, assign or otherwise transfer the Collateral, or any interest therein, without the prior written consent of the Secured Party. Debtor will, at all times, maintain, preserve and keep the Collateral in good repair, working order and condition and will not commit or suffer any waste thereof, reasonable wear and tear excepted.

7.      Debtor will pay promptly when due all taxes, charges, and assessments upon the Collateral or for its use or operation.

8.      The occurrence of any one of the following events shall constitute an "Event of Default" under this Security Agreement: (a) nonpayment when due of any Obligation hereby secured or failure to perform any duty or Obligation

**SECURITY AGREEMENT**
**Rev. July 2016**

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

set forth herein or incorporated by reference herein; (b) the discovery that any statement, representation or warranty at any time furnished by the Debtor to the Secured Party is untrue in any material respect as of the date made; (c) death, insolvency, failure in business, general assignment for the benefit of creditors, filing of a petition in bankruptcy or for relief under the U.S. Bankruptcy Code of, by, or against Debtor, or the commencement of any other proceeding against the Debtor alleging that such Debtor is insolvent or unable to pay debts as they mature; (d) the loss, theft, substantial damage, destruction, sale assignment or encumbrance to or of all or any portion of the Collateral or the making of any levy, seizure, or attachment thereof or thereon; (e) dissolution, merger or consolidation, or transfer of a substantial portion of the stock or assets of the Debtor corporation; (f) deterioration or impairment of the Collateral, or any portion thereof, or the decline or depreciation in the value or market price thereof which causes said Collateral, in the sole judgment of Secured Party, to become unsatisfactory as to the character or value of same; or (g) failure to perform any term, provision, or covenant of this Security Agreement.

9.      Upon the occurrence of an Event of Default, Secured Party shall provide Debtor with written notice thereof. Debtor shall have ten (10) days after the receipt of such notice to cure the Event of Default. If Debtor has not cured such Event of Default within said ten (10) day period, Secured Party may, at its option, and without notice or demand, declare all Obligations due and payable in full immediately, and the Secured Party may exercise any rights and remedies of a secured party under the Uniform Commercial Code or any other applicable law. If Debtor fails to cure any Event of Default as set forth herein, Debtor will make Collateral available to the Secured Party in all respects at a place acceptable to the Secured Party that is convenient to the Debtor.  Without limiting the generality of the foregoing, and in conjunction with or in addition thereto, Secured Party, at its reasonable discretion, may also use any one or more of the following remedies with respect to the Collateral encumbered hereunder:  (a) enter the premises wherever such Collateral may be located and take possession of, assemble and collect, any of said Collateral or to render it unusable; (b) require Debtor to assemble any or all of the Collateral and make it available to Secured Party as set forth above; (c) incur reasonable attorneys' fees and reasonable expenses in exercising any of its rights and remedies upon Debtor's default, which shall become part of its reasonable expense of taking, holding, and preparing for sale, the Collateral secured hereby; (d) pursue any remedy set forth in the Contract or in any other agreement or contract, the performance of which is secured by this Security Agreement.

10.     This Security Agreement shall be binding upon and inure to the benefit of the Debtor, the Secured Party, and each of their respective successors, assigns, heirs, executors and administrators.

11.     In the event any one or more of the provisions contained herein or in the Contract shall be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

12.     If any notification of disposition of all or any portion of the Collateral is required by law, such notification shall be deemed reasonably and properly given if mailed at least ten (10) days prior to such disposition, postage pre-paid to the Debtor at its latest address appearing on the records of the Secured Party.

13.     Unless otherwise prohibited by law, Secured Party shall apply the proceeds from the sale of Collateral and sums received or collected from or on account of the Collateral to (a) the payment of expenses incurred in connection with the sale, transfer, or delivery of the Collateral; (b) the payment of other costs, charges, attorneys fees and legal expenses herein aforementioned; (c) the payment of Obligations in the order and manner to be determined by Secured Party, in Secured Party's discretion; (d) the balance to Debtor or the person entitled to up upon proper demand.

14.     Debtor waives (a) its right to require Secured Party to proceed against any person, proceed against or exhaust any collateral, or pursue any other remedy available to Secured Party and (b) any defense arising any reason.

15.     Until all Obligations covered under this Security Agreement are paid and/or performed, the power of sale and all other rights, powers, and remedies available to Secured Party shall continue to exist and may be exercised at any time, irrespective of the fact that the Obligations or any part thereof may have become barred by statute of limitations.

16.      The rights, powers, and remedies given to the Secured Party hereunder are in addition to any rights, powers, and remedies available to Secured Party under applicable law.

17.      The forbearance, failure, or delay of Secured Party in exercising any rights, powers, or remedies available to it hereunder or under applicable law shall not be a waiver of such right, power, or remedy, nor shall the exercise of such right, power, or remedy preclude its further exercise. Every right, power, and remedy available to Secured Party shall continue in full force and effect until expressly waived by a written instrument executed by an authorized representative of Secured Party.

