# Exhibit L

dotloop signature verification: dtlp.us/nHw-Mpc0-HoGf

## AMENDMENT TO ASSIGNMENT AND ASSUMPTION AGREEMENT

This Amendment to the Assignment and Assumption Agreement ("Amendment") by and between MAC'S CONVENIENCE STORES LLC ("Mac's"), Paradise Petroleum LLC ("Assignor"), and Kaish LLC ("Assignee") having a place of business at 2300 Jenkins Road, Chattanooga, TN 37421 (the "Premises").

### WITNESSETH:

WHEREAS, Mac's and Assignor were parties to that certain Complete Contract of Sale (Branded Reseller) dated 04/01/2017, with a term beginning on 04/13/2017 and expiring on 04/12/2027 ("Contract"); and

WHEREAS, Mac's, Assignor and Assignee are parties to that certain Assignment and Assumption Agreement ("Assignment Agreement") with an effective date of 08/14/2019 where Assignor assigned all of its rights and obligations under the Contract to Assignee, and Assignee assumed such rights and obligations set forth therein.

WHEREAS, Mac's, Assignee and Assignor desire to Amend the Assignment Agreement as set forth herein below.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which the parties hereto acknowledge the Assignee and Assignor hereby agree as follows:

1.  <u>EFFECTIVE DATE</u>: The Effective Date of the Assignment Agreement and all ancillary documents, agreements and addendums thereto will hereby be Amended to become effective   09/16/2019  .

2.  There are no other modifications, amendments or alterations to the Assignment Agreement. If any provision or term of this Amendment conflicts with or contradicts any provision or term of the Assignment Agreement, the provision or term of this Amendment shall govern.

3.  The parties hereto agree further that the Amendment herein of the Assignment Agreement and all ancillary documents, agreements and addendums thereto does not create a new franchise for purposes of the PMPA.

[Signatures on following pages.]

dotloop signature verification: 

## Assignor:

Paradise Petroleum LLC
a Tennessee Limited Liability Company

*Mehul Shah*
dotloop verified
09/13/19 7:16 PM CDT
BYKR-KH4R-FQWI-DBRW

By: Mehul Shah
Its: Managing Member

## Assignee:

Kaish LLC
a Tennessee Limited Liability Company

*Akbar Bhamani*
dotloop verified
09/13/19 10:31 PM EDT
Z4NA-2HBE-QOH3-IED4

By: Akbar Bhamani
Its: Managing Member

## MAC'S:

MAC'S CONVENIENCE STORES LLC
a Delaware limited liability company

*Gerardo Valencia*
dotloop verified
09/24/19 8:36 AM CDT
ZDIR-7IOO-BZJN-23CA

By: Gerardo Valencia
Its: Authorized Representative



**Mac's Convenience Stores LLC**
**Assignment Agreements**

| NO. | DESCRIPTION |
|-----|-------------|
| 1. | Assignment and Assumption Agreement |
| 2. | Revised Summary of Title I of the PMPA |
| 3. | First Right of Refusal Addendum – 3 Party |
| 4. | Key Person Rider |
| 5. | Security Agreement |
| 6. | Personal Guaranty |
| 7. | Landlord Certification |

dotloop signature verification: dtlp.us/pgrH-PBfq-KSxn

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT ("Agreement") is entered into and made effective as of _____08/14/2019_____ ("Effective Date"), by and between MAC'S CONVENIENCE STORES LLC a Limited Liability Company ("Mac's"), Paradise Petroleum LLC, a Tennessee Limited Liability Company ("Assignor"), and Kaish LLC, a Tennessee Limited Liability Company ("Assignee").

### Recitals

A.     Mac's and Assignor are parties to that certain Complete Contract Of Sale (Branded-Reseller), dated 4/01/2017 ("Contract"), with a term beginning on 04/13/2017 and expiring on 04/12/2027, relating to the purchase and sale of motor fuels by Assignor at the retail motor fuel outlet located at 2300 Jenkins Road, Chattanooga, TN 37421 ("Premises"). Assignor is liable for the payment and performance of all of Assignor's obligations under the Contract and all other documents and agreements executed in connection with the Contract and relating to the Premises and/or the business conducted thereon, as listed on Exhibit A, attached hereto and incorporated herein (collectively, the "Franchise Agreements").

B.     Assignor now desires to assign all of its rights and obligations under the Franchise Agreements to Assignee, and Assignee desires to assume such rights and obligations, as set forth herein.

C.     Mac's has been asked to consent to the assignment of all of Assignor's rights, obligations, title, and interest in and to the Franchise Agreements to Assignee ("Assignment"); provided, however, that Assignor shall remain liable for all obligations under the Franchise Agreements. Mac's agrees to consent to the Assignment, subject to the terms and conditions herein.

**NOW, THEREFORE**, the parties agree as follows:

### Agreement

1.     Recitals. Each and every recital hereof shall be a covenant as well as a recital of this Agreement.

2.     Assignment and Assumption of Obligations. Assignor agrees to assign all of its rights and obligations under the Franchise Agreements to Assignee, and Assignee agrees to assume all of the rights and obligations of Assignor set forth in Franchise Agreements in accordance with their respective terms and conditions, as the same may be modified by this Agreement, including without limitation, payment of all sums due under the Franchise Agreements. Assignee further agrees to abide by and be bound by all of the terms of the

Franchise Agreements, all as though each of the Franchise Agreements had been made, executed and delivered by Assignee.

3.    Consent to Assignment.  Mac's hereby consents to the Assignment, subject to the terms and conditions set forth in this Agreement.  Mac's consent to the Assignment is not intended to be and shall not be construed as a consent to any subsequent assignment or transfer that requires Mac's consent pursuant to the terms of any of the Franchise Agreements.

4.    Liability of Assignor; Partial Release. Mac's hereby releases the liability of Assignor for any obligation or liability accrued after the Effective Date of the Agreement. Mac's hereby releases Mehul Shah, Bhupinder Sachar, and Rajeshri Chokshi from any liability under the Personal Guaranties of Performance dated 3/24/2017, 03/29/2017, and 04/10/2017 for any obligation or liability accrued after the Effective Date of this Agreement. This release shall not apply for any obligation or liability, known or unknown, which accrued prior to the Effective Date of the Agreement.