18.      All acknowledgments, representations, warranties, debts, and obligations of performance of Debtor under this Security Agreement are made, and binding on all those signing this Security Agreement, jointly and severally as the Debtor.

19.      Debtor authorizes Secured Party to file such financing statements as Secured Party deems advisable to perfect the security interest created hereby. A carbon, photographic or other reproduction of this Security Agreement or any financing statement relating to this Security Agreement shall be sufficient to serve as a financing statement. This Security Agreement shall be effective as a fixture filing with respect to all fixtures included within the Collateral and is to be filed for record in the real estate records office of the County Recorder where the real estate containing the fixtures is situated.

20.      By their signatures below, each of the following represent that they have authority to execute this Security Agreement and to bind the party on whose behalf their execution is made.

**ACCEPTED:**

**SECURED PARTY: Mac's Convenience Stores LLC**

By: _Matt McCure_
          B95B02F7806148C...
          Matt McCure

Title: _Vice President_

Witness: _Ken Langston_
           FA17B1DE22D44E4...

Date: _3/24/2017 | 12:51 MST_

**ACCEPTED:**

**DEBTOR: Paradise Petroleum LLC**

By: _Mehul Shah_
          35F95D97B0B74AE...
          Mehul Shah

Title: _Managing Member_

Date: _3/24/2017 | 06:48 MST_

# EXHIBIT A

## SCHEDULE OF COLLATERAL AFFIXED TO REAL ESTATE

Collateral Description

Equipment

Fixtures

Required Site Improvements

Gasoline and Petroleum Products in Inventory

Gasoline and Petroleum Accounts Receivable

After Acquired Gasoline and Petroleum Inventory

Accounts Owned By Secured Party and
Consigned To Dealer

_____

Location of Collateral or Description of Real Estate to Which Affixed:

2300 Jenkins Road, Chattanooga, Tennessee 37421

DocuSign Envelope ID: 8DCFD4A6-C969-421F-92D1-6C1A232B781F

### PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (the "Guaranty") from Mehul Shah, an individual (hereinafter "Guarantor"), in favor of Mac's Convenience Stores LLC (hereinafter "Seller"), is made on the following terms and conditions:

### WITNESSETH:

1. The Guaranty.
    (a) As an inducement for Seller to enter into the Contract (defined below) and Agreement (defined below) with Paradise Petroleum LLC (hereinafter "Purchaser"), and in consideration of the financial accommodations to be given, made or afforded by Seller to Purchaser therein, Guarantor hereby fully, unconditionally and irrevocably guarantees the full and prompt payment when due of the following ("Liabilities"):
        (i)      The payments to be made and other duties to be performed by Purchaser under the terms of a certain motor fuel supply contract dated April 1, 2017 between Seller and Purchaser (the "Contract"), the terms of which provide that Seller agrees to deliver and sell to Purchaser, and Purchaser agrees to receive, accept and pay for branded motor fuel products, pursuant to the terms and conditions of said Contract;
        (ii)     The payments to be made and other duties to be performed by Purchaser under the terms of a certain amortization agreement dated April 1, 2017 between Seller and Purchaser (the "Agreement"), and related secured promissory note ("Note"), which Agreement provides that Purchaser agrees to repay Seller certain sums in accordance with the terms; and
    (b) In the event that Purchaser fails at any time to make any part or all of its payments or perform its obligations under the Contract, Agreement, or Note, whether by acceleration or otherwise, the Guarantor will pay or perform the Liabilities guaranteed, in the same manner as if they constituted the direct and primary obligation of the Guarantor.
    (c) If Purchaser incorporates, reorganizes, reincorporates, liquidates, merges with another corporation, enters into a partnership or joint venture, sells or assigns the assets of its business, or otherwise effects a change in the legal entity conducting the business now conducted by Purchaser, the Liabilities of the successor to Seller are deemed to be Liabilities created by Purchaser and are included under this Guaranty.

2. Joint and Several Obligation. The obligations of the Guarantor under this Guaranty and those of any other guarantor or guarantors who may now or hereafter guarantee any indebtedness or obligations of Purchaser will be joint and several, and Seller may release or settle with any one or more of such guarantors at any time without affecting the continuing liability of the Guarantors.

3. Renewals, Extensions, and Substitutes. The renewals, extensions and substitutions of and for indebtedness and Liabilities of Purchaser guaranteed hereunder may be made by Seller upon such terms and conditions and with such modifications and changes as Seller may see fit and made at any time and from time to time without further notice to or consent from Guarantor.