5.    Release.  Assignor and Assignee, jointly and severally, agree to unconditionally and irrevocably release and forever discharge Mac's and its successor, assigns, agents, directors, officer, employees, attorneys, and representatives ("Mac's Indemnified Parties") from any and all possible claims, demands, actions, costs, attorneys' fees, expenses and liabilities whatsoever, known or unknown, at law or in equity, arise out of contract, tort, violation of laws, or regulations, or otherwise in connection with any of the Franchise Agreements, including, without limitation, any actions or omissions of any Mac's Indemnified Parties, originating in whole or in part, on or before the Effective Date, which Assignor and Assignee, and, as applicable, any of their respective partners, members, officers, agents or employees may now or hereafter have against any Mac's Indemnified Parties (collectively, "Claims"), but specifically excepting any claims of trade debt owed between Mac's and Assignor on or before the Effective Date, and further jointly and severally agree to indemnify and hold harmless Mac's Indemnified Parties from such Claims.  This release is accepted by Mac's pursuant to this Agreement and shall not be construed as an admission of liability on the part of Mac's.  Assignor and Assignee hereby represent and warrant that they are the current legal and beneficial owners of all Claims, if any, released hereby and have not assigned, pledged or contracted to assign or pledge any such Claims to any other person.  Further, Assignor and Assignee each acknowledges it may discover facts or law different from, or in addition to, the facts or law that it knows or believes to be true with respect to such released Claims and agrees, nonetheless, that this Agreement and the release contained herein shall be and remain effective in all respects notwithstanding such different or additional facts or the discovery of them.    ASSIGNOR AND ASSIGNEE EACH SPECIFICALLY WAIVES THE PROVISIONS OF TENNESSEE CIVIL CODE SECTION 1542, WHICH PROVIDES THAT:  "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."•

6.    Ancillary Documents.    Assignee shall execute any ancillary and incidental documents and agreements as are normally signed by parties to documents and agreements similar to the Franchise Agreements.

**ASSIGNMENT AND**                                     2
**ASSUMPTION AGREEMENT [unrelated]**
C0379001/1280385-1

dotloop signature verification: dtlp.us/pjzH-PBfrj-K5xn

7.    General Provisions.

a.    This Agreement shall be construed according to and governed by the laws of the State of Tennessee without regard to conflict of law principles.

b.    THIS WRITTEN AGREEMENT CONTAINS THE COMPLETE AND FINAL AGREEMENT OF THE PARTIES AS TO THE ASSIGNMENT DESCRIBED HEREIN, SUPERSEDES ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING THERETO, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL REPRESENTATIONS OR AGREEMENTS BY THE PARTIES. THERE ARE NO AGREEMENTS, REPRESENTATIONS, WARRANTIES, RESTRICTIONS OR UNDERTAKINGS OTHER THAN THOSE EXPRESSLY SET FORTH HEREIN.   Specifically, Mac's makes no representation or warranty regarding renewal of the Franchise Agreements or of any given level of performance or profitability under the Franchise Agreements.  No change or modification to this Agreement shall be valid unless it is in writing and signed by all parties hereto.  Except as expressly modified hereby, the Franchise Agreements shall remain in full force and effect. Assignor hereby ratifies the Franchise Agreements made by it to Mac's and represents, warrants, and agrees that, except to the extent modified hereby, all of the Franchise Agreements remain in full force and effect.

c.    If any provision of this Agreement is adjudicated to be invalid, illegal or unenforceable, in whole or in part, it will be deemed omitted to that extent and all other provisions of this Agreement will remain in full force and effect.

d.    The headings and captions contained in this Agreement are for convenience of reference only and in no event define, describe or limit the scope or intent of this Agreement or any of the provisions or terms hereof.  In construing this Agreement, the singular shall be deemed to include the plural, the plural shall be deemed to include the singular and the use of any gender shall include every other gender.

e.    This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

f.    To the fullest extent permitted by law, the prevailing party shall be entitled to all attorneys' fees, costs of suit and reasonable expenses incurred in order to secure, defend or protect the rights inuring to the prevailing party under this Agreement, or to enforce the terms thereof, in addition to any other relief to which the prevailing party may be entitled.

g.    Time is of the essence with respect to any performance required by this Agreement.

h.    This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All such counterparts shall be construed together and shall constitute one instrument, but in making proof hereof it shall only be necessary to produce one such counterpart.

dotloop signature verification: dtlp.us/pjzH-PBfq-K5xn

i. All exhibits attached hereto are hereby incorporated herein and made a part of this Agreement.

**IN WITNESS WHEREOF**, this Agreement is effective as of the date and year first above written.

**ASSIGNOR:**

Paradise Petroleum LLC,
a Tennessee Limited Liability Company

*Mehul Shah*    dotloop verified
08/12/19 9:39 AM
CDT
RRFI-YS96-J8J8-BF8L

By: Mehul Shah
Its: Managing Member

**ASSIGNEE:**

Kaish LLC,
a Tennessee Limited Liability Company

*Akbar Bhamani*    dotloop verified
08/12/19 10:42 AM EDT
CNSX-MBDK-HLRX-BFDY

By: Akbar Bhamani
Its: Managing Member

**MAC'S:**

MAC'S CONVENIENCE STORES LLC
a Delaware limited liability company

*Gerardo Valencia*    dotloop verified
08/12/19 10:19 AM CDT
EBQZ-OMRL-OBBJ-WANH

By: Gerardo Valencia
Its: Authorized Representative

Facility # 3781

**ASSIGNMENT AND**                        4
**ASSUMPTION AGREEMENT [unrelated]**
C0379001/1280385-1

dotloop signature verification: dtlp.us/pqrH-PBfq-KSan

# EXHIBIT A

**Description of Agreements**

**Effective Date Addendum**
**Complete Contract of Sale (Branded-Reseller)**
**Amendment to complete Contract of Sale (Branded-Reseller)**
**Schedule of Seller's Equipment**
**Commodity Schedule (Motor Fuel Sales to Purchaser)**
**Incentive and Amortization Agreement**

**ASSIGNMENT AND**       5
**ASSUMPTION AGREEMENT [unrelated]**
C0379001/1280385-1

DEPARTMENT OF ENERGY

**Revised Summary of Title I of the Petroleum Marketing Practices Act**
(Extracted from the Federal Register, Vol. 61, No. 123, Tuesday, June 25, 1996, 32786-32790)
AGENCY: Department of Energy.

ACTION: Notice.
--------------------------------------------------------------

SUMMARY: This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

FOR FURTHER INFORMATION CONTACT: Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-6978.

SUPPLEMENTARY INFORMATION: Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. Secs. 2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the Federal Register on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to ``company'' operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780.

Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C. Sections 2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term ``franchise'' is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act. Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located. Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading ``Trial and Interim Franchises.''

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. Secs. 2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

C. Mutual Agreement To Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. Sec. 2802(b)(E).

E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.
(2) You declare bankruptcy or a court determines that you are insolvent.
(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.
(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.
(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.
(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.
(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.
(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.
(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.
(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.
(12) Your conviction of any felony involving moral turpitude.
(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

## II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

### A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

### B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

### C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

### D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

## III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

### A. How Much Notice Is Required

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

### B. Manner and Contents of Notice

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:
(1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;
(2) The date the termination or non-renewal takes effect; and
(3) A copy of this summary.

## IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

### A. Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

### B. Interim Franchises

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading ``Notice Requirements for Termination or Nonrenewal.''

## V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. Sections 2801-2806.

## VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

Further Discussion of Title I--Definitions and Legal Remedies

### I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

### A. Franchise

A ``franchise'' is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use. The term ``franchise'' includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

### B. Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

### C. Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

### D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

### E. Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

### F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

### G. Fail to Renew and Nonrenewal

4

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

C. Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

D. Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

E. Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:
  (1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
  (2) To materially alter, add to, or replace such premises;
  (3) To sell such premises;
  (4) To withdraw from marketing activities in the geographic area in which such premises are located; or
  (5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.
Marc W. Chupka,
Acting Assistant Secretary for Policy.
[FR Doc. 96-16124 Filed 6-24-96; 8:45 am]

13.7 Summary Statement of PMPA Rights/BMA Contract Package 5.0

15 U.S.C. § 2807.    Prohibition on restriction of installation of renewable fuel pumps.

**(a) Definition**
In this section:

(1) Renewable fuel
The term "renewable fuel" means any fuel-

(A) at least 85 percent of the volume of which consists of ethanol; or

(B) any mixture of biodiesel and diesel or renewable diesel (as defined in regulations adopted pursuant to section 7545(o) of Title 42 (40 CFR, part 80)), determined without regard to any use of kerosene and containing at least 20 percent biodiesel or renewable diesel

(2) Franchise-related document
The term "franchise-related document" means-

(A) a franchise under this Chapter; and

(B) any other contract or directive of a franchisor relating to terms or conditions of the sale of fuel by a franchisee

**(b) Prohibitions**

(1) In general

No franchise-related document entered into or renewed on or after December 19, 2007, shall contain any provision allowing a franchisor to restrict the franchisee or any affiliate of the franchisee from-

(A) installing on the marketing premises of the franchisee a renewable fuel pump or tank, except that the franchisee's franchisor may restrict the installation of a tank on leased marketing premises of such franchisor;

(B) converting an existing tank or pump on the marketing premises of the franchisee for renewable fuel use, no long as such tank or pump and the piping connecting them are either warranted by the manufacturer or certified by a recognized standards setting organization to be suitable for use with such renewable fuel;

(C) advertising (including through the use of signage) the sale of any renewable fuel;

(D) selling renewable fuel in any specified area on the marketing premises of the franchisee (including any area in which a name or logo of a franchisor or any other entity appears);

(E) purchasing renewable fuel from sources other than the franchisor if the franchisor does not offer its own renewable fuel for sale by the franchisee;

(F) listing renewable fuel availability or prices, including on service station signs, fuel dispensers, or light poles; or

(G) allowing for payment of renewable fuel with a credit card,

so long as such activities described in subparagraphs (A) through (G) do not constitute mislabeling, misbranding, willful adulteration, or other trademark violations by the franchisee

(2) Effect of provision

Nothing in this section shall be construed to preclude a franchisor from requiring the franchisee to obtain reasonable indemnification and insurance policies

**(c) Exception to 3-grade requirement**

No franchise-related document that requires that 3 grades of gasoline be sold by the applicable franchisee shall prevent the franchisee from selling a renewable fuel in lieu of 1, and only 1, grade of gasoline.

**Revised Summary of Title I of the Petroleum Marketing Practices Act (PMPA)**

Case 1:23-cv-00284   Document 1-12   Filed 12/04/23   Page 15 of 27   PageID #: 343

dotloop signature verification: dtlp.us/M1bG-PKQ6-bMyV

# FIRST RIGHT OF REFUSAL ADDENDUM

This First Right of Refusal Addendum ("**Addendum**") is attached to and is part of that certain Complete Contract of Sale, dated _____ ("**Contract**") by and between _____ Kaish LLC _____, a corporation ("**Dealer**"), and _____ Mac's Convenience Stores LLC _____ a _____ Delaware Limited Liability Company _____ ("**Marketer**"). _____ Mac's Convenience Stores LLC _____ ("**Landlord**") is an affiliate of Dealer and owns and leases to Dealer the real property on which Dealer's Station is located. Through its affiliation with Dealer and its lease of Dealer's Station to Dealer, Landlord has a substantial interest in the success of Dealer's operation of Dealer's Station and Dealer's relationship with Marketer under the Contract. Accordingly, in support of and in consideration of the benefits Landlord will receive as a result of Marketer entering into the Contract with Dealer, Landlord has agreed to enter into this Addendum as an additional party and to grant Marketer certain rights with respect to all of Landlord's right, title, and interest in the real property and improvements for Dealer's Station, as set forth in this Addendum. Dealer and Landlord are hereinafter referred to as "**Dealer Group**." Any undefined term used herein shall have the meaning as set forth in the Contract to which this Addendum is attached.

1.      Grant of First Right of Refusal. Dealer Group hereby grants to Marketer, and its successors and assigns, a right of first refusal ("**Right of First Refusal**") to purchase the Property (as defined below) on the terms and conditions set forth in this Addendum. For purposes of this Addendum, "**Property**" means any and all assets of Dealer or Landlord, in whatever form, tangible or intangible, that now or in the future constitute, or that Dealer or Landlord uses now or in the future in the operation of, Dealer's Station, including without limitation, all of Dealer and Landlord's right, title and interest, whenever or however acquired, whether fee title, a leasehold, or other interest or right, in and to the real property the real property situated at _2300 Jenkins Road, Chattanooga, TN 37421_ in the County of _ Hamilton _, State of _____ TN _____, all improvements, including buildings, structures, and fixtures, now or in the future on, in or under such real property, and all of Dealer and Landlord's right, title and interest in and to all equipment, fixtures, and personal property at Dealer's Station. As used in this Addendum, Dealer and Landlord's personal property includes all contracts and leases to which Dealer or Landlord is a party that relate to the Dealer's Station, including without limitation the Contract and names, goodwill, business operations and other intangibles use in or related to Dealer's Station.

2.      Rights Period. All rights granted to Marketer and all obligations of Dealer Group in this Addendum are binding on any successors or assigns of Dealer or Landlord, run with the land, are not personal to either Dealer, Landlord or Marketer, and shall survive any future transfer of the Property to any party, entity, or person other than Marketer or any assignment of the Contract by Marketer. The rights granted in this Addendum shall continue until the later of the expiration of the Contract to which this Addendum is attached, or the expiration of any renewal or extension thereof (the "**Rights Period**").