4. Waivers of Guarantor.
    (a) Guarantor hereby waives each of the following:
        (i)      Notice of acceptance of this Guaranty of any extension of credit, advance, loan or similar accommodation by Seller to Purchaser, and of the amount of the Liabilities that may exist from time to time.
        (ii)     Presentment, diligence, demand, protest, or notice of protest, dishonor, nonpayment, or other default with respect to any of the Liabilities.
        (iii)    Any requirement that Seller marshal the security, or institute suit, or exercise or exhaust its rights or remedies against Purchaser or against any other person, guarantor, mortgage, or other securing all or any part of the Liabilities (the obligations of such mortgage or collateral being herein referred to as the "Collateral"), prior to enforcing any rights it has under this Guaranty, or otherwise against Guarantor.
        (iv)    Any right of subrogation with respect to the Liabilities or the Collateral until Seller shall have received payment in full of the Liabilities.

**PERSONAL GUARANTY OF PERFORMANCE**
**Rev. July 2016**

(v)     Any defenses now or hereafter arising or asserted by reason of (A) the invalidity or disability, in whole or in part, at the time of its acceptance, or at any other time, of the Collateral, (B) the fact that any of the property, a part of the Collateral, may at any such time be in default or be incorrectly estimated, (C) the deterioration in market or other value, waste, loss by fire, theft, loss or substitution of any property a part of the Collateral.

(d) The existence of any conditions hereinabove waived shall in no way affect or release the obligations of Guarantor hereunder.

5. Rights of Seller.

(a) Seller shall have the right, without notice to Guarantor, to deal in any manner with the Liabilities and the Collateral, including, but not limited to, the following rights:

(i)     to modify or otherwise change the terms or alter any part of the Liabilities, including, but not limited to, changing the rate of interest thereon, or effecting any release, compromise or settlement with respect thereto;

(ii)    to extend or renew the Liabilities, and to forbear to take steps to enforce the payment of all or any part thereof against Purchaser;

(iii)   to forbear from calling for additional Collateral, to consent to the substitution or release of all or any part of the Collateral, whether or not of the same or different character or value than the Collateral surrendered by Seller;

(iv)    to release or to forbear to proceed against all or any part of the Collateral, or to substitute any new for any existing Collateral;

(v)     to apply any payment received by Seller from Purchaser, or from any other source other than Guarantor, to the Liabilities of Purchaser to Seller in whatever order Seller elects, and to apply any payment received from Guarantor to any obligations of Purchaser to Seller guaranteed hereunder in whatever order Seller elects; or

(b) The obligations of Guarantor hereunder shall not be released, discharged or affected in any way, nor shall they have any recourse against Seller by reason of any action that Seller may take or omit to take under these powers, or otherwise existing with respect to the Liabilities or the Collateral.

(c) Neither Guarantor's obligation to make payment or perform in accordance with the terms of this Guaranty nor any remedy for the enforcement of this Guaranty shall be impaired, modified, changed, released, discharged, avoided, or limited in any manner whatsoever by any impairment, modification, change, release, discharge, avoidance, or rejection of the Liabilities or Purchaser's estate in bankruptcy or of any remedy for the enforcement of Seller's rights hereunder resulting from the operation of any present or future provision of the federal Bankruptcy Code or from the decision of any court.

6. Assignment of Liabilities.  If any of the Liabilities of Purchaser guaranteed hereunder should be assigned by Seller, this Guaranty will inure to the benefit of Seller's assignee to the extent of such assignment, provided that such assignment will not operate to relieve Guarantor from any obligation to Seller hereunder with respect to any unassigned Liabilities guaranteed hereunder and further that the rights of any assignee will be subordinate to the rights of Seller under this Guaranty as to any unassigned Liabilities.

7. Consent of Guarantor to Jurisdiction and Venue.  Guarantor hereby agrees that all actions to enforce the terms and provisions of this Guaranty shall be brought and maintained within the State of Tennessee (the "State"), and that the validity, construction and effect of this Guaranty shall be governed by the laws of the State. The Guarantor hereby consents to the jurisdiction of any court with proper venue within the State, and hereby consents that such service may be made by registered or certified mail, directed to Guarantor at the address hereinafter set forth.

8. Expenses/Costs/Attorney Fees.  In addition to any other amounts or payments to which Seller is entitled hereunder, Guarantor hereby agrees to pay unto Seller all costs and expenses (including without limitation, liquidation costs, expense payments, and attorneys' fees and other legal costs) incurred by Seller in the collection of the (a) Liabilities and the maintenance, sale or other disposition of any Collateral therefore and (b) any obligations of Guarantor hereunder and the maintenance, sale or other disposition of any Collateral therefor. Further, to the fullest

extent permitted by law, the prevailing party shall be entitled to all attorneys' fees, costs of suit and reasonable expenses incurred in order to secure, defend or protect the rights inuring to the prevailing party under this Guaranty, or to enforce the terms thereof, in addition to any other relief to which the prevailing party may be entitled.

9. Generally Provisions.

    (a) The rights and remedies of Seller under this Guaranty and any other otherwise created are cumulative and may be exercised singly or concurrently, and the exercise of any one or more of them will not be a waiver of any other. No act, delay, omission or course of dealing between Seller and Purchaser or Guarantor, or any other person, or any of them, will be a waiver of any of Seller's rights or remedies under this Guaranty, and no waiver, change, modification or discharge of this Guaranty or any obligation created hereby will be effective unless in writing signed by Seller.