3.      Offer to Purchase or Transfer Interest; Notice. The Right of First Refusal shall not apply to sales of Products, merchandise, and other inventory at the Dealer's Station and disposal/sale of obsolete equipment in the normal course of business. Subject to the preceding sentence, Marketer's rights hereunder are triggered by any Offer (as defined below) for any of the Property, whether the Offer is for some or all of the real property only, some or all of the equipment, fixtures, and personal property only, or some combination thereof. If at any time within the Rights Period, Dealer or Landlord receives from a third party ("**Offeror**") a bona fide written offer ("**Offer**") to purchase or otherwise transfer all or any portion of Dealer or Landlord's right, title and interest in the Property (the "**Interest**") that Dealer or Landlord, as applicable, wants to accept, then Dealer Group shall immediately notify Marketer in writing (the "**Offer Notice**") of the terms of the Offer. The Offer Notice shall include a complete copy of the proposed or executed written agreement or other documents embodying the Offer that contain all of the terms and conditions between the Dealer and/or Landlord, as applicable, and Offeror, with no material terms yet to be negotiated, together with copies of all information regarding the Property and the Interest that Dealer Group has supplied to Offeror. Dealer Group shall represent and warrant the accuracy and completeness of the information set forth in the Offer Notice and other documents submitted to Marketer. The term "transfer" includes a sale, lease, gift, or other transfer of possession, ownership, or control.

**FIRST RIGHT OF REFUSAL ADDENDUM**
**(Bleau Rev.)**

dotloop signature verification: dtlp.us/MTbG-PKQ6-uMj9

4.      Exercise of Right; Completion of Transaction.  Marketer may exercise its Right of First Refusal and acquire the Interest at the price and on the terms contained in the Offer, as such terms may be adjusted as set forth in Section 5 below, by providing written notice to Dealer Group of Marketer's exercise ("**Exercise Notice**") by no later than forty five (45) days after Marketer's receipt of the Offer Notice required in Section 3 above.  If Marketer exercises its Right of First Refusal, the closing shall be completed within sixty (60) days after Marketer's delivery of its Exercise Notice, or at such later date as may be specified in the Offer, and otherwise in accordance with the terms of the Offer.  Regardless of the terms of the Offer, Dealer Group shall deliver to Marketer title to the Interest free from all encumbrances and claims of creditors and with lease payments under any real or personal property lease paid in full through the date of closing.  Dealer Group shall cooperate and promptly undertake such action as may be requested by Marketer to transfer any applicable permits, leases, or other rights to Marketer.  In the absence of anything to the contrary contained in the Offer, (i) Dealer Group represents and warrants to Marketer that the transfer of the Interest does not include any of the liabilities associated therewith, and (ii) Dealer Group shall indemnify, defend and hold harmless Marketer from and against all claims resulting from or relating to the operations at the Property prior to closing, including but not limited to environmental contamination on the Property prior to the conveyance of the Interest to Marketer.

5.      Terms.  If the terms of the Offer provide for consideration for the purchase or transfer of the Interest other than the payment of cash at closing/acquisition, and/or the purchase of real or personal property other than the Property ("**Unrelated Property**"), then the provisions of this Section 5 shall apply to all such terms in the Offer for the purposes of determining the consideration Marketer shall pay to Dealer Group for the Interest should Marketer exercise its Right of First Refusal.

a.      Marketer shall have no obligation to purchase any Unrelated Property included in the Offer, and, regardless of any allocation in the Offer of the purchase price or other consideration to the Unrelated Property, the fair market value of any Unrelated Property included in the Offer shall be disregarded when determining the consideration Marketer shall pay Dealer Group for the Interest.  Dealer Group shall bear all costs and expenses required to determine the fair market value of any Unrelated Property included in the Offer.

b.      If the consideration payable to Dealer Group under the Offer includes any post-transfer consulting, non-compete, or employment agreement for Dealer Group or any of Dealer and/or Landlord's owners, directors, officers, or employees, those agreements and any value thereof shall be disregarded when determining the consideration Marketer shall pay Dealer Group for the Interest.  Dealer Group shall bear all costs and expenses required to determine the fair market value of any agreement noted herein and included in the Offer.

c.      If the Offer provides for payment of the purchase price or any portion thereof over any period of time after the transfer, then Marketer may pay in cash at closing the full present value of such post-transfer payments, using the interest rate specified in the Offer as the discount rate for computing the present value of such payments, or, if no interest rate is specified therein, then using a discount rate equal to the then-current prime rate of Bank of America, N.T. & S.A., at San Francisco, California.

d.      If the Offer includes as consideration for the Interest an exchange of other real or personal property interests of Offeror, this shall be deemed to constitute an offer to purchase the Interest for a price equal to the fair market value of the real or personal property offered in exchange (the "**Exchange Property**") (plus any other consideration provided for in the Offer).  Marketer is not obligated to accept the Dealer and/or Landlord's and Offeror's agreed-upon value of any Exchange Property as may be specified in the Offer and may demand a determination by a neutral third party appraiser of the fair market value of the Exchange Property.  Dealer Group shall bear all costs and expenses required to determine the fair market value of any Exchange Property included in the Offer.

6.      Assessment of Property Condition.  During the forty five (45) day period following Marketer's receipt of the Offer Notice, Marketer may enter the Property to inspect, test, and otherwise make an assessment of the condition of the Property, including without limitation the environmental and/or geological condition thereof

**FIRST RIGHT OF REFUSAL ADDENDUM**          2
**(Bleau Rev.)**

dotloop signature verification: dtlp.us/MTbG-PKQ6-uMj9

and Dealer Group hereby grants Marketer a limited license to enter the Property for such purposes; provided that any such inspection, testing, and assessment shall be made in a manner so as to minimize interference with normal operations on the Property. Marketer's rights under this Section 6 include the right to undertake any testing, surveying, drilling or other analysis, including subsurface testing of the Property. Marketer shall indemnify, defend and hold harmless Dealer Group against any personal injury or property damage caused by Marketer or its contractors or employees in making any such inspections, testing, or assessment; provided, however, that in no event shall Marketer have any liability to Dealer Group as a result of any condition of the Property discovered by Marketer during its inspections, testing and assessments, or as a result of any statement in any report or other written statement or oral communication regarding the Property; and provided further that in no event shall Marketer have any liability to Dealer Group for any lost profits or business interruption suffered by Dealer or Landlord during, or as result of, any inspection, testing, or other assessment of the Property conducted by Marketer.