    (b) The rights and obligations created by this Guaranty shall inure for the benefit of and shall be binding upon the personal representatives, successors and assigns, including, but not limited to, the holders or owners of the Liabilities, of the parties hereto.

    (c) Any notice or demand to be given hereunder shall be effectively given if made in writing, delivered to Guarantor or to Seller or mailed by certified mail to any of the parties at the following addresses for each, or at such other address as any party may furnish the other in writing:

    Seller:      Mac's Convenience Stores LLC
                 4080 West Jonathan Moore Pike
                 Columbus, Indiana 47201
                 Attention: Vice President

    Guarantor:

    Name:        Mehul Shah
    Address:     2300 Jenkins Road
    City, State: Chattanooga, Tennessee 37421

    (d) Guarantor acknowledges receipt of a copy of this Guaranty, and certifies that Guarantor has read all of this Guaranty, and fully understands and agrees to the same, before having signed it.

Executed, this ____3/24/2017 | 06:48 MST_____.

**GUARANTOR:**

Mehul Shah
35F95D97B0B74AE
    (signature)

Mehul Shah
    (print name)

DocuSign Envelope ID: 13A9CD75-65A1-4717-BDD2-14196A9CA805

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (the "Guaranty") from Rajeshri Chokshi, an individual (hereinafter "Guarantor"), in favor of Mac's Convenience Stores LLC (hereinafter "Seller"), is made on the following terms and conditions:

### WITNESSETH:

1. The Guaranty.

(a) As an inducement for Seller to enter into the Contract (defined below) and Agreement (defined below) with Paradise Petroleum LLC (hereinafter "Purchaser"), and in consideration of the financial accommodations to be given, made or afforded by Seller to Purchaser therein, Guarantor hereby fully, unconditionally and irrevocably guarantees the full and prompt payment when due of the following ("Liabilities"):

(i)       The payments to be made and other duties to be performed by Purchaser under the terms of a certain motor fuel supply contract dated April 1, 2017 between Seller and Purchaser (the "Contract"), the terms of which provide that Seller agrees to deliver and sell to Purchaser, and Purchaser agrees to receive, accept and pay for branded motor fuel products, pursuant to the terms and conditions of said Contract;

(ii)       The payments to be made and other duties to be performed by Purchaser under the terms of a certain amortization agreement dated April 1, 2017 between Seller and Purchaser (the "Agreement"), and related secured promissory note ("Note"), which Agreement provides that Purchaser agrees to repay Seller certain sums in accordance with the terms; and

(b) In the event that Purchaser fails at any time to make any part or all of its payments or perform its obligations under the Contract, Agreement, or Note, whether by acceleration or otherwise, the Guarantor will pay or perform the Liabilities guaranteed, in the same manner as if they constituted the direct and primary obligation of the Guarantor.

(c) If Purchaser incorporates, reorganizes, reincorporates, liquidates, merges with another corporation, enters into a partnership or joint venture, sells or assigns the assets of its business, or otherwise effects a change in the legal entity conducting the business now conducted by Purchaser, the Liabilities of the successor to Seller are deemed to be Liabilities created by Purchaser and are included under this Guaranty.

2. Joint and Several Obligation. The obligations of the Guarantor under this Guaranty and those of any other guarantor or guarantors who may now or hereafter guarantee any indebtedness or obligations of Purchaser will be joint and several, and Seller may release or settle with any one or more of such guarantors at any time without affecting the continuing liability of the Guarantors.

3. Renewals, Extensions, and Substitutes. The renewals, extensions and substitutions of and for indebtedness and Liabilities of Purchaser guaranteed hereunder may be made by Seller upon such terms and conditions and with such modifications and changes as Seller may see fit and made at any time and from time to time without further notice to or consent from Guarantor.

4. Waivers of Guarantor.

(a) Guarantor hereby waives each of the following:

(i)       Notice of acceptance of this Guaranty of any extension of credit, advance, loan or similar accommodation by Seller to Purchaser, and of the amount of the Liabilities that may exist from time to time.

(ii)       Presentment, diligence, demand, protest, or notice of protest, dishonor, nonpayment, or other default with respect to any of the Liabilities.

(iii)       Any requirement that Seller marshal the security, or institute suit, or exercise or exhaust its rights or remedies against Purchaser or against any other person, guarantor, mortgage, or other securing all or any part of the Liabilities (the obligations of such mortgage or collateral being herein referred to as the "Collateral"), prior to enforcing any rights it has under this Guaranty, or otherwise against Guarantor.

(iv)       Any right of subrogation with respect to the Liabilities or the Collateral until Seller shall have received payment in full of the Liabilities.