7. <u>Completion of Transfer</u>. If Marketer does not exercise its Right of First Refusal, then Dealer Group may, at any time within six (6) months after the expiration of such 45-day period, transfer the Interest that was the subject of the Offer, but only to the original Offeror and only upon the terms in the Offer Notice. If, after the delivery to Marketer of the Offer Notice, there are any changes in the Offer, or if the transfer is not consummated in the time period provided in this Section 7, and, under any circumstances, with respect to any portion of the Property that is not included in the Offer, Marketer's Right of First Refusal shall continue in existence and Dealer Group must comply fully and anew with its notice and other obligations as set forth in this Addendum with respect to any changes in the Offer, any transfer not timely consummated, and any transfer of any

ACCEPTED:

**MARKETER:** Mac's Convenience Stores LLC    **LANDLORD:** Mac's Convenience Stores LLC

By: _Gerardo Valencia_    By: _Gerardo Valencia_
   Gerardo Valencia       Gerardo Valencia

dotloop verified
08/12/19 10:19 AM CDT
OZJO-KDTE-VQN1-KXB3

dotloop verified
08/12/19 10:19 AM CDT
9IOG-F0DY-1VZ1-SOZM

Title: Authorized Representative    Title: Authorized Representative

Witness: _Mari Prudente_

dotloop verified
08/12/19 12:05 PM EDT
KK5D-YG39-8ZPQ-ENPJ

**DEALER:** Kaish LLC

By: _Akbar Bhamani_
   Akbar Bhamani

dotloop verified
08/07/19 2:47 PM EDT
ZGNV-7S8W-GXVO-W0DB

Title: Managing Member

**FIRST RIGHT OF REFUSAL ADDENDUM**    3
**(Bleau Rev.)**

dotloop signature verification: dtlp.us/Ch2-Up6L-5KRk

Facility # <u>3781</u>

### KEY PERSON RIDER
### (The "Key Person Rider")

1. Purchaser states that the following named person, <u>Akbar Bhamani</u> (such person referred to as the "Owner"), has an ownership interest in Purchaser. The parties hereto agree that, should Owner, or any one of the Owners, relinquish, convey, or otherwise transfer, directly or indirectly, in whole or in part, his or her ownership interest in the Purchaser, the complete contract of sale ("Contract") between Purchaser and Seller, to which this Key Person Rider is attached and incorporated into, may be terminated or nonrenewed by Seller.

2. (a) It is understood and agreed that <u>Akbar Bhamani</u> is designated the "Key Person," which designation is deemed by the parties hereto to be a reasonable and material provision of the Contract. The Key Person shall personally operate on a daily basis the business of Purchaser at the Premises covered by the Contract. The phrase "to operate on a daily basis the business of Purchaser at the Premises covered by the Contract" shall mean that the Key Person must (i) manage the business in accordance with the Contract and (ii) have authority to make all business decisions that an unincorporated retail service station dealer normally makes concerning operations of a retail service station business. Purchaser represents that the Key Person has the authority to buy and sell motor fuel, to enter into financing agreements on behalf of Purchaser, and to authorize merchandising and/or cooperative advertising programs.

(b) Notwithstanding anything contained to the contrary in this Key Person Rider, nothing in the Key Person Rider releases, transfers, or otherwise modifies the obligations or duties of Purchaser under the Contract. The parties hereto agree that failure of the Key Person to operate on a daily basis the business of Purchaser at the Premises covered by the Contract in compliance with the terms and conditions contained in the Contract shall be grounds for the termination or nonrenewal, as applicable, of the Contract by the Seller.

3. Purchaser may seek Seller's consent to add, modify, or delete, by amendment, one or more of the names listed above in paragraph 1 or 2(a) by making a written request at least thirty (30) days prior to any change. Such request shall include such information as Seller may designate as necessary to determine the qualifications of the new person. Seller will consider and respond to Purchaser's request within thirty (30) days following receipt of Purchaser's written request. Such request for amendment may be denied at Seller's reasonable discretion.

4. These covenants are attached to and incorporated into the Contract between Purchaser and Seller and may be enforced as if set forth in said Contract. This Key Person Rider cancels and supersedes any pre-existing Key Person Rider of said Contract.

**ACCEPTED:**                                    **ACCEPTED:**

**SELLER:** <u>Mac's Convenience Stores LLC</u>     **PURCHASER:** Kaish LLC
            **a** <u>Delaware Limited Liability Company</u>

By: *Gerardo Valencia*   dotloop verified        By: *Akbar Bhamani*   dotloop verified
                         08/12/19 10:19 AM CDT                         08/07/19 2:48 PM EDT
                         RYPV-Z4KE-LH0L-BKHR                           A7GK-QPSG-OAH2-G96P
    <u>Gerardo Valencia</u>                            <u>Akbar Bhamani</u>

Title: <u>Authorized Representative</u>           Title <u>Managing Member</u>

Witness: *Mari Prudente*   dotloop verified
                           08/12/19 12:05 PM EDT
                           CV2C-EUUB-MKR4-IAXC

**KEY PERSON RIDER**
**Rev. July 2016**

dotloop signature verification: dtlp.us/2Gcn-g6i0u-uVGs

## SECURITY AGREEMENT

_____ Kaish LLC _____, with an address of  1260 Cresthaven Lane, Lawrenceville GA 30043  (hereinafter referred to as the "Debtor") hereby grants a security interest to  Mac's Convenience Stores LLC , with a business address of  4080 West Jonathan Moore Pike, Columbus, IN 46201 (hereinafter referred to as the "Secured Party"), in and to all of its interest in the equipment, fixtures, gasoline and petroleum products in inventory, gasoline and petroleum accounts receivable, after acquired inventory, accounts owned by Secured Party and consigned to Debtor and contract rights more fully described in Exhibit A, attached hereto and made a part hereof (such equipment, fixtures, and contract rights referred to hereinafter as the "Collateral"). Proceeds from the sale of the Collateral are also included with the definition of Collateral.

Debtor hereby represents, warrants, covenants and agrees that:

1.      This security agreement (referred to hereinafter as the "Security Agreement") is given to secure (a) the performance by the Debtor of the covenants and agreements contained herein; (b) the performance and payments by the Debtor under the covenants and agreements contained in the Complete Contract of Sale, dated _____04/01/2017____, by and between Secured Party and Debtor (the "Contract"), which is hereby expressly made a part hereof; or (c) any and all other indebtedness or obligations now or hereafter incurred or arising pursuant to the provisions of this Security Agreement, the Contract, or any other agreement or contract between Debtor and Secured Party (all such performance, payments, and/or obligations hereinafter collectively referred to as the "Obligations").  This Security Agreement shall also secure any and all renewals or extensions of the whole or any part of the Obligations, however evidenced, with interest, if necessary, at such lawful rate as may be agreed upon, and any such renewals or extensions or any change in the terms shall not impair in any manner the validity of or the priority of this Security Agreement, nor release the Debtor from liability for the Obligations.

2.      To the extent that the Collateral, or any portion thereof, will be attached to real estate, the description of such real estate and the known owner of record of such real estate are set forth in Exhibit A attached hereto and made a part hereof.  If the Collateral is attached to such real estate prior to the perfection of the security interest granted herein, the Debtor will, on demand, furnish the Secured Party with a disclaimer or disclaimers, executed by persons having an interest in such real estate.