**PERSONAL GUARANTY OF PERFORMANCE**
**Rev. July 2016**

(v)     Any defenses now or hereafter arising or asserted by reason of (A) the invalidity or disability, in whole or in part, at the time of its acceptance, or at any other time, of the Collateral, (B) the fact that any of the property, a part of the Collateral, may at any such time be in default or be incorrectly estimated, (C) the deterioration in market or other value, waste, loss by fire, theft, loss or substitution of any property a part of the Collateral.

(d) The existence of any conditions hereinabove waived shall in no way affect or release the obligations of Guarantor hereunder.

5. Rights of Seller.

(a) Seller shall have the right, without notice to Guarantor, to deal in any manner with the Liabilities and the Collateral, including, but not limited to, the following rights:

(i)     to modify or otherwise change the terms or alter any part of the Liabilities, including, but not limited to, changing the rate of interest thereon, or effecting any release, compromise or settlement with respect thereto;

(ii)     to extend or renew the Liabilities, and to forbear to take steps to enforce the payment of all or any part thereof against Purchaser;

(iii)     to forbear from calling for additional Collateral, to consent to the substitution or release of all or any part of the Collateral, whether or not of the same or different character or value than the Collateral surrendered by Seller;

(iv)     to release or to forbear to proceed against all or any part of the Collateral, or to substitute any new for any existing Collateral;

(v)     to apply any payment received by Seller from Purchaser, or from any other source other than Guarantor, to the Liabilities of Purchaser to Seller in whatever order Seller elects, and to apply any payment received from Guarantor to any obligations of Purchaser to Seller guaranteed hereunder in whatever order Seller elects; or

(b) The obligations of Guarantor hereunder shall not be released, discharged or affected in any way, nor shall they have any recourse against Seller by reason of any action that Seller may take or omit to take under these powers, or otherwise existing with respect to the Liabilities or the Collateral.

(c) Neither Guarantor's obligation to make payment or perform in accordance with the terms of this Guaranty nor any remedy for the enforcement of this Guaranty shall be impaired, modified, changed, released, discharged, avoided, or limited in any manner whatsoever by any impairment, modification, change, release, discharge, avoidance, or rejection of the Liabilities or Purchaser's estate in bankruptcy or of any remedy for the enforcement of Seller's rights hereunder resulting from the operation of any present or future provision of the federal Bankruptcy Code or from the decision of any court.

6. Assignment of Liabilities. If any of the Liabilities of Purchaser guaranteed hereunder should be assigned by Seller, this Guaranty will inure to the benefit of Seller's assignee to the extent of such assignment, provided that such assignment will not operate to relieve Guarantor from any obligation to Seller hereunder with respect to any unassigned Liabilities guaranteed hereunder and further that the rights of any assignee will be subordinate to the rights of Seller under this Guaranty as to any unassigned Liabilities.

7. Consent of Guarantor to Jurisdiction and Venue. Guarantor hereby agrees that all actions to enforce the terms and provisions of this Guaranty shall be brought and maintained within the State of Tennessee (the "State"), and that the validity, construction and effect of this Guaranty shall be governed by the laws of the State. The Guarantor hereby consents to the jurisdiction of any court with proper venue within the State, and hereby consents that such service may be made by registered or certified mail, directed to Guarantor at the address hereinafter set forth.

8. Expenses/Costs/Attorney Fees. In addition to any other amounts or payments to which Seller is entitled hereunder, Guarantor hereby agrees to pay unto Seller all costs and expenses (including without limitation, liquidation costs, expense payments, and attorneys' fees and other legal costs) incurred by Seller in the collection of the (a) Liabilities and the maintenance, sale or other disposition of any Collateral therefore and (b) any obligations of Guarantor hereunder and the maintenance, sale or other disposition of any Collateral therefor. Further, to the fullest

DocuSign Envelope ID: 13A9CD75-65A1-4717-BDD2-14196A9CA805

extent permitted by law, the prevailing party shall be entitled to all attorneys' fees, costs of suit and reasonable expenses incurred in order to secure, defend or protect the rights inuring to the prevailing party under this Guaranty, or to enforce the terms thereof, in addition to any other relief to which the prevailing party may be entitled.

9. General Provisions.

    (a) The rights and remedies of Seller under this Guaranty and any other otherwise created are cumulative and may be exercised singly or concurrently, and the exercise of any one or more of them will not be a waiver of any other. No act, delay, omission or course of dealing between Seller and Purchaser or Guarantor, or any other person, or any of them, will be a waiver of any of Seller's rights or remedies under this Guaranty, and no waiver, change, modification or discharge of this Guaranty or any obligation created hereby will be effective unless in writing signed by Seller.

    (b) The rights and obligations created by this Guaranty shall inure for the benefit of and shall be binding upon the personal representatives, successors and assigns, including, but not limited to, the holders or owners of the Liabilities, of the parties hereto.