3.      Debtor has, or will acquire, full and clear title to the Collateral, and, except for the security interest granted herein, will at all times keep the Collateral free from any adverse lien, security interest or encumbrance.

4.      Debtor warrants and represents that no financing statement covering all or any portion of the Collateral is currently on file in any public office.

5.      Debtor authorizes Secured Party, at the expense of Debtor, to execute and file financing statements and/or fixture filings in those public offices deemed necessary by the Secured Party to protect its security interest established hereby.  Debtor will pay all filing fees for the filing of this instrument or of financing statements or fixture filings filed to perfect the security interest established hereby or in connection herewith.

6.      Debtor shall not sell or assign, or offer to sell, assign or otherwise transfer the Collateral, or any interest therein, without the prior written consent of the Secured Party.  Debtor will, at all times, maintain, preserve and keep the Collateral in good repair, working order and condition and will not commit or suffer any waste thereof, reasonable wear and tear excepted.

7.      Debtor will pay promptly when due all taxes, charges, and assessments upon the Collateral or for its use or operation.

8.      The occurrence of any one of the following events shall constitute an "Event of Default" under this Security Agreement:  (a) nonpayment when due of any Obligation hereby secured or failure to perform any duty or Obligation

**SECURITY AGREEMENT**
**Rev. July 2016**

set forth herein or incorporated by reference herein; (b) the discovery that any statement, representation or warranty at any time furnished by the Debtor to the Secured Party is untrue in any material respect as of the date made; (c) death, insolvency, failure in business, general assignment for the benefit of creditors, filing of a petition in bankruptcy or for relief under the U.S. Bankruptcy Code of, by, or against Debtor, or the commencement of any other proceeding against the Debtor alleging that such Debtor is insolvent or unable to pay debts as they mature; (d) the loss, theft, substantial damage, destruction, sale assignment or encumbrance to or of all or any portion of the Collateral or the making of any levy, seizure, or attachment thereof or thereon; (e) dissolution, merger or consolidation, or transfer of a substantial portion of the stock or assets of the Debtor corporation; (f) deterioration or impairment of the Collateral, or any portion thereof, or the decline or depreciation in the value or market price thereof which causes said Collateral, in the sole judgment of Secured Party, to become unsatisfactory as to the character or value of same; or (g) failure to perform any term, provision, or covenant of this Security Agreement.

9.      Upon the occurrence of an Event of Default, Secured Party shall provide Debtor with written notice thereof. Debtor shall have ten (10) days after the receipt of such notice to cure the Event of Default. If Debtor has not cured such Event of Default within said ten (10) day period, Secured Party may, at its option, and without notice or demand, declare all Obligations due and payable in full immediately, and the Secured Party may exercise any rights and remedies of a secured party under the Uniform Commercial Code or any other applicable law. If Debtor fails to cure any Event of Default as set forth herein, Debtor will make Collateral available to the Secured Party in all respects at a place acceptable to the Secured Party that is convenient to the Debtor. Without limiting the generality of the foregoing, and in conjunction with or in addition thereto, Secured Party, at its reasonable discretion, may also use any one or more of the following remedies with respect to the Collateral encumbered hereunder: (a) enter the premises wherever such Collateral may be located and take possession of, assemble and collect, any of said Collateral or to render it unusable; (b) require Debtor to assemble any or all of the Collateral and make it available to Secured Party as set forth above; (c) incur reasonable attorneys' fees and reasonable expenses in exercising any of its rights and remedies upon Debtor's default, which shall become part of its reasonable expense of taking, holding, and preparing for sale, the Collateral secured hereby; (d) pursue any remedy set forth in the Contract or in any other agreement or contract, the performance of which is secured by this Security Agreement.

10.     This Security Agreement shall be binding upon and inure to the benefit of the Debtor, the Secured Party, and each of their respective successors, assigns, heirs, executors and administrators.

11.     In the event any one or more of the provisions contained herein or in the Contract shall be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

12.     If any notification of disposition of all or any portion of the Collateral is required by law, such notification shall be deemed reasonably and properly given if mailed at least ten (10) days prior to such disposition, postage pre-paid to the Debtor at its latest address appearing on the records of the Secured Party.

13.     Unless otherwise prohibited by law, Secured Party shall apply the proceeds from the sale of Collateral and sums received or collected from or on account of the Collateral to (a) the payment of expenses incurred in connection with the sale, transfer, or delivery of the Collateral; (b) the payment of other costs, charges, attorneys fees and legal expenses herein aforementioned; (c) the payment of Obligations in the order and manner to be determined by Secured Party, in Secured Party's discretion; (d) the balance to Debtor or the person entitled to up upon proper demand.

14.     Debtor waives (a) its right to require Secured Party to proceed against any person, proceed against or exhaust any collateral, or pursue any other remedy available to Secured Party and (b) any defense arising any reason.

15.     Until all Obligations covered under this Security Agreement are paid and/or performed, the power of sale and all other rights, powers, and remedies available to Secured Party shall continue to exist and may be exercised at any time, irrespective of the fact that the Obligations or any part thereof may have become barred by statute of limitations.

dotloop signature verification: dtlp.us/2Gcn-g6Ou-oVGs

16. The rights, powers, and remedies given to the Secured Party hereunder are in addition to any rights, powers, and remedies available to Secured Party under applicable law.

17. The forbearance, failure, or delay of Secured Party in exercising any rights, powers, or remedies available to it hereunder or under applicable law shall not be a waiver of such right, power, or remedy, nor shall the exercise of such right, power, or remedy preclude its further exercise. Every right, power, and remedy available to Secured Party shall continue in full force and effect until expressly waived by a written instrument executed by an authorized representative of Secured Party.

18. All acknowledgments, representations, warranties, debts, and obligations of performance of Debtor under this Security Agreement are made, and binding on all those signing this Security Agreement, jointly and severally as the Debtor.

19. Debtor authorizes Secured Party to file such financing statements as Secured Party deems advisable to perfect the security interest created hereby. A carbon, photographic or other reproduction of this Security Agreement or any financing statement relating to this Security Agreement shall be sufficient to serve as a financing statement. This Security Agreement shall be effective as a fixture filing with respect to all fixtures included within the Collateral and is to be filed for record in the real estate records office of the County Recorder where the real estate containing the fixtures is situated.

20. By their signatures below, each of the following represent that they have authority to execute this Security Agreement and to bind the party on whose behalf their execution is made.