    (c) Any notice or demand to be given hereunder shall be effectively given if made in writing, delivered to Guarantor or to Seller or mailed by certified mail to any of the parties at the following addresses for each, or at such other address as any party may furnish the other in writing:

|  |  |
|---|---|
| Seller: | Mac's Convenience Stores LLC |
| | 4080 West Jonathan Moore Pike |
| | Columbus, Indiana 47201 |
| | Attention: Vice President |

|  |  |
|---|---|
| Guarantor: | |
| Name: | Rajeshri Chokshi |
| Address: | 2300 Jenkins Road |
| City, State: | Chattanooga, Tennessee 37421 |

    (d) Guarantor acknowledges receipt of a copy of this Guaranty, and certifies that Guarantor has read all of this Guaranty, and fully understands and agrees to the same, before having signed it.

Executed, this ___3/29/2017 | 09:33 MST_____.

**GUARANTOR:**

DocuSigned by:

*Rajeshri Chokshi*

D7F12A1EF3794D1...
(signature)

Rajeshri Chokshi
_____
(print name)

Case 1:23-cv-00284   Document 1-9   Filed 12/04/23   Page 52 of 60   PageID #: 268

DocuSign Envelope ID: EB26E238-C0ED-453C-9581-F8E358BCE8D4

### PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (the "Guaranty") from Bhupinder Sachar, an individual (hereinafter "Guarantor"), in favor of Mac's Convenience Stores LLC (hereinafter "Seller"), is made on the following terms and conditions:

### WITNESSETH:

1. The Guaranty.
    (a) As an inducement for Seller to enter into the Contract (defined below) and Agreement (defined below) with Paradise Petroleum LLC (hereinafter "Purchaser"), and in consideration of the financial accommodations to be given, made or afforded by Seller to Purchaser therein, Guarantor hereby fully, unconditionally and irrevocably guarantees the full and prompt payment when due of the following ("Liabilities"):
        (i)     The payments to be made and other duties to be performed by Purchaser under the terms of a certain motor fuel supply contract dated April 1, 2017 between Seller and Purchaser (the "Contract"), the terms of which provide that Seller agrees to deliver and sell to Purchaser, and Purchaser agrees to receive, accept and pay for branded motor fuel products, pursuant to the terms and conditions of said Contract;
        (ii)    The payments to be made and other duties to be performed by Purchaser under the terms of a certain amortization agreement dated April 1, 2017 between Seller and Purchaser (the "Agreement"), and related secured promissory note ("Note"), which Agreement provides that Purchaser agrees to repay Seller certain sums in accordance with the terms; and
    (b) In the event that Purchaser fails at any time to make any part or all of its payments or perform its obligations under the Contract, Agreement, or Note, whether by acceleration or otherwise, the Guarantor will pay or perform the Liabilities guaranteed, in the same manner as if they constituted the direct and primary obligation of the Guarantor.
    (c) If Purchaser incorporates, reorganizes, reincorporates, liquidates, merges with another corporation, enters into a partnership or joint venture, sells or assigns the assets of its business, or otherwise effects a change in the legal entity conducting the business now conducted by Purchaser, the Liabilities of the successor to Seller are deemed to be Liabilities created by Purchaser and are included under this Guaranty.

2. Joint and Several Obligation. The obligations of the Guarantor under this Guaranty and those of any other guarantor or guarantors who may now or hereafter guarantee any indebtedness or obligations of Purchaser will be joint and several, and Seller may release or settle with any one or more of such guarantors at any time without affecting the continuing liability of the Guarantors.

3. Renewals, Extensions, and Substitutes. The renewals, extensions and substitutions of and for indebtedness and Liabilities of Purchaser guaranteed hereunder may be made by Seller upon such terms and conditions and with such modifications and changes as Seller may see fit and made at any time and from time to time without further notice to or consent from Guarantor.

4. Waivers of Guarantor.
    (a) Guarantor hereby waives each of the following:
        (i)     Notice of acceptance of this Guaranty of any extension of credit, advance, loan or similar accommodation by Seller to Purchaser, and of the amount of the Liabilities that may exist from time to time.
        (ii)    Presentment, diligence, demand, protest, or notice of protest, dishonor, nonpayment, or other default with respect to any of the Liabilities.
        (iii)   Any requirement that Seller marshal the security, or institute suit, or exercise or exhaust its rights or remedies against Purchaser or against any other person, guarantor, mortgage, or other securing all or any part of the Liabilities (the obligations of such mortgage or collateral being herein referred to as the "Collateral"), prior to enforcing any rights it has under this Guaranty, or otherwise against Guarantor.
        (iv)   Any right of subrogation with respect to the Liabilities or the Collateral until Seller shall have received payment in full of the Liabilities.

**PERSONAL GUARANTY OF PERFORMANCE**
**Rev. July 2016**

DocuSign Envelope ID: EB26E238-C0ED-453C-9581-F8E358BCE8D4

(v)     Any defenses now or hereafter arising or asserted by reason of (A) the invalidity or disability, in whole or in part, at the time of its acceptance, or at any other time, of the Collateral, (B) the fact that any of the property, a part of the Collateral, may at any such time be in default or be incorrectly estimated, (C) the deterioration in market or other value, waste, loss by fire, theft, loss or substitution of any property a part of the Collateral.