**ACCEPTED:**                                    **ACCEPTED:**

**SECURED PARTY:** Mac's Convenience Stores LLC      **DEBTOR:** Kaish LLC
                  a Delaware Limited Liability Company

By: *Gerardo Valencia*      dotloop verified
                            08/12/19 10:19 AM
                            CDT
                            0EA4-1VJG-SVCB-TPMX

By: *Akbar Bhamani*      dotloop verified
                         08/07/19 2:48 PM EDT
                         6GZ1-A2AR-FVJG-CGUJ

    Gerardo Valencia          Akbar Bhamani

Title: Authorized Representative      Title: Managing Member

Witness: *Mari Prudente*      dotloop verified
                             08/12/19 12:06 PM EDT
                             LUTF-PDQL-OKYB-NETJ

**SECURITY AGREEMENT**
**Rev July 2016**

3

dotloop signature verification: dtlp.us/2Gcn-g60u-uVGs

# EXHIBIT A

## SCHEDULE OF COLLATERAL AFFIXED TO REAL ESTATE

Collateral Description

| |
|---|
| Equipment |
| Fixtures |
| Required Site Improvements |
| Gasoline and Petroleum Products in Inventory |
| Gasoline and Petroleum Accounts Receivable |
| After Acquired Inventory |
| Accounts Owned By Secured Party and Consigned To Dealer |

Location of Collateral or Description of Real Estate to Which Affixed:

2300 Jenkins Road, Chattanooga, TN 37421

Owner of Real Estate to Which Collateral is Affixed, if Applicable:

Mac's Convenience Stores LLC

**SECURITY AGREEMENT**
**Rev July 2016**                    4

dotloop signature verification: dtlp.us/q6be-9dnj-Vrg8

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (the "Guaranty") from _____ Akbar Bhamani _____ , an individual (hereinafter "Guarantor"), in favor of __Mac's Convenience Stores LLC__ a __Delaware Limited Liability Company__ (hereinafter "Seller"), is made on the following terms and conditions:

### WITNESSETH:

1. The Guaranty.
(a) As an inducement for Seller to enter into the Contract (defined below) and Agreement (defined below) with _____ Kaish LLC _____ (hereinafter "Purchaser"), and in consideration of the financial accommodations to be given, made or afforded by Seller to Purchaser therein, Guarantor hereby fully, unconditionally and irrevocably guarantees the full and prompt payment when due of the following ("Liabilities"):
(i) The payments to be made and other duties to be performed by Purchaser under the terms of a certain motor fuel supply contract dated _____ 04/01/2017 _____ between Seller and Purchaser (the "Contract"), the terms of which provide that Seller agrees to deliver and sell to Purchaser, and Purchaser agrees to receive, accept and pay for branded motor fuel products, pursuant to the terms and conditions of said Contract;
(ii) The payments to be made and other duties to be performed by Purchaser under the terms of a certain amortization agreement dated _____ 04/01/2017 _____ between Seller and Purchaser (the "Agreement"), and related secured promissory note ("Note"), which Agreement provides that Purchaser agrees to repay Seller certain sums in accordance with the terms; and
(b) In the event that Purchaser fails at any time to make any part or all of its payments or perform its obligations under the Contract, Agreement, or Note, whether by acceleration or otherwise, the Guarantor will pay or perform the Liabilities guaranteed, in the same manner as if they constituted the direct and primary obligation of the Guarantor.
(c) If Purchaser incorporates, reorganizes, reincorporates, liquidates, merges with another corporation, enters into a partnership or joint venture, sells or assigns the assets of its business, or otherwise effects a change in the legal entity conducting the business now conducted by Purchaser, the Liabilities of the successor to Seller are deemed to be Liabilities created by Purchaser and are included under this Guaranty.

2. Joint and Several Obligation. The obligations of the Guarantor under this Guaranty and those of any other guarantor or guarantors who may now or hereafter guarantee any indebtedness or obligations of Purchaser will be joint and several, and Seller may release or settle with any one or more of such guarantors at any time without affecting the continuing liability of the Guarantors.

3. Renewals, Extensions, and Substitutes. The renewals, extensions and substitutions of and for indebtedness and Liabilities of Purchaser guaranteed hereunder may be made by Seller upon such terms and conditions and with such modifications and changes as Seller may see fit and made at any time and from time to time without further notice to or consent from Guarantor.

4. Waivers of Guarantor.
(a) Guarantor hereby waives each of the following:
(i) Notice of acceptance of this Guaranty of any extension of credit, advance, loan or similar accommodation by Seller to Purchaser, and of the amount of the Liabilities that may exist from time to time.
(ii) Presentment, diligence, demand, protest, or notice of protest, dishonor, nonpayment, or other default with respect to any of the Liabilities.
(iii) Any requirement that Seller marshal the security, or institute suit, or exercise or exhaust its rights or remedies against Purchaser or against any other person, guarantor, mortgage, or other securing all or any part of the Liabilities (the obligations of such mortgage or collateral being herein referred to as the "Collateral"), prior to enforcing any rights it has under this Guaranty, or otherwise against Guarantor.
(iv) Any right of subrogation with respect to the Liabilities or the Collateral until Seller shall have received payment in full of the Liabilities.

**PERSONAL GUARANTY OF PERFORMANCE**
**Rev. July 2016**

dotloop signature verification: dtlp.us/q66e-9dnj-VngB

(v)     Any defenses now or hereafter arising or asserted by reason of (A) the invalidity or disability, in whole or in part, at the time of its acceptance, or at any other time, of the Collateral, (B) the fact that any of the property, a part of the Collateral, may at any such time be in default or be incorrectly estimated, (C) the deterioration in market or other value, waste, loss by fire, theft, loss or substitution of any property a part of the Collateral.

(d) The existence of any conditions hereinabove waived shall in no way affect or release the obligations of Guarantor hereunder.

5. Rights of Seller.

(a) Seller shall have the right, without notice to Guarantor, to deal in any manner with the Liabilities and the Collateral, including, but not limited to, the following rights:

(i)     to modify or otherwise change the terms or alter any part of the Liabilities, including, but not limited to, changing the rate of interest thereon, or effecting any release, compromise or settlement with respect thereto;

(ii)    to extend or renew the Liabilities, and to forbear to take steps to enforce the payment of all or any part thereof against Purchaser;

(iii)   to forbear from calling for additional Collateral, to consent to the substitution or release of all or any part of the Collateral, whether or not of the same or different character or value than the Collateral surrendered by Seller;

(iv)    to release or to forbear to proceed against all or any part of the Collateral, or to substitute any new for any existing Collateral;

(v)     to apply any payment received by Seller from Purchaser, or from any other source other than Guarantor, to the Liabilities of Purchaser to Seller in whatever order Seller elects, and to apply any payment received from Guarantor to any obligations of Purchaser to Seller guaranteed hereunder in whatever order Seller elects; or

(b) The obligations of Guarantor hereunder shall not be released, discharged or affected in any way, nor shall they have any recourse against Seller by reason of any action that Seller may take or omit to take under these powers, or otherwise existing with respect to the Liabilities or the Collateral.