(d) The existence of any conditions hereinabove waived shall in no way affect or release the obligations of Guarantor hereunder.

5. Rights of Seller.

(a) Seller shall have the right, without notice to Guarantor, to deal in any manner with the Liabilities and the Collateral, including, but not limited to, the following rights:

(i)     to modify or otherwise change the terms or alter any part of the Liabilities, including, but not limited to, changing the rate of interest thereon, or effecting any release, compromise or settlement with respect thereto;

(ii)    to extend or renew the Liabilities, and to forbear to take steps to enforce the payment of all or any part thereof against Purchaser;

(iii)   to forbear from calling for additional Collateral, to consent to the substitution or release of all or any part of the Collateral, whether or not of the same or different character or value than the Collateral surrendered by Seller;

(iv)    to release or to forbear to proceed against all or any part of the Collateral, or to substitute any new for any existing Collateral;

(v)     to apply any payment received by Seller from Purchaser, or from any other source other than Guarantor, to the Liabilities of Purchaser to Seller in whatever order Seller elects, and to apply any payment received from Guarantor to any obligations of Purchaser to Seller guaranteed hereunder in whatever order Seller elects; or

(b) The obligations of Guarantor hereunder shall not be released, discharged or affected in any way, nor shall they have any recourse against Seller by reason of any action that Seller may take or omit to take under these powers, or otherwise existing with respect to the Liabilities or the Collateral.

(c) Neither Guarantor's obligation to make payment or perform in accordance with the terms of this Guaranty nor any remedy for the enforcement of this Guaranty shall be impaired, modified, changed, released, discharged, avoided, or limited in any manner whatsoever by any impairment, modification, change, release, discharge, avoidance, or rejection of the Liabilities or Purchaser's estate in bankruptcy or of any remedy for the enforcement of Seller's rights hereunder resulting from the operation of any present or future provision of the federal Bankruptcy Code or from the decision of any court.

6. Assignment of Liabilities.  If any of the Liabilities of Purchaser guaranteed hereunder should be assigned by Seller, this Guaranty will inure to the benefit of Seller's assignee to the extent of such assignment, provided that such assignment will not operate to relieve Guarantor from any obligation to Seller hereunder with respect to any unassigned Liabilities guaranteed hereunder and further that the rights of any assignee will be subordinate to the rights of Seller under this Guaranty as to any unassigned Liabilities.

7. Consent of Guarantor to Jurisdiction and Venue.  Guarantor hereby agrees that all actions to enforce the terms and provisions of this Guaranty shall be brought and maintained within the State of Tennessee (the "State"), and that the validity, construction and effect of this Guaranty shall be governed by the laws of the State. The Guarantor hereby consents to the jurisdiction of any court with proper venue within the State, and hereby consents that such service may be made by registered or certified mail, directed to Guarantor at the address hereinafter set forth.

8. Expenses/Costs/Attorney Fees.  In addition to any other amounts or payments to which Seller is entitled hereunder, Guarantor hereby agrees to pay unto Seller all costs and expenses (including without limitation, liquidation costs, expense payments, and attorneys' fees and other legal costs) incurred by Seller in the collection of the (a) Liabilities and the maintenance, sale or other disposition of any Collateral therefore and (b) any obligations of Guarantor hereunder and the maintenance, sale or other disposition of any Collateral therefor. Further, to the fullest

**PERSONAL GUARANTY OF PERFORMANCE**          **2**
**Rev. July 2016**

DocuSign Envelope ID: EB26E238-C0ED-453C-9581-F8E358BCE8D4

extent permitted by law, the prevailing party shall be entitled to all attorneys' fees, costs of suit and reasonable expenses incurred in order to secure, defend or protect the rights inuring to the prevailing party under this Guaranty, or to enforce the terms thereof, in addition to any other relief to which the prevailing party may be entitled.

9. General Provisions.
    (a) The rights and remedies of Seller under this Guaranty and any other otherwise created are cumulative and may be exercised singly or concurrently, and the exercise of any one or more of them will not be a waiver of any other. No act, delay, omission or course of dealing between Seller and Purchaser or Guarantor, or any other person, or any of them, will be a waiver of any of Seller's rights or remedies under this Guaranty, and no waiver, change, modification or discharge of this Guaranty or any obligation created hereby will be effective unless in writing signed by Seller.
    (b) The rights and obligations created by this Guaranty shall inure for the benefit of and shall be binding upon the personal representatives, successors and assigns, including, but not limited to, the holders or owners of the Liabilities, of the parties hereto.
    (c) Any notice or demand to be given hereunder shall be effectively given if made in writing, delivered to Guarantor or to Seller or mailed by certified mail to any of the parties at the following addresses for each, or at such other address as any party may furnish the other in writing:

| | |
|---|---|
| Seller: | Mac's Convenience Stores LLC |
| | 4080 West Jonathan Moore Pike |
| | Columbus, Indiana 47201 |
| | Attention: Vice President |

Guarantor:

| | |
|---|---|
| Name: | Bhupinder Sachar |
| Address: | 2300 Jenkins Road |
| City, State: | Chattanooga, Tennessee 37421 |

    (d) Guarantor acknowledges receipt of a copy of this Guaranty, and certifies that Guarantor has read all of this Guaranty, and fully understands and agrees to the same, before having signed it.