(c) Neither Guarantor's obligation to make payment or perform in accordance with the terms of this Guaranty nor any remedy for the enforcement of this Guaranty shall be impaired, modified, changed, released, discharged, avoided, or limited in any manner whatsoever by any impairment, modification, change, release, discharge, avoidance, or rejection of the Liabilities or Purchaser's estate in bankruptcy or of any remedy for the enforcement of Seller's rights hereunder resulting from the operation of any present or future provision of the federal Bankruptcy Code or from the decision of any court.

6. Assignment of Liabilities. If any of the Liabilities of Purchaser guaranteed hereunder should be assigned by Seller, this Guaranty will inure to the benefit of Seller's assignee to the extent of such assignment, provided that such assignment will not operate to relieve Guarantor from any obligation to Seller hereunder with respect to any unassigned Liabilities guaranteed hereunder and further that the rights of any assignee will be subordinate to the rights of Seller under this Guaranty as to any unassigned Liabilities.

7. Consent of Guarantor to Jurisdiction and Venue. Guarantor hereby agrees that all actions to enforce the terms and provisions of this Guaranty shall be brought and maintained within the ___State of Tennessee___ (the "State"), and that the validity, construction and effect of this Guaranty shall be governed by the laws of the State. The Guarantor hereby consents to the jurisdiction of any court with proper venue within the State, and hereby consents that such service may be made by registered or certified mail, directed to Guarantor at the address hereinafter set forth.

8. Expenses/Costs/Attorney Fees. In addition to any other amounts or payments to which Seller is entitled hereunder, Guarantor hereby agrees to pay unto Seller all costs and expenses (including without limitation, liquidation costs, expense payments, and attorneys' fees and other legal costs) incurred by Seller in the collection of the (a) Liabilities and the maintenance, sale or other disposition of any Collateral therefore and (b) any obligations of

**PERSONAL GUARANTY OF PERFORMANCE**     2
**Rev. July 2016**

dotloop signature verification: dtlp.us/q66e-9dnj-VngR

Guarantor hereunder and the maintenance, sale or other disposition of any Collateral therefor. Further, to the fullest extent permitted by law, the prevailing party shall be entitled to all attorneys' fees, costs of suit and reasonable expenses incurred in order to secure, defend or protect the rights inuring to the prevailing party under this Guaranty, or to enforce the terms thereof, in addition to any other relief to which the prevailing party may be entitled.

9. General Provisions.

    (a) The rights and remedies of Seller under this Guaranty and any other otherwise created are cumulative and may be exercised singly or concurrently, and the exercise of any one or more of them will not be a waiver of any other. No act, delay, omission or course of dealing between Seller and Purchaser or Guarantor, or any other person, or any of them, will be a waiver of any of Seller's rights or remedies under this Guaranty, and no waiver, change, modification or discharge of this Guaranty or any obligation created hereby will be effective unless in writing signed by Seller.

    (b) The rights and obligations created by this Guaranty shall inure for the benefit of and shall be binding upon the personal representatives, successors and assigns, including, but not limited to, the holders or owners of the Liabilities, of the parties hereto.

    (c) Any notice or demand to be given hereunder shall be effectively given if made in writing, delivered to Guarantor or to Seller or mailed by certified mail to any of the parties at the following addresses for each, or at such other address as any party may furnish the other in writing:

| | |
|---|---|
| Seller: | Mac's Convenience Stores LLC |
| | 4080 West Jonathan Moore Pike, Columbus, IN 46201 |
| | Attention: Vice President |

| | |
|---|---|
| Guarantor: | |
| Name: | Akbar Bhamani |
| Address: | 1260 Cresthaven Lane, |
| City, State: | Lawrenceville, GA 30043 |

    (d) Guarantor acknowledges receipt of a copy of this Guaranty, and certifies that Guarantor has read all of this Guaranty, and fully understands and agrees to the same, before having signed it.

Executed, _____8/7/2019_____.

**GUARANTOR:**

*Akbar Bhamani*
    (signature)

dotloop verified
08/07/19 2:48 PM EDT
2PT9-9FK0-WCOO-4FIR

Akbar Bhamani_____
    (print name)

**PERSONAL GUARANTY OF PERFORMANCE**    3
**Rev. July 2016**

dotloop signature verification: dtlp.us/rPhT-hZKE-HZ1w

# LANDLORD CERTIFICATION

I, _____ Gerardo Valencia _____, do hereby certify as follows:

1.    I certify that I am the duly elected, qualified, and acting Authorized Representative of Mac's Convenience Stores LLC and am duly authorized to make this certification on behalf of Mac's Convenience Stores LLC, and that I do so upon my personal knowledge.

2.    I certify that Mac's Convenience Stores LLC is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Tennessee, and that I directly own a greater than fifty percent (50%) interest in Mac's Convenience Stores LLC.

3.    I certify that the tax identification number for Mac's Convenience Stores LLC is _____.

4.    I certify that Mac's Convenience Stores LLC owns the premises located at 2300 Jenkins Road, Chattanooga, TN 37421 ("Premises"), and that _____ Kaish LLC _____ ("Dealer") currently leases the Premises pursuant to a written lease agreement with Mac's Convenience Stores LLC ("Lease"), and that the Lease grants Dealer possessory and operational rights to the Premises throughout the Term (as defined in the Contract defined below), on such terms that are commercially reasonable and are economically feasible for the continuous operation of the property as a first-class retail motor fuel facility.

5.    I acknowledge that Dealer is entering a contract for fuel supply ("Contract") with Mac's Convenience Stores LLC (" Mac's ") for the Premises, and I certify that Dealer's entering into the Contract with _____ Mac's _____ will not cause a breach of the Lease.

6.    I certify that the Lease does not contain any provisions that conflict with, or would cause or require Dealer to breach the Contract or any other agreement Dealer is entering into with Mac's.

7.    I certify that Landlord will not exercise any of its rights under the Lease or otherwise take any action thereunder that would cause or require Dealer to breach the Contract or any other agreement Dealer is entering into with Mac's.

8.    I certify that the Lease prohibits the parties thereto from modifying the terms of the Lease or any extension or renewal thereof in a manner that would cause or require Dealer to breach the Contract or any other agreement Dealer is entering into with Mac's.

9.    I agree that I will promptly notify _____ Mac's _____ in writing if any certification made herein becomes untrue or incorrect in any material respect after the date set forth below.

I certify under penalty of perjury under the laws of the _____ State of Tennessee _____ that the foregoing is true and correct.

Dated: August 12, 2019

By: *Gerardo Valencia*

dotloop verified
08/12/19 10:19 AM CDT
76HK-QUZS-YTZQ-URST

Gerardo Valencia , Authorized Representative

**Landlord Certification**