Executed, this ____4/10/2017 | 12:28 MST_____.

**GUARANTOR:**

DocuSigned by:

_B.N..........._
B532E43B3E7C414...
(signature)

Bhupinder s sachar
_____
(print name)

**PERSONAL GUARANTY OF PERFORMANCE**     3
**Rev. July 2016**



## Certificate Of Completion

Envelope Id: 8DCFD4A6C969421F92D16C1A232B781F
Subject: Please DocuSign: 3781 Paradise Petroleum LLC - Contract 4/1/17
Source Envelope:
Document Pages: 47
Supplemental Document Pages: 0
Certificate Pages: 5
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-07:00) Arizona

Signatures: 24
Initials: 5

Payments: 0

Status: Completed

Envelope Originator:
National Wholesale Fuels

1130 W Warner Rd Ste B
Tempe, AZ 85284
sward@circlek.com
IP Address: 50.200.238.18

## Record Tracking

Status: Original
        3/21/2017 | 13:19

Holder: National Wholesale Fuels
        sward@circlek.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Mehul Shah<br>kwikstop1.moe@gmail.com<br>Security Level: Email, Account Authentication<br>(None) | *Mehul Shah*<br>35F95D97B0R74AE..<br><br>Using IP Address: 74.222.230.98 | Sent: 3/21/2017 \| 13:32<br>Viewed: 3/24/2017 \| 06:48<br>Signed: 3/24/2017 \| 06:48 |
| Electronic Record and Signature Disclosure:<br>    Accepted: 1/30/2017 \| 17:05<br>    ID: bc7684fa-6223-4769-8d80-98e0b0741d09 | | |
| Gena Dunten<br>gdunten@circlek.com<br>Security Level: Email, Account Authentication<br>(None) | *signature*<br><br>Using IP Address: 107.147.15.216 | Sent: 3/24/2017 \| 06:48<br>Viewed: 3/24/2017 \| 07:15<br>Signed: 3/24/2017 \| 07:16 |
| Electronic Record and Signature Disclosure:<br>    Accepted: 3/24/2017 \| 07:15<br>    ID: e4c380f0-0883-4743-9089-ac069c001e79 | | |
| Ken Langston<br>klangston@circlek.com<br>Security Level: Email, Account Authentication<br>(None) | *Ken Langston*<br>FA17B1DE22D44E4..<br><br>Using IP Address: 50.200.238.42 | Sent: 3/24/2017 \| 07:16<br>Viewed: 3/24/2017 \| 12:40<br>Signed: 3/24/2017 \| 12:41 |
| Electronic Record and Signature Disclosure:<br>    Accepted: 3/24/2017 \| 12:40<br>    ID: 8406f048-0d4f-4ee8-b60a-9ac46d037215 | | |
| Matt McCure<br>mmccure@circlek.com<br>Security Level: Email, Account Authentication<br>(None) | *Matt McCure*<br>B95B02F7806148C..<br><br>Using IP Address: 192.189.253.31 | Sent: 3/24/2017 \| 12:41<br>Viewed: 3/24/2017 \| 12:50<br>Signed: 3/24/2017 \| 12:51 |
| Electronic Record and Signature Disclosure:<br>    Accepted: 3/24/2017 \| 12:50<br>    ID: 9b94739d-0343-4bfb-9747-6150c0d81729 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| **Editor Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Agent Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Intermediary Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Certified Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Carbon Copy Events** | **Status** | **Timestamp** |
|---|---|---|

| **Notary Events** | | **Timestamp** |
|---|---|---|

| **Envelope Summary Events** | **Status** | **Timestamps** |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/24/2017 | 12:41 |
| Certified Delivered | Security Checked | 3/24/2017 | 12:50 |
| Signing Complete | Security Checked | 3/24/2017 | 12:51 |
| Completed | Security Checked | 3/24/2017 | 12:51 |

| **Payment Events** | **Status** | **Timestamps** |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Circle K Stores Inc. (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Circle K Stores Inc.:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

To contact us by email send messages to: tcelik@circlek.com

**To advise Circle K Stores Inc. of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at tcelik@circlek.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Circle K Stores Inc.**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to tcelik@circlek.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Circle K Stores Inc.**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an e-mail to tcelik@circlek.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Circle K Stores Inc. as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Circle K Stores Inc. during the course of my relationship with you.